# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KAREN RAWERS,

       Plaintiff,

vs.                                                                    No.  CIV 19-0034 JB\CG

UNITED STATES OF AMERICA and
CLARISSA SKINNER-RAMP

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant United States' Motion for Summary Judgment and Memorandum in Support, filed May 18, 2020 (Doc. 56)("U.S. MSJ"); and (ii) the Plaintiff's Motion for Partial Summary Judgement, filed May 18, 2020 (Doc. 57)("Rawers MSJ").  The Court held a hearing on June 15, 2020.  See Clerk's Minutes at 1, filed June 15, 2020 (Doc. 69).  The primary issues are: (i) whether the Court lacks subject-matter jurisdiction over the case, because Plaintiff Karen Rawers filed her lawsuit fewer than six months after submitting a new administrative claim in violation of 28 C.F.R. § 14.2(c); (ii) whether Rawers' September 28 Letter constitutes an amendment per 28 C.F.R. § 14.2(c); and (iii) whether Defendant Clarissa Skinner-Ramp was negligent per se when she crashed into Rawers' car.  The Court concludes that: (i) it has subject-matter jurisdiction over the case, because 28 C.F.R. § 14.2(c) is a claim-processing rule rather than a jurisdictional rule; (ii) the September 28 Letter is not an amendment under 28 C.F.R. § 14.2(c); and (iii) Rawers has established that Skinner-Ramp acted negligently per se.  The Court denies the U.S. MSJ and grants the Rawers MSJ.[1]

---

[1]This is an amended version of the Court's Memorandum Opinion and Order.  Rawers v. United States, No. CIV 19-0034 JB\CG, 2020 WL 4569591 (D.N.M. Aug. 7, 2020), Memorandum

## FACTUAL BACKGROUND

On April 5, 2016, Rawers' car collided with a vehicle that a United States Postal Service ("USPS") employee was operating.  See U.S. MSJ ¶ 1, at 2 (asserting this fact)(citing Complaint (Jury Trial Demanded) ¶¶ 3, 6-12, at 1, 3-4, filed January 15, 2020 (Doc. 1)("Complaint")); Rawers Response ¶ 1, at 5 (admitting this fact).

### 1.    Breach of the Duty of Care.

At the time of the crash, Rawers was driving eastbound along Hoagland Road, in Las Cruces, New Mexico, heading to her home on Carlyle Drive, which is the next street after Chateau Drive.  See Rawers MSJ ¶ 2, at 2 (asserting this fact)(citing Affidavit of Thaddeus Allen at 1 (undated), filed May 18, 2020 (Doc. 57-1)("Allen Aff.")); Deposition of Karen Rawers at 23:19-24:4 (taken February 27, 2020), filed May 18, 2020 (Doc. 57-2)("Rawers Depo."); Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment at 1, filed June 9, 2020 (Doc. 63)(stating that this fact is undisputed).[2]

---

Opinion and Order, entered August 7, 2020 (Doc. 83)("MOO").  The Court amended this order to consider the Defendant United States' Independent Medical Examination Report ("IME Report,") which had been excluded from the previous MOO.  This MOO also offers updated guidance regarding Rawers' ability to call the United States' expert witnesses at trial during her case in chief.

[2]For Rawers' proposed undisputed material facts ¶¶ 1, 3-5, she cites only the Allen Aff. See Rawers MSJ at 1-2.  The United States disputes these facts, arguing that "the affidavit, and its attachment, are hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence."  U.S. Response ¶ 1, at 1.  The United States argues that there are two fundamental reasons preventing the Court from relying on the Allen Aff.  See U.S. Response at 10-11.

First, the United States asserts that an affidavit at the summary judgment stage must be based on personal knowledge and must set forth admissible facts.  See U.S. Response at 11.  It argues that a "'third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'" U.S. Response at 11-12 (quoting Thomas v. Int'l Bus. Machines, 48 F.3d 478, 485 (10th Cir. 1995)).  The United States says this rule applies to police officers

investigating accidents. <u>See</u> Defendant's Response in Opposition to Plaintiff's Motion For Partial Summary Judgment at 12, filed June 9, 2020 (Doc. 63)("U.S. Response")(citing <u>Stevenson v. City of Albuquerque</u>, No. CIV 17-0855 JB\LF, 2020 WL 1906065, at *1 n.4 (D.N.M. Apr. 18, 2020)(Browning, J.); <u>Holtz v. Boyd</u>, No. CIV 99-1034 MV/WWD, 2001 WL 37124843, at *6 (D.N.M. Sept. 17, 2001)(Vázquez, J.)). The United States notes that the Allen Aff. is based on hearsay evidence, because Allen did not witness the accident. <u>See</u> U.S. Response at 13. It also notes that Allen is not an expert qualified to give this testimony at trial. <u>See</u> U.S. Response at 13.

The United States also challenges the Allen Aff. on the grounds that it is not sworn. <u>See</u> U.S. Response at 12-13. It argues that, because it is not made under penalty of perjury, it does not qualify as a declaration under rule 56(c)(4) of the Federal Rules of Civil Procedure. <u>See</u> U.S. Response at 12-13. The United States argues that these facts mean that the Court may not consider the Allen Aff. <u>See</u> U.S. Response at 11 (citing <u>Estrada v. Cook</u>, 166 F. Supp. 3d 1230, 1238 (D.N.M. 2015)(Johnson, J.); <u>Garcia v. City of Albuquerque</u>, No. CIV 08-0144 MV/LAM, 2009 WL 10708228, at * 1 (D.N.M. May 15, 2009)(Vazquez, C.J.)).

In response, Rawers filed Allen's notarized, dated, and sworn affidavit. <u>See</u> Affidavit of Thaddeus Allen at 1 (dated June 11, 2020), filed June 12, 2020 (Doc. 64-1)("Second Allen Aff."). Rawers argues that, thus corrected, the Second Allen Aff. is appropriate for the Court to consider at summary judgment. <u>See</u> Rawers Reply at 8. She asserts that Allen will testify to everything in the Second Allen Aff. <u>See</u> Rawers Reply at 8. She contends, further, that the Second Allen Aff. is based on Allen's personal knowledge, because he personally spoke with all parties and issued a traffic citation to Skinner-Ramp. <u>See</u> Rawers Reply at 9.

Because the Second Allen Aff. resolves the verification issue that the United States raises, the only question left is whether the Court may rely on Allen's substantive statements in the Second Allen Aff. or whether these statements are based on hearsay. Skinner-Ramp's statements to Allen are not hearsay, because they are statements of a party opponent. <u>See</u> Fed. R. Evid. 801(d)(2). Rawers offers the Second Allen Aff. against the United States, and Skinner-Ramp made the statements while acting as the United States' employee "on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). On the other hand, Rawers' own statements, when she offers them herself, are hearsay without any exception to save their admissibility. Rawers does not argue otherwise; instead, she argues that the United States "does not and cannot dispute the material facts associated with Officer Allen's testimony." Rawers Reply at 9.

Rawers has not established the facts that she argues are undisputed. Aside from Skinner-Ramp's statements in Allen's police report that "she stopped at stop sign and began to cross intersection headed northbound," and "she looked both ways but did not see [Rawers' car]," Uniform Crash Report compiled by Thaddeus Allen at 2 (April 5, 2016), filed May 18, 2020 (Doc. 57-1)("Allen Report"), there is no other testimony from either Rawers or Skinner-Ramp that the Court may consider at the summary judgment stage concerning the accident. Rawers sat for a deposition, but she attaches only one page from the deposition to the Rawers MSJ. This page establishes where the accident took place, that Rawers was not on her telephone at the time of the accident, that she was on some medication at the time but cannot recall exactly what medication, and that she was driving between twenty-five and thirty-five miles per hour at the time of the accident. <u>See</u> Rawers Depo. at 21:1-24:25 (Rawers). Rawers had the option to put before the

The accident occurred on Tuesday, April 5, 2016, between 4:30 p.m. and 4:50 p.m.  See

Rawers MSJ ¶ 1, at 1 (asserting that the collision occurred around 4:50 p.m., but dispatch was

notified at 4:36 p.m.)(citing Allen Report).[3]  Rawers had the right of way as she drove east on

---

Court and before the United States her version of the crash for the United States to dispute, but she did not do so and instead provides only these secondary details.  Accordingly, the Court will not adopt any characterization of the crash to which Allen cannot testify based on his firsthand observations or Skinner-Ramp's statements in the Allen Report.

    [3]The United States purports to dispute this fact, arguing that the Allen Report is "hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence." U.S. Response ¶ 1, at 1.  "In a civil case, police reports may be admissible as public records under rule 803(8)(A)(ii) of the Federal Rules of Evidence."  Dorato v. Smith, 108 F. Supp. 3d 1064, 1071 n.6 (D.N.M. 2015)(Browning, J.)(citing Dortch v. Fowler, 588 F.3d 396, 402 (6th Cir. 2009); Foster v. Gen. Motors Corp., 20 F.3d 838, 839 (8th Cir. 1994)).  Rule 803(8)(A)(ii) renders admissible "a record or statement of a public office" setting out "a matter observed while under a legal duty to report," although it excludes from the exception, "in a criminal case, a matter observed by law-enforcement personnel."  Fed. R. Evid. 803(8)(A)(ii).  "This exception, however, covers only information that the officer observed and recorded in the police report, and not information that the officer received from third parties."  Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6.  "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not."  Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (citing Walker v. City of Okla. City, 203 F.3d 837, 2000 WL 135166, at *8 (10th Cir. Feb. 7, 2000)(unpublished table opinion)).  See Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (refusing to admit information in a police report when the Court deemed unlikely "that the officer observed, first hand" a vehicle's registration information).  See also Walker v. Spina, 2018 WL 6519133, at *15 (D.N.M. Dec. 11, 2018)(Browning, J.)(concluding that a police report was admissible under rules 803(8)(a)(iii) and 801(d)(2)).

    As discussed above in note 1, the Court will not rely on any information from the Allen Report or Allen Aff. that derives from Rawers' hearsay statements concerning the accident.  In this case, however, the Allen Report provides independent evidence of the crash's time.  Allen notes that Las Cruces Police Department dispatch was notified of the crash at 4:36 p.m.  and that he arrived on the scene at 4:43 p.m.  See Allen Report at 2.  On the first page of the accident report, he states that the crash's time was 4:50 p.m.  See Allen Report at 1.  These times are inconsistent, and the Allen Aff. and Second Allen Aff. do not clarify the accident's time.  See Allen Aff. at 1-2; Second Allen Aff. at 1-2.  Given the inconsistency, the Court alters Rawers' proposed fact to reflect the possibility that the crash occurred between 4:30 p.m.  -- shortly before Las Cruces Police Department's central dispatch was notified -- and 4:50 p.m.  -- when Allen states that the crash occurreD.

Hoagland Road going through the intersection with Chateau Drive.  See Rawers MSJ ¶ 4, at 2 (asserting this fact)(citing Allen Aff.; Allen Report).[4]  Skinner-Ramp was driving a USPS vehicle northbound on Chateau Drive towards its intersection with Hoagland Road and approached the stop sign that is on Chateau Drive, right before Chateau Drive intersects Hoagland Road.  See Rawers MSJ ¶ 3, at 2 (asserting this fact)(citing Allen Aff.; Allen Report).[5]

Skinner-Ramp's vehicle sustained damage to its front left side, while the front of Rawers' vehicle was damaged in the crash.  See Rawers MSJ ¶ 5, at 2 (asserting that "Ms. [Skinner-Ramp] failed to yield to oncoming traffic and proceeded to drive through the intersection and pulled out into the path of Plaintiff's vehicle, causing the side of Defendant [Skinner-Ramp's] USPS delivery vehicle to collide with the front of Plaintiff's vehicle")(citing Allen Aff. ¶ 6, at 1; Allen Report at 1).[6]

---

[4]The United States purports to dispute this fact, arguing that the Allen Report and the Allen Aff. are "hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence."  U.S. Response ¶ 4, at 2.  The United States has already admitted that Rawers was driving east on Hoagland Road at the time of the accident, see U.S. Response ¶ 2, at 1, and Allen's testimony that cars driving east on Hoagland Road at that intersection have the right of way is based on his personal observation of the roads' layout rather than on Rawers and Skinner-Ramp's statements  Accordingly, this fact is based on admissible evidence and not hearsay, and the United States has not provided evidence that specifically controverts Rawers' fact.  Accordingly, the Court will deem it undisputed. See D.N.M. LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[5]The United States purports to dispute this fact, arguing that the Allen Report and the Allen Aff. are "hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence."  U.S. Response ¶ 4, at 2.  As discussed in note 1, Skinner-Ramp's statements in the Allen Report are not hearsay, and in these statements she confirms the material elements of Rawers' proposed fact: that before the crash she was driving northward and approached the stop sign on Hoagland Road. See Allen Report at 2.

[6]The United States purports to dispute this fact, arguing that the Allen Report and the Allen Aff. are "hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence."  U.S. Response ¶ 5, at 2.  As discussed above in note 1, the Court will

2. **Communications Between the Postal Service and Rawers**.

Rawers, through her former counsel, filed a Claim for Damage, Injury or Death, Standard Form with the USPS on December 18, 2017, seeking $953,179.75 in damages arising from the accident. See U.S. MSJ ¶ 1, at 2 (asserting this fact)(citing Declaration of Stanford M. Bjurstrom (executed May 14, 2020), filed May 18, 2020 (Doc. 56-1)("Bjurstrom Decl."); Letter from Dania Gardea to Cynthia Wood (dated December 20, 2017), filed May 18, 2020 (Doc. 56-3)("Gardea Letter"); Claim for Damage, Injury, or Death (undated), filed May 18, 2020 (Doc. 56-2)("Rawers SF-95"));[7] Rawers Response ¶ 7, at 6 (citing Gardea Letter at 12). The Gardea Letter states: "On behalf of my client, Ms. Karen Rawers, and based on the above information, we hereby demand $953,179.95 in full settlement of all claims." Rawers Response ¶ 7, at 6 (asserting this fact)(citing Gardea Letter at 12); Defendants' Reply in Support of Motion for Summary Judgment ¶ 7, at 1, filed June 13, 2020 (Doc. 65)("U.S. Reply")(stating that the fact is admitted).

---

not rely on any information from the Allen Report or Allen Aff. that derives from Rawers' hearsay statements concerning the accident. Here, the Court will not adopt as an undisputed material fact that Skinner-Ramp failed to yield and pulled out into Rawers' way, because this statement is a characterization of the crash based on statements from Skinner-Ramp and from Rawers, and not based on Allen's personal observations. It will adopt, however, Allen's observation that Rawers' car sustained damage to its front, and that Skinner-Ramp's vehicle sustained damage to its front left side in the crash, because this testimony is based on his personal observations.

Even if the Court could rely on Allen's statements in the Allen Aff., it would hesitate to do so. Although the Allen Aff. states that Skinner-Ramp and Rawers "confirmed essentially the same story," Allen Aff. ¶ 8, at 1, Skinner-Ramp makes contradictory statements in the Allen Report. There, Allen notes that Skinner-Ramp told him that she had stopped at the stop sign and had looked both ways but did not see Rawers' car. See Allen Report at 2.

[7]A claim against the United States may be filed by the injured person or his or her legal representative using Standard Form 95 ("SF-95"), Claim for Damage, Injury, or Death. See Begay v. United States, 188 F. Supp. 3d 1047, 1062 n.42 (D.N.M. 2016)(Browning, J.).

On March 14, 2018, Lilley & O'Connell sent a letter to the National Tort Center[8] indicating that Lilley & O'Connell represents Ms. Rawers and that the Gardea Law Firm no longer represented Ms. Rawers. See Rawers MSJ ¶ 8, at 6 (asserting this fact)(citing Letter from Jerome O'Connell to Kyle Harbaugh (dated March 14, 2018), filed June 1, 2020 (Doc. 61-8)("March 14 Letter")).[9]  The letter states in part: "Please be advised the Lilley & O'Connell, P.A. are now representing Karen Rawers in the personal claim for damages."   Rawers MSJ ¶ 8, at 6 (asserting this fact)(citing March 14 Letter at 1).  The National Tort Center neither responded to nor acknowledged receipt of Rawers' March 14 Letter.  See Rawers Response ¶ 9, at 6 (asserting this fact)(citing Declaration of Jerome O'Connell, Esq. ¶ 10, at 2, filed June 1, 2020 (Doc. 61-1)("O'Connell Decl.")).[10]

---

[8]The National Tort Center, based in St. Louis, Missouri, is the USPS' center for processing tort claims against it.

[9]The United States purports to dispute that this fact is based on proper evidence.  It argues that it

> objects pursuant to Fed. R. Civ. P. 56(c)(2) on the grounds that the declaration of Mr. O'Connell and the materials attached thereto are inadmissible hearsay.  The declaration does not include an attestation that it was signed under "penalty of perjury," as required for consideration in summary judgment and pursuant to 28 U.S.C. § 1746.

U.S. Reply ¶ 6, at 1.  Although O'Connell's declaration was not sworn under penalty of perjury, the March 14 Letter, which Rawers cites in in support of the fact, see Rawers Response ¶ 8, at 6, entirely supports Rawers' proposed fact.  Further, Rawers refiled the declaration after swearing to it under penalty of perjury.  See Amended Declaration of Jerome O'Connell, Esq. at 2, filed June 13, 2020 (Doc. 66)("O'Connell Amended Decl.").  The United States did not object to the O'Connell Amended Decl. at the hearing.  See generally Tr. at 2:23-44:18.  Accordingly, for this proposed undisputed material fact, and for others that Rawers proposes and to which the United States objects on this basis, see U.S. Reply at 1-2 (objecting to Rawers Response ¶¶ 6, 8-18, at 6-8, for relying on the O'Connell Decl.), the O'Connell Decl. is no longer a basis for dispute.

[10]See note 8, at 7; U.S. Reply ¶ 9, at 1 (objecting only because the O'Connell Decl. is not

The National Tort Center sent a letter to Rawers' former counsel on March 23, 2018.  See Rawers Response ¶ 10, at 6 (asserting this fact).[11]  Lilley & O'Connell responded on April 3, 2018, by again advising the USPS that she had retained new counsel.  See Rawers Response ¶ 10, at 6 (asserting this fact)(citing Letter from Kathy Vinyard to Tyler Reder (dated April 3, 2018), filed June 1, 2020 (Doc. 61-10)("April 3 Letter")).[12]  The April 3 Letter states in part: "Enclosed is a copy of the letter sent to Mr. Harbaugh on March 14, 2018, advising that Lilley & O'Connell, P.A. are now representing Karen Rawers in the personal claim for damages."  Rawers Response ¶ 10, at 6 (asserting this fact)(citing April 3 Letter at 1).[13]  The National Tort Center neither responded to, nor acknowledged receipt of the April 3 Letter.  See Rawers Response ¶ 11, at 7 (asserting this fact)(citing O'Connell Decl. ¶ 13, at 2).[14]

On June 15, 2018, Lilley & O'Connell sent a letter to the National Tort Center providing references to New Mexico Jury Instructions and providing additional medical information regarding Rawers' damages, including Rawers' electronic medical records.  See Rawers Response

_____

sworn under penalty of perjury).

[11]Rawers does not support this factual assertion with a citation "to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  Rawers attaches this letter, however, to the Rawers Response as Exhibit I.  See Letter from Tyler Reder to Dania Gardea (dated March 23, 2018), filed June 1, 2020 (Doc. 61-9).  As the United States does not dispute the letter's authenticity or admissibility, see U.S. Reply ¶ 10, at 1, the Court deems the fact undisputed.

[12]See note 8, at 7; U.S. Reply ¶ 10, at 1 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[13]See note 8, at 7; U.S. Reply ¶ 10, at 1 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[14]See note 8, at 7; U.S. Reply ¶ 11, at 1 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

¶ 12 (asserting this fact)(citing Letter from Jerome O'Connell to Tyler Reder (dated June 15, 2018), filed June 1, 2020 (Doc. 61-11)("June 15 Letter")).[15]  The June 15 Letter's purpose was an attempt to resolve Rawers' Claim.  See Rawers Response ¶ 12, at 7 (asserting this fact)(citing O'Connell Decl. ¶ 14, at 2).[16]  The National Tort Center neither responded to, nor acknowledged receipt of the June 15 Letter.  See Rawers Response ¶ 13, at 7 (asserting this fact)(citing O'Connell Decl. ¶ 15, at 2).[17]

On September 28, 2018, Lilley & O'Connell sent a letter to the National Tort Center beginning: "This letter is a follow-up to the December 20, 2017 tort claims notice and settlement demand submitted on behalf of Ms. Rawers in $953,179.95."  Rawers Response ¶ 14, at 7 (asserting this fact)(citing Letter from Jerome O'Connell to Tyler Reder (dated September 28, 2018), filed May 18, 2020 (Doc. 56-5)("Sept. 28 Letter")).  See U.S. Reply ¶ 14, at 2 (stating that it admits the Sept. 28 Letter's quotations); U.S. MSJ ¶ 1, at 2 (asserting this fact)(citing Bjurstrom Decl. ¶ 5, at 2).[18]  In the September 28 Letter, Rawers' counsel wrote that she had undergone

---

[15]The United States admits that Rawers sent a letter to the National Tort Center.  See U.S. Reply ¶ 12, at 2.  The United States purports to dispute the fact that Rawers Response ¶ 12, at 7 proffers.  See U.S. Reply ¶ 12, at 2.  The United States "admits this letter was delivered to the National Tort Center, but objects the remainder of the factual assertions in UMF No. 12 on the same grounds set forth with respect to UMF No. 6."  U.S. Reply ¶ 12, at 2.  Because Rawers refiled the O'Connell Decl. under penalty of perjury, see O'Connell Amended Declaration at 1, the Court considers this fact undisputed.

[16]See note 8, at 7; U.S. Reply ¶ 12, at 2 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[17]See note 8, at 7; U.S. Reply ¶ 13, at 2 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[18]See also Rawers Response ¶ 3, at 5 (admitting that she delivered a letter the Postal Service on this date).

additional medical procedure that the automobile collision caused. See U.S. MSJ ¶ 3, at 2 (asserting this fact)(citing Bjurstrom Decl. ¶ 5, at 2); Letter from Jerome O'Connell to Tyler Reder at 1 (dated September 28, 2018), filed May 18, 2020 (Doc. 56-5)("Sept. 28 Letter); Rawers Response ¶ 3, at 5 (admitting that the Sept. 28 Letter provided additional information concerning her damages). In the Sept. 28 Letter, Rawers' counsel "revoked" the SF-95 claim amount of $953,179.75 and demanded $3,500,000.00 in compensation to resolve the claim. See U.S. MSJ ¶ 4, at 2 (asserting this fact)(citing Bjurstrom Decl. ¶ 5, at 2; Sept. 28 Letter at 2-3).[19] The National Tort Center neither responded to nor acknowledged receipt of the Sept. 28 Letter.[20] See Rawers Response ¶ 15, at 7 (asserting this fact)(citing O'Connell Decl. ¶ 17, at 2); Amended Declaration

---

[19]Rawers admits that the Sept. 28 Letter notified the Postal Service that Rawers revoked her initial offer and increased her demand to $3,500,000.00. See Rawers Response ¶ 14, at 7. Rawers purports to dispute the United States' proposed undisputed material fact ¶ 4, at 2, in the Rawers Response. See Rawers Response ¶ 3, at 5. She "denies the letter constitutes an amendment to the SF-95 claim previously provided to the Government" and "denies any of her letters constitutes an amendment to the SF-95 previously provided to the Government." Rawers Response ¶ 3, at 5. The United States proffers as an undisputed material fact that the Sept. 28 Letter constitutes an amendment, and the Court will address the legal consequence of Rawers' Sept. 28 Letter in the Analysis section. The Court will address materiality in this opinion's Analysis section. See SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.)(stating that "relevance is a legal argument that is best left for the Analysis Section")

[20]Rawers proposes as undisputed that the Sept. 28 Letter "was an attempt to resolve the claim." Rawers Response ¶ 14, at 7. The United States "specifically disputes the contention that September 28 Letter was 'an attempt to resolve the claim,'" and argues that "[t]he letter speaks for itself and the Government relied only on the content of the letter, not the thoughts of counsel which are set forth in his declaration." U.S. Reply ¶ 14, at 2. Rawers' characterization of the Sept. 28 Letter as "an attempt to resolve the claim," Rawer Response ¶ 14, at 7, rather than as an amendment to the claim is a legal conclusion, rather than a fact, and the Court will address this issue in the Analysis section. See SEC v. Goldstone, 2015 WL 5138242, at *27 n.95 (stating that "relevance is a legal argument that is best left for the Analysis Section").

¶ 12, at 2.[21]

On January 15, 2019, Rawers filed her Complaint, asserting a claim for damages against the United States arising from the April 5, 2016, motor vehicle accident. See U.S. MSJ ¶ 5, at 2 (asserting this fact)(citing Complaint ¶¶ 3, 46, at 1, 8).[22] Before Rawers filed the lawsuit, the United States did not contact Rawers regarding her claim, and it did not respond to any of her letters. See Rawers Response ¶ 16, at 7-8 (asserting this fact)(citing June 15 Letter at 1; Sept. 28 Letter at 1; O'Connell Decl. ¶¶ 10, 13, 15, 17, at 2).[23] Lilley & O'Connell is the only counsel of record for Rawers; the Gardea Law Firm, P.C., has neither appeared nor participated in this litigation, and it has not had any involvement in the claim process since March, 2018. See Rawers Response ¶ 17, at 8 (asserting this fact)(citing O'Connell Decl. ¶ 8, at 1).[24]

The USPS denied Rawers' SF-95 tort claim via letter dated March 20, 2019 (the "March 20 Letter"). See U.S. MSJ ¶ 6, at 3 (asserting this fact)(citing Bjurstrom Decl. ¶ 7, at 2; Letter from Stanford Bjurstrom to Dania Gardea (dated March 20, 2019), filed May 18, 2020 (Doc. 56-6)); Rawers Response ¶ 5, at 5-6 (admitting this fact). The United States sent the March 20 Letter denying Rawers' SF-95 tort claim to the Gardea Law Firm. The March 20 Letter also specifically referenced the lawsuit. See Rawers Response ¶ 18, at 8 (asserting this fact)(citing O'Connell Decl.

---

[21]See note 8, at 7; U.S. Reply ¶ 15, at 2 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[22]Rawers admits that she filed the lawsuit on January 15, 2019. See Rawers Response ¶ 4, at 5; id. ¶ 17, at 8.

[23]See note 8, at 7; U.S. Reply ¶ 16, at 2 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

[24]See note 8, at 7; U.S. Reply ¶ 17, at 2 (objecting only because the O'Connell Decl. is not sworn under penalty of perjury).

¶ 20, at 3); U.S. Reply ¶ 18, at 2 (admitting this fact); Letter from Stanford Bjurstrom to Dania

Gardea (dated March 20, 2019), filed June 1, 2020 (Doc. 61-13)("March 20 Letter")("As your

client has now filed a civil action in the United States District Court regarding this matter, her

administrative claim is hereby denied.").  Neither Rawers nor her attorney received the March 20

Letter from the United States via registered or certified mail.  See Rawers Response ¶ 18, at 8

(asserting this fact)(citing O'Connell Decl.  ¶ 20, at 3).[25]

### 3.    Rawers' Medical History Since the Accident.

Rawers has received medical treatment for her injuries she suffered from the accident.  See

U.S. MSJ ¶ 2, at 2 (asserting this fact)(citing Complaint ¶¶ 4, 15-16, 18, at 2-4); Rawers Response

¶ 1, at 5 (admitting this fact).  Rawers underwent an examination with her retained surgical spine

expert, Dr. Paul Saiz, on December 4, 2019, and he subsequently issued his expert report in this

matter on December 19, 2019.  See Rawers MSJ ¶ 7, at 2 (asserting this fact)(citing Spine

Opinion/Medical Record Review (dated December 19, 2019), filed May 18, 2020 (Doc. 57-

3)("Saiz Report")).[26]

---

[25]Rawers proposes that "[n]either Ms.  Rawers nor her attorney of record" received the March 20 Letter.  The United States "objects to the inadmissible statement (relying on Mr. O'Connell's declaration) that Ms.  Rawers did not receive" the March 20 Letter.  U.S. Reply ¶ 18, at 2.  The O'Connell Decl. and the O'Connell Amended Decl. do not make clear whether Mr. O'Connell had an independent basis for knowing that Rawers did not receive the letter aside from Rawers' statements -- which are not evidence before the Court at this stage.  See O'Connell Amended Decl. ¶ 14, at 2; O'Connell Decl. ¶ 20, at 3. Rule 56 does not generally prohibit hearsay at the summary judgment stage but rather prohibits only hearsay that "cannot be presented in a form that would be admissible in evidence."  FeD. R.  Civ. P.  56(c)(2).  Rawers states that she would testify at trial.  See Stipulated Pretrial Order at 13, filed June 26, 2020 (Doc. 77).  There is, therefore, no reason to think that Rawers' statements regarding whether she received the March 20 Letter will not be admitted at trial.  Accordingly, the Court has not altered Rawers' proposed fact.

[26]The United States disputes Rawers use of expert witness reports from Dr. Saiz,

Rawers then retained spinal cord stimulator specialist, Dr. Richard Rauck, who reviewed Rawers' medical records, interviewed her by telephone on December 30, 2019, and subsequently issued his expert report on January 13, 2020.  See Rawers MSJ ¶ 8, at 2 (asserting that Dr. Rauck examined Rawers on December 30, 2019)(citing Letter from Richard Rauck to Jerome O'Connell (dated Jan. 13, 2020), filed May 18, 2020 (Doc. 57-4)("Rauck Report")).[27] Rawers submitted a number of her claimed medical billings in this matter to Joan Schofield, RN, BSN, MBA, for a reasonableness review, and Schofield subsequently issued her expert report on January 14, 2020. See Rawers MSJ ¶ 9, at 3 (asserting that she submitted all of her medical bills to Schofield)(citing Letter from Joan Schofield to Jerome O'Connell (dated Jan. 14, 2020), filed May 18, 2020 (Doc.

---

Dr. Rauck, and Schofield.  See U.S. Response ¶¶ 7-9, 26, at 2-3, 6.  It argues that these reports are unsworn hearsay testimony that may not be presented as admissible evidence.  See U.S. Response ¶ 7, at 3 (citing Fed. R. Evid. 603, 801-803).  It further argues that, because these reports are unsworn, it is "'not competent evidence on summary judgment'" and that the Court cannot consider it.  U.S. Response at 14 (quoting Peak ex rel. Peak v. Cent. Tank Coatings, Inc., 606 F. App'x 891, 895 (10th Cir. 2015)).  The Court has previously excluded unsworn expert reports from its consideration of summary judgment motions.  See Coffey v. United States, No. CIV 08-0588, 2011 WL 6013611, at *4 n.26 (D.N.M. Nov. 28, 2011)(Browning, J.).

    In her reply, Rawers resolves this issue.  She obtained declarations from Dr. Saiz, Dr. Rauck, and Schofield in which each swears under the penalty of perjury that they would testify under oath in accordance with the opinions and statements in their reports.  See Declaration of Paul Saiz, M.D. at 1 (undated), filed June 12, 2020 (Doc. 64-2)("Saiz Decl."); Rauck Decl. at 1 (undated), filed June 12, 2020 (Doc. 64-3)("Rauck Decl."); Declaration of Joan Schofield at 1 (undated), filed June 12, 2020 (Doc. 64-4)("Schofield Decl.").  As the United States does not dispute the substance of the proposed facts, the Court deems these facts undisputed.

    [27]The United States purports to dispute this fact, and it argues that the Rauck Report suggests that Dr. Rauck did not himself examine Rawers but instead only reviewed her medical records and conducted a telephone interview.  See U.S. Response at 3.  Rawers argues that this distinction is "an immaterial argument of counsel."  Rawers Reply ¶ 4, at 5.  The record reflects that Dr. Rauck did not physically examine Rawers and only reviewed her medical records and spoke with her on the telephone.  See Rauck Report at 1.  Accordingly, the Court has altered the fact to better reflect the record, which shows that Dr. Rauck has not examined Rawers.

57-5)("Schofield Report")).[28]  An Independent Medical Examination panel ("IME Panel")

produced a report on Rawers' medical condition dated April 6, 2020.  See Panel Independent

Medical Examination Report (dated April 6, 2020), filed May 18, 2020 (Doc. 57-6)("IME

Report").[29]  The United States asked the IME Panel to provide opinions on "(i) diagnoses and

---

[28]The United States purports to dispute this fact's substance and argues that the Schofield Report indicates only that Rawers submitted "a number of medical bills" rather than all medical bills.  U.S. Response ¶ 9, at 3-4.  The United States also disputes this fact's materiality.  See U.S. Response ¶ 9, at 4.  Rawers does not directly respond to these arguments in her Reply.  See Rawers Reply ¶ 5, at 5.  Because the record reflects only that Rawers submitted "a number of medical bills," Schofield Report at 1, the Court alters Rawers' proposed fact.  The Court will address materiality in this opinion's Analysis section.  See SEC v. Goldstone, 2015 WL 5138242, at *27 n.95 (stating that "relevance is a legal argument that is best left for the Analysis Section").

[29]Rawers proposes several facts based on the IME Report, which the United States' expert witnesses produced.  See Rawers MSJ ¶¶ 10-25, 27, at 3-6.  The United States argues that the IME Report "is hearsay, without any exception, and cannot be presented in a form that would be admissible as evidence."  U.S. Response ¶ 10, at 4.  In addition, the United States argues that Rule 26(b)(4) of the Federal Rules of Civil Procedure bars Rawers from calling the IME Panelists as witness without showing "exceptional circumstances," and that Rawers has not made this showing.  U.S. Response at 15.
    The IME Report is admissible because it is non-hearsay, and neither an affidavit nor a sworn declaration need accompany the report.  When a party introduces its own expert report, courts -- including the Court -- have held that such evidence is inadmissible hearsay.  See Liebling v. Novartis Pharm. Corp., No. CV 11-10263 MMM (MRWX), 2014 WL 12576619, at *1 (C.D. Cal. March 24, 2014)(Morrow, J.)(collecting cases); Coffey v. United States, 2011 WL 6013611, at *4 & nn.22, 26 (D.N.M. Nov. 28, 2011)(Browning, J.).  When a party introduces its opponent's expert report, however, courts have found this evidence admissible as non-hearsay under Rule 801(d)(2) of the Federal Rules of Evidence.  See, e.g., Collins v. Wayne Corp., 621 F.2d 777, 781-82 (5th Cir. 1980)(finding that an expert employed by a company is that company's agent, and statements by the expert regarding the matter of expertise are admissions of the company)("Collins")(superseded on other grounds by Fed. R. Evid. 103(a), as recognized by Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002)); In re Chicago Flood Litig., No. 93 C 1214, 1995 WL 437501, at *11 (N.D. Ill. July 21, 1995)(Conlon, J.)("A party's pleadings and expert reports often constitute party admissions pursuant to Fed. R. Evid. 801(d)(2).").  See also Pernix Ireland Pan Dac v. Alvogen Malta Operations Ltd., 316 F. Supp. 3d 816, 819-22 (D. Del. 2018)(Bryson, J.)(surveying case law); Lizotte v. Praxair, Inc., 640 F. Supp. 2d 1335, 1337 (W.D. Wash. 2009)(finding that a plaintiff truck driver could not introduce a report produced by a consulting group hired by plaintiff's employer's insurance company because the consulting group "was not [the defendant's] agent at the time of the accident or when the report was prepared").

But see Kirk v. Raymark Indus., Inc., 61 F.3d 147, 164 (3d Cir. 1995)("[A]n expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give."); In re Refco Inc. Sec. Litig., No. 07-MD-1902 (JSR), 2013 WL 12191891, at *10 (S.D.N.Y. March 11, 2013); Durham v. Cty. of Maui, 804 F. Supp. 2d 1068, 1070 (D. Haw. 2011)(Seabright, J.). Rule 801(d)(2)(c) of the Federal Rules of Evidence provides that "a statement [is] admissible as non-hearsay if it 'was made by a person whom the party authorized to make a statement on the subject.'" United States v. Ballou, 59 F. Supp. 3d 1038, 1059 (D.N.M. 2014)(Browning, J.). "[Rule 801(d)(2)(D)] makes 'a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,' not hearsay." Boutwell v. SW Com. Mgmt., Inc., No. CIV. 07-1103 JB/LFG, 2009 WL 2950839, at *5-7 (D.N.M. Aug. 7, 2009)(Browning, J.). Courts have admitted a party's submission of its opponent's expert reports or testimony as non-hearsay by finding either that: (i) the expert was authorized to make a statement on the subject by the party that retained the expert; or (ii) the expert was an agent or employee of the party that retained the expert. See In re Hanford Nuclear Rsrv. Litig., 534 F.3d 986 (9th Cir. 2008)(concluding that an expert's testimony at a bellwether trial was an admission of a party opponent under rule 801(d)(2)(C), and therefore "plaintiff [could] not now exclude trial testimony that she, herself, proffered"); Collins, 621 F.2d at 781-82 (finding that an expert employed by a company is that company's agent, and statements by the expert concerning the matter of expertise are admissions of the company).

First, the Court may admit the IME Report as non-hearsay, because the United States authorized the members of the IME Panel to make the statements therein. See In re Hanford Nuclear Rsrv. Litig., 534 F.3d at 1016; Reid Bros. Logging Co. v. Ketchikan Pulp Co.,699 F.2d 1292, 1306-07 (9th Cir. 1983), cert. denied, 464 U.S. 916 (1983)(finding that a report prepared by an employee of a shareholder of the defendant's parent company at the defendant's request that was circulated within the office was an authorized statement under rule 801(d)(2)(C)); Marceau v. Int'l Bd. Elec. Workers, 618 F. Supp. 2d 1127, 1142-43 (D. Ariz. 2009)(Murguia, J.)(expert report admissible under rule 801(d)(2)(c), because the defendants "authorized [the expert] to investigate the subject matter of the Report and then issue the Report"); Glendale Federal Bank v. United States, 39 Fed. Cl. 422, 423-25 (Fed. Cl. 1997)(holding that the deposition of an expert who was not withdrawn before trial was an authorized party admission); Fed. R. Evid. 801(d)(2)(c). Dr. Shelley's contract with the United States details compensation for responsibilities including "prepar[ing[ testimony, reports, charts, and exhibits and discuss[ing] findings with USAO." Contract Between Dr. Brian Shelley and the U.S. Attorney's Office for the District of New Mexico at 7 (dated August 25, 2019), filed June 12, 2020 (Doc. 64-6)("Dr. Shelley Contract"). The United States' expert witnesses "conduct record reviews and data analyses in preparation for testimony in person or by written report and to provide such testimony in court or by trial deposition." Dr. Shelley Contract at 8. The Dr. Shelley Contract indicates that the United States not only authorizes, but compensates Dr. Shelley for producing written and oral statements regarding Rawers' case. See Dr. Shelley Contract. Further, as here, once a party puts an expert forward as its expert to testify at trial, that expert is "authorized" to speak for the party regarding the issues the party hired the expert to address. Consequently, the Court finds that the IME Report may be properly considered as an authorized admission under rule 801(d)(2)(C).

The IME Report is also admissible as non-hearsay, because the IME panelists act as the

United States' agents during their period of employment by the United States.  See Collins, 621 F.2d at 781-82; Boutwell v. SW Commerical Mgmt., Inc., 2009 WL 2950839, at *5-7.  Cf. N5 Techs. LLC v. Capital One N.A., 56 F. Supp. 3d 755, 765 (E.D. Va. 2014)(Ellis, J.)("[A]n expert report therefore is not admissible under Rule 801(d)(2) absent a showing . . . that the expert was acting as the party's agent or employee or was specifically authorized to make a statement on that subject.").

The Honorable Judge Royce Lamberth of the United States District Court for the District of Columbia found that "[i]f an expert is truly a mere agent or employee of the hiring party, then our judicial system's reliance on expert testimony is misplaced."  Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship, No. 1:17-CV-01079-RCL, 2019 WL 6910168, at *3 (D.D.C. Oct. 22, 2019)(Lamberth, J.).  The Court has great respect for Judge Lamberth and Judge Ellis, who come out differently than the Court.  Nevertheless, the Court thinks the rationale of this approach is idealistic, and does not reflect accurately what is happening in the real world of modern expert testimony.  It might be a better world if experts' testimony did not match what the proponent of the evidence wants the expert to say, and was truly independent.  But this does not match the reality in our own adversarial system, and an alternate universe might not be better or as good as the current system.  Experts who give unwanted opinions rarely see the light of day.  They become undesirable "consult" experts.  When an expert gives formal opinions, and the proponent lists the expert as a witness and produces the expert report, that party is signaling that opinion is the proponent's position.

It is evident that a testifying expert acts as an agent of the proponent, because the proponent means the Court and the opposing party to rely on the expert's statistics as the proponent's own.  Further, the proponent is adopting the positions detailed in the expert's report.  It does not make sense for the opponent to not be able to use these statistics that the proponent is advancing as its own at the summary judgment stage or at all.  The notion that testifying experts are not their proponent's agents does not accurately reflect what is going on in the law.  See Collins, 621 F.2d at 781-82.

Additionally, agents need not be puppets; they may still maintain some measure of independence or objectivity while acting under the principal's direction.  See Dr. Shelley Contract (asking Dr. Shelley to "[e]xercise neutrality and maintain independence").  Actual authority stems from a principal's expressions to an agent.  See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013).  An agent has actual authority when she "'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent'" to engage in the action.  1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251 (quoting Restatement (Third) of Agency § 2.01).  Here, the United States has asked the IME Panelists to prepare the IME Report and to testify at trial.  See Rawers Reply at 6 (emphasis in original)(citing Dr. Shelley contract)(stating that Dr. Shelley is expected to "[t]estify, if applicable, as an expert witness during the trial either in person or by written report.").  The Dr. Shelley Contract also states that scope of the "work will be determined as the matter proceeds, and will be subject to the needs and requests of the USAO."  Dr. Shelley Contract at 9.  The Dr. Shelley Contract thus makes clear that the IME Panelists were "subject to the . . . control" of the United States.  See Restatement (Third) of Agency § 1.01 (2006)(defining agency); Dr. Shelley Contract.

Although the United States hired the IME Panelists as independent contractors, actors'

designation of their relationships are not determinative of the relationships' legal status.  See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013)("An independent contractor can be an agent.  An agent need not be an employee."); Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1360 (10th Cir. 1987)("[T]he terms 'agents' and 'independent contractor' are not necessarily mutually exclusive."); Appleby v. Kewanee Oil Co., 279 F.2d 334, 336 (10th Cir. 1960)("[A] broker is but a species of agent who may also be an independent contractor.").  See also Proctor & Gamble Co.  v. Haugen, 222 F.3d 1262, 1278 (10th Cir. 2000)(finding that, although distributors were "more analogous to independent contractors than to employees," they could nevertheless be agents); Dr. Shelley Contract at 10.  Here, the United States provided the IME Panelists with "express authority" to generate the IME Report by providing the panelists with "actual authority .  .  .  in very specific or detailed language."  Restatement (Third) of Agency § 2.01.  See Dr. Shelley Contract at 7-10 (listing all services the United States wants Dr. Shelley to provide in association with the Rawers case).  Based upon the Dr. Shelley Contract, the IME "report appears to have been conducted at .  .  .  the defendant's request and to be within the scope of their agreement."  Boutwell v. SW Com. Mgmt., Inc., 2009 WL 2950839, at *5-7 (finding that under these circumstances "rule 801(d)(2)(D) would apply"); Dr. Shelley Contract.  Accordingly, the Court concludes that the IME Report may be considered as an agent admission under rule 801(d)(2)(D).

Additionally, when a party introduces its own expert report as evidence at the summary judgment stage, an affidavit or sworn declaration must support that report.  See Peak ex rel.  Peak v. Cent. Tank Coatings, Inc., 606 F. App'x 891, 895 (10th Cir. 2015)(noting that "unsworn expert reports are not competent evidence on summary judgment" and "cannot be considered on summary judgment."); Tanner v. McMurray, 429 F. Supp. 3d 1047, 1135 n.176 (D.N.M. 2019)(Browning, J.)("Courts may not consider unsworn expert reports in the summary judgment context."); Fed. R. Civ. P.  56(c).  Cf. Doe v. Univ. of Denver, 952 F.3d 1182, 1191 n.7 (10th Cir. 2020)(noting the party's dispute over unsworn expert reports and suggesting solutions that "might" work); Tesone v. Empire Mktg.  Strategies, 942 F.3d 979, 1000 (10th Cir. 2019)(remanding to the district court with the instruction that "an unsworn doctor's note *can* be considered when the defendants attach the note to their motion for summary judgment and relied on it in arguing for summary judgment")(emphasis in original).  By contrast, here, Rawers is attempting to rely on her opponent's expert report.  See Rawers MSJ ¶¶ 10-25, 27, at 3-6.  Accordingly, the United States' IME Report need not be sworn because Rawers is offering the report.  See Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005)(finding that a district court's *sua sponte* decision to exclude a defendant's submission of a plaintiff's unsworn doctor's letters from summary judgment consideration was an abuse of discretion); Stonebarger v. Union Pac.  R.R.  Co., 76 F. Supp. 3d 1228, 1236 (D. Kan. 2015)(Robinson, J.)(considering an unsworn expert report after the movant's opponent attached it in response); Samaritan Health Ctr. v. Simplicity Health Care Plan, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006)(Clevert, J.)("To get an expert's opinion into the record for summary judgment usually involves use of an affidavit or deposition testimony.  However, because [the party] proffers its opponent's expert report against that opponent, the report can be considered an admission by a party-opponent[.]").  Accordingly, the Court will consider the IME Report's statements for the truth of the matter asserted and adopts the substance of Rawers MSJ ¶¶ 11-25, 27 at 3-6.

Finally, the Court concludes that the United States correctly argues that Rawers must show "exceptional circumstances" before she may call the IME Report's authors to testify. See Fed. R. Civ. P. 26(b)(4)(D)(ii). As indicated above, the United States has stated that it intends to call the IME Panelists as witnesses. See Stipulated Pretrial Order at 17, filed June 26, 2020 (Doc. 77). Courts determining whether a party may rely on its opponent's expert have primarily applied three different tests: (i) the exceptional circumstances test; (ii) the discretionary/balancing test; and (iii) the entitlement test. See Lehan v. Ambassador Programs, Inc., 190 F.R.D. 670, 673 (E.D. Wash. 2000)(collecting cases)(Shea, J.)("Lehan").

First, many courts have held that a party may call an opponent's expert witness to testify at trial only under "exceptional circumstances." E.g., Archer v. Grynberg, 951 F.2d 1258 (10th Cir. 1991)(upholding a district court's decision to prohibit a plaintiff from contacting a defendant's non-testifying expert or calling the expert as a witness at trial because the plaintiff failed to demonstrate that he "was a particularly unique expert or that they are unable to employ" another expert "with similar expertise"); Lehan, 190 F.R.D. at 672. See generally S. Fifth Towers, LLC v. Aspen Ins. UK, Ltd., No. 3:15-CV-151-CRS, 2016 WL 11200224, at *4 (W.D. Ky. Jan. 13, 2016)(Whalin, M.J.)(finding that "a party that seeks to obtain discovery of facts or opinions held by a non-testifying consulting expert bears the burden to show exceptional circumstances."); Roach v. Hughes, No. 4:13CV-00136-JHM, 2015 WL 13022807, at *3 (W.D. Ky. Jan. 8, 2015)(finding that non-testifying expert witness not subject to discovery by party's opponent unless the "opposing party can demonstrate exceptional circumstances, and that it is impracticable for the party to obtain the facts or opinions on the same subject by other means"); R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 899, 904 (N.D. Ohio 2009)(Lioi, J.)(requiring exceptional circumstances for a party to depose its opponent's non-testifying expert), aff'd, 606 F.3d 262 (6th Cir. 2010); FMC Corp. v. Vendo Co., 196 F. Supp. 2d 1023, 1046 (E.D. Cal. 2002)(Wanger, J.)(applying the exceptional circumstances test to prevent a party from deposing its opponent's expert witness); In re Shell Oil Refinery, 132 F.R.D. 437, 440 (E.D. La. 1990), opinion clarified, 134 F.R.D. 148 (E.D. La. 1990)(Mentz, J.)(concluding that a party's non-testifying experts are subject to discovery by the party's opponent only under exceptional circumstances). Cf. Peterson v. Willie, 81 F.3d 1033, 1037 (11th Cir. 1996)(holding that a party's designation of a witness does not control whether the witness should be allowed to testify for the party's opponent).

The Honorable Judge Blair Bennett of the United States District Court for the Northern District of Iowa also found that "the ability of an opposing party to call a never-designated expert at trial should depend upon the showing of extraordinary circumstances." House v. Combined Ins. Co. of Am., 168 F.R.D. 236, 245 (N.D. Iowa 1996)(Bennett, J.)("House"). Nonetheless, Judge Bennett in House found that, after "an expert is designated, the expert is recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony available to all parties." 168 F.R.D. at 245. See also S.E.C. v. Koenig, 557 F.3d 736, 744 (7th Cir. 2009)(Easterbrook, C.J.)("A witness identified as a testimonial expert is available to either side[.]"). Judge Bennett applied a test "guided by a balancing of probative value against prejudice under Fed. R. Evid. 403," that considered the following factors: (i) "the interests Rule 26 was designed to protect"; (ii) "the peculiar prejudice that could arise if the jury is informed that an expert presented by one party was hired, then dropped, by the other party"; (iii) "the court's interest

in the proper resolution of issues"; and (iv) "the interests of the party seeking the testimony in presenting" the testimony to the jury. 168 F.R.D. at 245. See Rubel v. Eli Lilly, 160 F.R.D. 458, 460 (S.D.N.Y. 1995)(Kaplan, J.)(applying a similar four factor test).

Third, some courts have applied an "entitlement" standard, which allows a party who undergoes a rule 35 examination by the party opponent's expert witness to call that witness at trial. See, e.g., Crowe v. Nivison, 145 F.R.D. 657, 658 (D. Md. 1993)(Kaufman, J.)(citing Fed. R. Evid. 35); Fitzpatrick v. Holiday Inns, Inc., 507 F. Supp. 979, 979-80 (E.D. Pa. 1981)(Huyett, J.)(allowing a plaintiff to call the defendant's expert at trial after a rule 35 examination, but limiting the witness to the facts and opinions in the expert report, and ordering the plaintiff to pay the expert "the customary expert witness fee for testimony at trial"). In Crowe v. Nivision, the Honorable Judge Kaufman for the United States District Court for the District of Maryland, explained that, "[i]n return for suffering an invasion of his person, the examined party is entitled to make use of such information as results from the examination." 145 F.R.D. at 658.

A small minority of courts have analyzed this issue under the Federal Rules of Evidence. See, e.g, Selvidge v. United States, 160 F.R.D. 153, 156 (D. Kan. 1995)(Newman, M.J.). For example, the Honorable Magistrate Judge Newman of the United States District Court for the District of Kansas, found that, under rule 703, "a designated expert witness may not withhold" opinions "within the area of his expertise, simply because the inquiring party is not the party that has retained him." 160 F.R.D. at 156 (granting plaintiff leave to depose his opponent's expert witness). See Kowalsky v. Dakota, Minnesota & E. R.R. Corp., No. 07-CV-292-D, 2009 WL 10692837, at *4 (D. Wyo. Oct. 15, 2009)(Beaman, M.J.)(finding that, under rule 702, "once a party has designated an expert witness as some who will testify at trial, the later withdrawal of that designation may neither prevent the deposition of that witness by the opposing party nor the expert's testimony at trial")(citing James Wm. Moore et al., Moore's Federal Practice ¶ 26.80[l][a]).

One of the hardest things in litigation is finding a good expert. It is a skill that must be learned and often takes a lot of time. Many plaintiffs' lawyers expend their own time without immediate compensation for their efforts. Lawyers often develop close relationships with experts that can last well beyond that case and often surpass multiple cases and years. It violates the principle of protecting an attorney's work if the opponent can call that witness as its own witness. The other side is getting something for free. See generally Alan L. Zimmerman et al., Economics and the Evolution of Non-Party Litigation Funding in America, 12 N.Y.U. J.L. & Bus. 635, 644 (2016)(noting the rising cost of expert witness fees). The opponent should have to show exceptional circumstances to benefit from the other side's work. Such free loading is inconsistent with the Anglo-American adversarial system and with the American rule, which leaves attorney fees with the parties. See Peter v. Nantkwest, Inc., 140 S. Ct. 365, 370-71 (explaining that under the American rule, which "has roots in our common law reaching back to at least the 18th century," every "each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise")(internal quotations and citations omitted).

Accordingly, of the aforementioned approaches, the Court concludes that the exceptional circumstances test best recognizes the "underlying principles of litigation." Lehan, 190 F.R.D. at 672. "The advisory committee notes indicate that the structure of rule 26 was largely developed around the doctrine of unfairness designed to prevent a party from building his own case by means

of his opponent's financial resources, superior diligence and more aggressive preparation." <u>Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses</u>, 622 F.2d 496, 502 (10th Cir. 1980). <u>See</u> <u>Durflinger v. Artiles</u>, 727 F.2d 888 (10th Cir. 1984)(Doyle, C.J.)("The rule is designed to promote unfairness by precluding unreasonable access to an opposing party's diligent trial preparation."). Moreover, allowing a party to call its opponent's expert puts the opponent in the difficult position of cross-examining its own expert witness. <u>Granger v. Wisner</u>, 134 Ariz. 377, 382, 656 P.2d 1238, 1243 (1982)(refusing to allow plaintiff's former expert to testify for defendant, because plaintiff would be unable to cross-examine expert effectively and stating that "[c]ross-examination is a difficult art which is not made easier when counsel must perform it on a tightrope"). Similarly, expert might be dissuaded from testifying candidly if he or she could later be called at trial by both parties. <u>See</u> <u>Healy v. Counts</u>, 100 F.R.D. 493, 497 (D. Colo. 1984)(Kane, J.).

Also, any other rule cripples the proponent's ability to control its presentation of evidence. For example, sometimes experts get carries away and give lots opinions in their enthusiasm to serve the person who hired them. The expert may comment on facts that are not true or sound for witnesses. The proponent may want the expert to testify on only one of ten opinions. The proponent should be able to present that one opinion without the opponent then cherry picking the opinions and presenting one or more others. <u>See</u> <u>Lehan</u>, 190 F.R.D. at 672 (stating that an "underlying principle[] of litigation" is "that each party is free to choose its own expert witnesses . . . and to exercise its judgment").

Typically, to demonstrate exceptional circumstances, a party must show that it cannot obtain equivalent information from another source. <u>See</u> <u>Fifth Towers, LLC</u>, 2016 WL 11200224, at *4; <u>Wolt v. Sherwood</u>, 828 F. Supp. 1562, 1568 n.18 (D. Utah 1993)(Anderson, J.)("[E]xceptional circumstances might exist where the settling party's expert has unique expertise which may not be readily available to other non-settling parties, or where the settling party's expert participated in tests which cannot be replicated by new experts."). "Obviously, if the party has already retained its own expert to testify on the same subject matter then exceptional circumstances will be lacking." <u>S. Fifth Towers, LLC</u>, 2016 WL 11200224, at *4. <u>See</u> <u>Sanchez v. Dupnik</u>, 362 F. App'x 679, 681 (9th Cir. 2010)(finding that the district court acted within its discretion when it denied a party's request to call the opposing party's expert during his case in chief); <u>Wells Fargo Bank, N.A. v. Chesapeake Fin. Servs., Inc.</u>, No. CIV.A. MJG-08-2439, 2013 WL 5816489, at *2 (D. MD. Oct. 28, 2013)(Garbis, J.)(finding that it would be unfair to allow a party to call an opponent's expert witness if the opponent planned to call the witness at trial); <u>R.C. Olmstead, Inc. v. CU Interface, LLC</u>, 657 F. Supp. 2d 899, 903 (N.D. Ohio 2009)("The Sixth Circuit . . . generally forbids a party from calling the opposing party's expert as a witness at trial, even if the opposing party does not intend to use that expert."), <u>aff'd</u>, 606 F.3d 262 (6th Cir. 2010). <u>See</u> <u>Ferguson v. Michael Foods, Inc.</u>, 189 F.R.D. 408, 409 (D. Minn. 1999)(Doty, J.)(prohibiting a party from calling his opponent's expert witness at trial, because it would "undermine a principal objective of Rule 26, namely, to 'prevent a party from piggybacking on another party's trial preparation'"). "Once a witness has been designated as expected to testify at trial, there may be situations when the witness should be permitted to testify for the opposing party." <u>Peterson v. Willie</u>, 81 F.3d 1033, 1037-38 (11th Cir. 1996). Nevertheless, "[t]his decision is committed to the sound discretion of the district court." <u>Peterson v. Willie</u>, 81 F.3d at 1037.

A party "'carries a heavy burden' in demonstrating the existence of exceptional

circumstances." Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses, 622 F.2d 496, 503 (10th Cir. 1980)(citing Hoover v. United States Dept. of Interior, 611 F.2d 1132, 1142 n.13 (5th Cir. 1980)). Here, Rawers' experts are able to testify regarding all issues discussed in the IME Report. Compare Rauck Report at 8-9; Saiz Report at 12-14, with IME Report at 23. Like the IME Panel, Rawers' experts examined her following the accident and prior to trial. See Saiz Report at 1. Further, there is no indication that the United States made any attempt to "corner the market" on experts in this area. Indeed, in a routine personal injury case like this one, the United States could not do so. In this area, there is a robust and abundant market for plaintiffs' and defendants' expert witnesses who testify regarding all varieties of bodily ailments and injuries. See generally Alan L. Zimmerman et al., Economics and the Evolution of Non-Party Litigation Funding in America, 12 N.Y.U. J.L. & Bus. 635, 644 (2016)(describing the market for expert witnesses). Accordingly, unless Rawers demonstrates exceptional circumstances, Rawers may not call the IME Panel at trial. See generally R.C. Olmstead, Inc., 657 F. Supp. 2d at 904 ("[T]he Sixth Circuit does not allow a party to call another party's expert as a witness.").

Assuming that the balancing approach applies, the House factors still weigh against allowing Rawers to call the IME Panel at trial. See 168 F.R.D. at 245. First, the Court concludes that prohibiting Rawers from calling the IME Panel serves rule 26's underlying interests by preventing Rawers from relying on her opponent's "diligence" and "preparation" for trial. Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses, 622 F.2d 496, 502 (10th Cir. 1980). See Fed. R. Civ. P. 26. Further, because this trial is to the bench, there is no risk of the "peculiar prejudice" to the jury. House, 168 F.R.D. at 246. Preventing Rawers from calling the IME Panel would not limit the Court's ability to properly resolve the issue, because the United States intends to call the IME Panel. Moreover, Rawers has her own experts. The Court will thus hear testimony from both the IME Panel and Rawers' experts, and have the IME Report in evidence. This is a full and robust record from which the Court will have plenty of information to make its findings of fact; the Court will not be short of evidence. This will provide the Court with sufficient information to decide the relevant issues. Finally, as discussed above, Rawers has demonstrated no special interest in presenting this testimony. Hence, the Court has considered the relevant factors under House, and has determined that it would be inappropriate to allow Rawers to call the IME Panelists as witnesses at trial. See 168 F.R.D. at 245.

Finally, the Court is not convinced that the minority entitlement approach is consistent with rule 35. Rule 35 provides an examinee with the right to "a copy of the examiner's report" upon request. Fed. R. Civ. P. 35. This right allows the examinee to discover the opinions that the report contains to prepare for trial. See Fed. R. Civ. P. 35. Rule 35 is limited to this reporting requirement; it does not allow a party to call the examiner as a witness at trial. See Carroll v. Praxair, Inc., No. 05-307, 2007 WL 437697, at *2 (W.D. La. Feb.7, 2007)(Wilson, M.J.)(explaining that Rule 35 "could have stated that the party is also entitled to depose the examiner, but it does not"; thus, "the limitations of other rules will control the taking of depositions of examination-conducting expert witnesses"); House, 168 F.R.D. at 246 (concluding that Rule 35 "undeniably *does not* provide for deposition or use at trial of the examining expert by either party")(emphasis in the original). The Court gave consideration to whether the testimony of the United State' expert IME witnesses should make any difference. The Court ultimately decides that it should not treat the IME any differently than any other defendant's experts. While

conditions resulting from the motor vehicle crash on 4/5/16; (ii) reasonableness and necessity of treatment for the diagnoses and conditions listed above; (iii) current related diagnoses and conditions; and (iv) necessary future care to treat the diagnoses and conditions listed in (iii)." Rawers MSJ ¶ 13, at 3 (citing IME Report at 2).

The IME Panel found that the crash caused Rawers' asymptomatic cervical degenerative disk disease[30] at C4-5, C5-6, and C6-7[31] to become permanently symptomatic. See Rawers MSJ

_____

defendants like to call their experts independent, ultimately, they are the defendant's expert. They deserve no different rule. It is true that the party who moved for examination must, on request, deliver the examiner's report to the plaintiff. See Fed. R. Civ. P. 35(b)(1). The plaintiff then must deliver all the reports to the examiners it has. See Fed. R. Civ. P. 35(b)(3). But these special rules for the IME report do not make the United States' IME panelists available for Rawers to call at trial. The Court, therefore, finds that rule 35 does not allow Rawers to call the IME Panel at trial.

[30]Cervical degenerative disk disease affects patients as follows:

> The dehydration or desiccation of the disc material reduces the flexibility and typically the height of the disc. In some cases, the degeneration causes pain from loss of disc height and abnormal motion or compression between the vertebra and causing pain. Cervical disc degenerative disorder can be characterized by neck pain. This neck pain can be most prevalent when the patient is upright or moving the head and can be reduced by lying down or reclining . . . The cervical nerve roots innervate the back of the head and neck as well as the arms and hands. If they are affected, the patient could have burning, tingling, numbness, and pain in these areas. Sometimes headaches result from cervical degenerative disc problems."

Cervical Degenerative Disk Disease, UCLA Spine Center, https://www.uclahealth.org/spinecenter/cervical-degenerative-disc-disease (last visited Sept. 14, 2020).

[31]"The neck region of the spine is known as the cervical spine. This region consists of seven vertebrae, which are abbreviated C1 through C7." Understanding Spinal Anatomy: Regions of the Spine: Cervical, Thoracic, Lumbar, Sacral, Colorado Comprehensive Spine Institute, https://www.coloradospineinstitute.com/education/anatomy/spinal-regions/ (last visited Sept. 14, 2020).

¶ 21, at 5 (asserting that the IME panelists agree with Dr. Saiz' conclusion on this fact)(citing IME Report at 25); Saiz Report at 12.[32]  The crash also aggravated Rawers' previously asymptomatic cervical stenosis, resulting in neck pain.[33]  See Rawers MSJ ¶ 14(a), 17, at 3-4.  Rawers received a "required" three-level anterior cervical discectomy and fusion ("ACDF")[34] because of this neck pain, as well as nerve impingement caused by the crash.  Rawers MSJ ¶ 14(a), at 3.[35] The crash

_____

[32]Rawers proposes as an undisputed material fact a quotation from the IME Report: "Dr. Saiz concluded that the motor vehicle crash of 4/5/16 caused Ms. Rawers' prior asymptomatic cervical degenerative disk disease at C4-5, C5-6, and C6-7 to become permanently symptomatic, and the AIMS panel agrees with this."  Rawers MSJ ¶ 20, at 5.  The United States argues that the fact represents "a quote of a hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report."  U.S. Response ¶ 21, at 7.  As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Saiz' conclusion.  Dr. Saiz' statements in the Saiz Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Saiz stating that he will testify to the Saiz Report's contents at trial.  See Saiz Decl. at 1.  Dr. Saiz states in the Saiz Report that the "motor vehicle accident on 4/5/2016, to a reasonable degree of medical probability, caused Ms. Rawers' prior asymptomatic cervical degenerative disc disease at C4-5, C5-6 and C6-7 to become permanently symptomatic."  Saiz Report at 12.  Because this statement supports Rawers' proposed fact, and because the United States does not specifically controvert it, see U.S. Response ¶ 21, at 7, the Court will adopt Dr. Saiz' conclusion as undisputed.

[34]An ACDF is "a surgery to remove a herniated or degenerative disk in the neck."  Anterior Cervical Disectomy & Fusion, Mayfield Brain & Spine, https://mayfieldclinic.com/pe-acdf.htm (last visited Sept. 14, 2020).

[35]Rawers proposes as an undisputed material fact the following conclusion from the IME Report: "The panel attributed the following to the crash: neck pain, from aggravation of previously asymptomatic spinal degeneration; canal stenosis and nerve impingement required three-level ACDF."  Rawers MSJ ¶ 14 at 3-4 (citing IME Report at ¶ 23).  The United States purports to dispute this fact.  U.S. Response ¶ 14, at 5.  The United States argues that Rawers "relies solely on the unsworn hearsay testimony contained in an expert report."  U.S. Response ¶ 14, at 5.  As discussed above, the IME Report is admissible as non-hearsay.  Because the IME Report supports Rawers' proposed fact, and because the United States does not specifically controvert it, see U.S. Response ¶ 14, at 5, the Court will adopt the IME Report's conclusion as undisputed.

did not aggravate Rawers' pre-existing degenerative disk disease at L3-4.[36] See Rawers MSJ ¶ 22, at 5 (asserting that the IME panelists agree with Dr. Saiz' conclusion)(citing IME Report at 25-26); Saiz Report at 12.[37] Rawers has incomplete spinal fusion at C4-5 and C5-6. See Rawers MSJ ¶ 18, 23, at 5 (the IME Panel agrees with Dr. Saiz' conclusion that there is incomplete fusion at C4-5 and C5-6)(citing IME Report at 25-26); Saiz Report at 13.[38]

---

[36]"The lumbar spine has five vertebrae abbreviated L1 through L5 (largest)." Understanding Spinal Anatomy: Regions of the Spine: Cervical, Thoracic, Lumbar, Sacral, Colorado Comprehensive Spine Institute, https://www.coloradospineinstitute.com/education/anatomy/spinal-regions/ (last visited Sept. 14, 2020).

[37]Rawers proposes as an undisputed material fact a quotation from the IME Report: "Dr. Saiz concluded that the motor vehicle crash of 4/5/16 did not cause aggravation of pre-existing degenerative disk disease at L3-4, and the AIMS panel agrees with this." Rawers MSJ ¶ 22, at 5. The United States argues that the fact represents "a quote of a hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report." U.S. Response ¶ 22, at 8. As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Saiz' conclusion. Dr. Saiz' statements in the Saiz Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Saiz stating that he will testify to the Saiz Report's contents at trial. See Saiz Decl. at 1. Dr. Saiz states in the Saiz Report that the "motor vehicle accident on 4/5/2016, to a reasonable degree of medical probability, did NOT cause aggravation of her preexisting degenerative disc disease at L3-4." Saiz Report at 12 (capitalization in original). Because this statement supports Rawers' proposed fact, and because the United States does not specifically controvert it, see U.S. Response ¶ 22, at 7-8, the Court will adopt Dr. Saiz' conclusion as undisputed.

[38]Rawers proposes as an undisputed material fact a quotation from the IME Report: "After reviewing the cervical spine radiographs taken on 12/4/19, the panel agrees with Dr. Saiz that there is incomplete fusion at C4-5 and C5-6." Rawers MSJ ¶ 23, at 5. The United States argues that the fact represents "a quote of a hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report." U.S. Response ¶ 23, at 8. As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Saiz' conclusion. Dr. Saiz' statements in the Saiz Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Saiz stating that he will testify to the Saiz Report's contents at trial. See Saiz Decl. at 1. Dr. Saiz states in the Saiz Report that Rawers "has evidence of nonunion at C4-5 and C5-6." Saiz Report at 13. Because this statement supports Rawers' proposed fact, and because the United States does not specifically controvert it, see U.S. Response ¶ 23, at 8, the Court will adopt Dr. Saiz' conclusion that Rawers

The crash also caused Rawers' spinal cord stimulator[39] to malfunction, which exacerbated her preexisting condition causing "low back pain and left lower extremity pain."[40]  Rawers MSJ ¶ 14(c), at 4; see also Rawers MSJ ¶ 19, at 5 ("Dr.  Malizzo found that the spinal cord stimulator probably was damaged in" the accident, and "the subsequent care for this was related to the same accident.").  As a result of the damage to the stimulator, Rawers had to undergo surgery for its "replacement and revision."  See Rawers MSJ ¶ 24, at 6; Rauck Report at 8-9.  Future replacements of the system would not be related to the April 5, 2016, crash.  See Rawers MSJ ¶ 24, at 6 (asserting that the IME Panel agreed with Dr.  Rauck's conclusion that the crash damaged the spinal cord stimulator, necessitating replacement and revision)(citing IME Report at 26); Rauck Report at 8-9.[41]  Once the stimulator was properly revised, Rawers reverted to baseline status.  See Rawers

---

has evidence of nonunion at C4-5 and C5-6 as undisputed.

[39]"A spinal cord stimulator is an implanted device that sends low levels of electricity direction into the spinal cord to relieve pain…Spinal cord stimulators consist of thin wires (the electrodes) and a small, pacemaker-like battery pack (the generator).  The electrodes are placed between the spinal cord and the vertebrae (the epidural space), and the generator is placed under the skin, usually near the buttocks or abdomen.  Spinal cord stimulators allow patients to send the electrical impulses using a remote control when they feel pain."  Eellan Sivanesan, M.D., Spinal Cord Stimulator, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/treating-pain-with-spinal-cord-stimulators (last visited Sept. 14, 2020).

[40]Rawers proposes as an undisputed material fact the following conclusion from the IME Report: "The panel attributed the following to the crash: low back pain and left lower extremity pain, from exacerbation of pre-existing condition; requiring removal and replacement of spinal cord stimulator, with wound complications."  Rawers MSJ ¶ 14(c) at 3-4 (citing IME Report at ¶ 23).  The United States purports to dispute this fact.  U.S. Response ¶ 14, at 5.  The United States argues that Rawers "relies solely on the unsworn hearsay testimony contained in an expert report." U.S. Response ¶ 14, at 5.  As discussed above, the IME Report is admissible as non-hearsay. Because the IME Report supports Rawers' proposed fact, see IME Report ¶ 25, and because the United States does not specifically controvert it, see U.S. Response ¶ 14, at 5, the Court will adopt the IME Report's conclusion as undisputed.

[41]Rawers proposes as an undisputed material fact:

MSJ ¶ 20, at 5 (asserting that the IME Panelists agree with Dr.  Saiz' conclusion on this fact)(citing IME Report at 25); Saiz Report at 12 (asserting this fact).[42] The IME Report found that "[a]ll care

---

       The IME Panel agreed with Dr. Rauck who also "found that the MVC of 4/5/16 resulted in damage to the spinal cord stimulator, necessitating replacement and revision.  [Dr. Rauck] also stated that future replacements of the system, beyond 2019 would not be related to the motor vehicle crash of 4/5/16, and the AIMS panel is in agreement with this as well, having also concluded that Ms. Rawers had been restored to her baseline following the February 2018 spinal cord stimulator generator system replacement.

Rawers MSJ ¶ 24, at 6 (citing IME Report at 26).  The United States argues that the fact represents "a quote of a hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report."  U.S. Response ¶ 24, at 8.  As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Rauck's conclusion.  Dr. Rauck's statements in the Rauck Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Rauck stating that he will testify to the Rauck Report's contents at trial.  See Rauck Decl. at 1.  Dr. Rauck states in the Rauck Report that "Ms.  Rawers' motor vehicle accident of April 5, 2016 resulted in her spinal cord stimulator being damaged and required replacement in 2016.  This failed which subsequently required replacement in 2018.  Neither of these replacements/revisions would have been necessary absent the MVA of April 5, 2016."  Rauck Report at 8.  Dr. Rauck also states that "future replacements of the system (beyond 2019) would not be related to the motor vehicle accident of April 5, 2016."  Rauck Report at 9.  Because these statements support Rawers' proposed fact, and because the United States does not specifically controvert it, see U.S. Response ¶ 24, at 8, the Court will adopt Dr. Rauck's conclusions as undisputed.

    [42]Rawers proposes as an undisputed material fact a quotation from the IME Report: "Dr. Saiz concluded that the motor vehicle crash of 4/5/16 caused malfunction of the spinal cord stimulator, and that once the stimulator was properly revised she reverted to baseline status, and the AIMS panel agrees with this."  Rawers MSJ ¶ 20, at 5.  The United States argues that the fact represents "hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report."  U.S. Response ¶ 20, at 7.  As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Saiz' conclusion.  Dr. Saiz' statements in the Saiz Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Saiz stating that he will testify to the Saiz Report's contents at trial.  See Saiz Decl. at 1.  Dr. Saiz states in the Saiz Report that the "motor vehicle accident on 4/5/2016, to a reasonable degree of medical probability, caused malfunction of the spinal cord stimulator, which increased Ms. Rawers prior asymptomatic left leg pain and increased her baseline low back pain.  Once the spinal cord stimulator was revised, she did revert to her baseline status."  Saiz Report at 12.  Because this statement supports Rawers' proposed fact,

for the conditions listed above was reasonable and necessary, and related to the 4/5/16 [motor vehicle collision]." See Rawers MSJ ¶ 15(a), at 4 (citing IME Report at 23).[43]

Rawers is expected to have cervical pain and left upper extremity pain despite future treatment, related to the accident, and she will need future medication and physical therapy to maintain her current level of functioning. See Rawers MSJ ¶ 25, at 6 (asserting that the IME Panel agrees with this conclusion of Dr. Rauck)(citing IME Report at 26); Rauck Report at 9.[44]  Rawers

---

and because the United States does not specifically controvert it, see U.S. Response ¶ 20, at 7, the Court will adopt Dr. Saiz' conclusion as undisputeD.

[43]The United States argues that the fact represents "hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report." U.S. Response ¶ 15, at 5.  Further, the United States contends that "The IME [R]eport does not delineate or define what constitutes '[a]ll care.'"  This is incorrect.  The IME Report does specify which "care" it refers to.  It specifies care for "diagnoses and conditions resulting from the motor vehicle crash on 4/5/16."  IME Report at 23.  It lists the following conditions: (i) "neck pain, from aggravation of previously asymptomatic spinal degenerations; canal stenosis and nerve impingement required three level ACDF; (ii) numbness and tingling in the thumb, index, and long fingers, left hand"; (iii) low back pain and left lower extremity pain, from exacerbation of pre-existing condition; requiring removal and replacement of spinal cord stimulator, with wound complications"; and (iv) "secondary depression, resolved."  As discussed above, the IME Report is admissible as non-hearsay.  Because the IME Report supports Rawers' proposed fact, see IME Report at 23, and because the United States does not specifically controvert it, see U.S. Response ¶ 5, at 5, the Court will adopt the IME Report's conclusion as undisputed.

[44]Rawers proposes as an undisputed material fact that the IME Panel agrees with Dr. Rauck that "Ms. Rawers would be expected to have cervical pain and left upper extremity pain despite future treatment, related to the motor vehicle crash of 4/5/16, and that she would need future medication and physical therapy to maintain her current level of functioning[.]" Rawers MSJ ¶ 25, at 6.  The United States argues that the fact represents "a quote of a hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report." U.S. Response ¶ 25, at 8.  As discussed above, the IME Report is admissible as non-hearsay, and Rawers may introduce its statement that it agrees with Dr. Rauck's conclusion.  Dr. Rauck's statements in the Rauck Report are also acceptable evidence after Rawers attached a sworn declaration from Dr. Rauck stating that he will testify to the Rauck Report's contents at trial.  See Rauck Decl. at 1.  Dr. Rauck states in the Rauck Report that "I would expect Ms. Rawers to continue to have cervical pain and left upper extremity pain despite future treatment.  This pain is related to the motor vehicle accident of April 5, 2016.  I believe she will need future medications

submitted bills totaling $469,902.94 to an expert for a reasonableness analysis, but her reasonable

expenses totaled $381,781.94.   See Rawers MSJ ¶ 26, at 6 (asserting that Rawers incurred

$469,902.94 in medical expenses as a result of the accident and that a reasonableness analysis

suggested this amount should be reduced by $88,131)(citing Schofield Report at 1).[45] The IME

Panel "did not disagree with" these findings in general, but "d[id] not think Ms.  Rawers is

currently in need of surgical fusion revision in the cervical spine.  See Rawers MSJ ¶ 27, at 6

---

and physical therapy to maintain her current level of functioning."  Rauck Report at 8-9.  Because
this statement supports Rawers' proposed fact, and because the United States does not specifically
controvert it, see U.S. Response ¶ 25, at 8, the Court will adopt Dr. Rauck's conclusion as
undisputed.

    [45]The United States disputes this fact and argues that Schofield's report is hearsay, an
opinion rather than a fact, and not material.  See U.S. Response ¶ 26, at 6.  These arguments lack
a sound basis in the law and the case's facts.  After the United States filed the U.S. Response,
Rawers submitted a declaration from Schofield which states under penalty of perjury that she will
testify to the contents of her report at trial.  See Schofield Decl. at 1.  Further, expert witnesses are
allowed to testify in the form of an opinion, and if the United States has specific issues with the
expert's methodology or conclusions, the proper remedy is to file a motion pursuant to Daubert v.
Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The Court always addresses materiality
disputes in the Analysis section.  See SEC v. Goldstone, 2015 WL 5138242, at *27 n.95 (stating
that "relevance is a legal argument that is best left for the Analysis Section").
    The United States also argues that Rawers' proposed fact "misstates the report's content."
U.S. Response ¶ 26, at 9.  It asserts that Schofield does not link any particular bills to Rawers'
accident but instead "merely reviewed the bills that were presented to her by counsel for
reasonableness."  U.S. Response ¶ 26, at 29.  In reply, Rawers asserts that Schofield "has no
obligation to link the 'medical necessity' of the care as the Government's experts have already
done so."  Rawers Reply ¶ 10, at 8.  The Schofield Report states that Rawers' council "submitted
a number of medical bills incurred by your client .  .  .  subsequent to injuries she sustained from
a 04/05/2016" accident.  Schofield Report at 1.  Schofield also states that she "defer[s] to Dr. Saiz'
opinion as to the claim-relatedness of any of the analyzed bills."  Schofield Report at 1.
    As discussed above, Rawers may not rely on the hearsay statements of the IME panelists.
Without the IME Panel's hearsay statements, Rawers has not proven that her medical bills are
linked to the accident and necessary, but only that she had certain medical expenses after April 5,
2016.  Accordingly, the Court modifies Rawers' proposed fact to reflect that she has submitted
$469,902.94 in expenses for review and not that Rawers has $469,902.94 in medical expenses
linked to the accident.

(citing IME Report at 26).[46]

## PROCEDURAL BACKGROUND

Rawers filed her Complaint in Federal Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346.  See Complaint ¶ 1, at 1.  Rawers alleges that Skinner-Ramp, a Postal Service mailwoman, negligently crashed into Rawers' car, causing her significant injury.  See Complaint ¶¶ 6-12, at 2-3.  The Complaint contains one count: "Negligence Resulting in Personal Injury Damages and Property Damages."  Complaint at 7.  The United States filed a motion to dismiss Rawers' claims against Skinner-Ramp, because plaintiffs may bring Federal Tort Claims Act claims only against the United States and not against individual employees.  See Unopposed Motion to Dismiss Claims Against Defendant Clarissa Skinner-Ramp, filed August 21, 2019 (Doc. 28)("Partial MTD").  The Court granted the Partial MTD.  See Order Granting Unopposed Motion to Dismiss Claims Against Defendant Clarissa Skinner-Ramp, filed September 20, 2019 (Doc. 31).

### 1.    The U.S. MSJ.

Following discovery, the United States filed for summary judgment.  See U.S. MSJ at 1. The United States argues that, before a plaintiff may sue under the Federal Tort Claims Act,  he or she must filed a claim with the appropriate agency.  See U.S. MSJ at 4.  It contends that the plaintiff must file this claim within two years of its accrual, and the plaintiff may not sue in federal court

---

[46]The United States argues that the fact represents "hearsay opinion contained in an unsworn expert report that characterizes a hearsay opinion in another unsworn expert report."  U.S. Response ¶ 27, at 9.  As discussed above, the IME Report is admissible as non-hearsay.  Because the IME Report supports Rawers' proposed fact, see IME Report at 26, and because the United States does not specifically controvert it, see U.S. Response ¶ 27, at 9, the Court will adopt the IME Report's conclusion as undisputed.

until either the claim is "'finally denied'" by the agency or the agency does not issue a final disposition.  U.S. MSJ at 4 (quoting 28 U.S.C. 2675(a)).

The United States notes that Rawers filed the Rawers SF-95 with the Postal Service in December 2017, and a second SF-95 Form in October, 2018.  See U.S. MSJ at 4-5.  It argues that the second SF-95 Form amended the first SF-95 Form.  See U.S. MSJ at 5 (citing 28 C.F.R. § 14.2(c)).  It cites several courts that have concluded that increasing the money claimed is an amendment under 28 C.F.R. § 14.2.  See U.S. MSJ at 6 (citing Lopatina v. United States, 528 F. App'x 352, 356 (4th Cir. 2013)(unpublished); Weston v. United States, No. 1:15CV84, 2015 WL 5511133, at *9 (M.D.N.C. Sept. 17, 2015)(Osteen, J.); Robinson v. United States, 746 F. Supp. 1059, 1063 (D. Kan. 1990)(Rogers, J.)).  The United States asserts that federal regulations give an agency "'six months in which to make a final disposition of the claim as amended.'"  U.S. MSJ at 5 (quoting 28 C.F.R. § 14.2(c)).  The United States argues that the October, 2018, SF-95 Form is an amendment, because it increased the sum certain demand, updated a description of the alleged injury, was delivered to the agency before its final decision, and was in writing from the plaintiff's legal representative.  See U.S. MSJ at 6.  The United States also asserts that the Postal Service considered the letter an amendment, and courts should defer to the agency's determination.  See U.S. MSJ at 6-7 (citing Wright v. City of Santa Cruz, No. 13-CV-1230 BLF, 2014 WL 3058470, at *5 (N.D. Cal. July 3, 2014)(Freeman, J.)).

The United States argues that, because Rawers' second SF-95 Form was an amendment, it restarted the clock for consideration, and she was not permitted to file suit before six months elapsed.  See U.S. MSJ at 7.  The United States says this bar is jurisdictional, and the Court must dismiss Rawers' suit.  See U.S. MSJ at 7 (citing McNeil v. United States, 508 U.S. 106, 113 (1993);

Haceesa v. United States, 309 F.3d 722, 733 (10th Cir. 2002)).  It cites Lucero v. United States, No. CIV 17-0634 SCY/JHR, 2019 WL 2869059, at *2 (D.N.M. July 3, 2019)(Yarbrough, M.J.), which also dismissed a lawsuit filed under the Federal Tort Claims Act for failing to wait six months after filing for reconsideration.  See U.S. MSJ at 7-8.  The United States asserts that the United States Court of Appeals for the Tenth Circuit has held that the regulations in 28 C.F.R. § 14 are jurisdictional.  See U.S. MSJ at 8 (citing Kendall v. Watkins, 998 F.3d 848, 852-53 (10th Cir. 1993); Cizek v. United States, 953 F.2d 1232, 1233 (10th Cir. 1992)).  It notes that the Tenth Circuit has "consistently enforced presentment regulations as jurisdictional."  U.S. MSJ at 8 (citing Hart v. Dep't of Labor, 116 F.3d 1338, 1340-41 (10th Cir. 1997)).  The United States therefore requests that the Court dismiss Rawers' claim for lack of subject-matter jurisdiction.  See U.S. MSJ at 9.

## 2.    **The Rawers MSJ.**

Rawers also files for partial summary judgment and asks the Court to grant summary judgment on whether Skinner-Ramp committed negligence, leaving only damages for resolution at trial.  See Rawers MSJ at 1, 10.  Rawers argues that Skinner-Ramp was acting negligently per se, because she violated a traffic statute immediately before the crash.  See Rawers MSJ at 7-8. She asserts that Skinner-Ramp's conduct meets negligence per se's four elements: (i) a statute prescribing actions or defining a standard of conduct; (ii) violation of that statute; (iii) plaintiff being in the class of persons that the statute protects; and (iv) the injury must be of the type the legislature sought to prevent.  See Rawers MSJ at 8 (citing Apodaca v. AAA Gas Co., 2003-NMCA-85, ¶ 43, 73 P.3d 215, 231).

Rawers argues that N.M. Stat. Ann. § 66-7-330, which requires that vehicles stop at stop

signs and yield to others with the right of way, and N.M. Stat. Ann. § 66-8-114(A), which requires

that a driver "give his full time and entire attention to the operation of the vehicle," were in effect

on the collision's date.  Rawers MSJ at 8-9.  Rawers argues that Skinner-Ramp violated these

statutes, because Skinner-Ramp was inattentive and did not yield to her, even though she had the

right of way.  See Rawers MSJ at 9.  Rawers argues that the New Mexico Legislature enacted these

statutes to protect drivers on the roads and that she was in that protected class when the accident

occurred.  See Rawers MSJ at 9.  Finally, Rawers argues that "'it is foreseeable that violations of

a traffic rule may cause accidents,'" Rawers MSJ at 9 (quoting Kelly v. Montoya, 1970-NMCA-

063, ¶ 17, 470 P.2d 563, 566), and that "all the defense's medical doctors in this case agree with

Plaintiff's experts and opine that the injuries and past medical care that Plaintiff received were

caused by and attributable to the automobile accident," Rawers MSJ at 10.

**3.      The Rawers Response.**

Rawers responds to the U.S. MSJ, and she argues that the Court has subject-matter

jurisdiction and that the Court should award sanctions under 28 U.S.C. § 1927.  See Plaintiff's

Response to Defendant's Summary Judgment Motion [Doc. #56], at 1, filed June 1, 2020

(Doc. 61)("Rawers Response").  She first argues that, although violating 28 U.S.C. § 2675(a)

jurisdictionally bars claims, violating 28 C.F.R. § 14.2 does not divest courts of subject-matter

jurisdiction.  See Rawers Response at 3 (citing Seals v. United States, 319 F. Supp. 2d 741, 744-

45, (W.D. Tex. 2004)(Yeakel, J.)); id. at 9-11 (citing Transco Leaving Corp. v. United States, 896

F.2d 1435, 1442 (5th Cir. 1990); Knapp v. United States, 844 .2d 376, 378 (6th Cir. 1988); GAF

Corp. v. United States, 818 F.2d 901, 918-19 (D.C. Cir. 1987); Douglas v. United States, 658 F.2d

445, 447-48 (6th Cir. 1981); Adams v. United States, 615 F.2d 284, 290 (5th Cir. 1980); Marricone

v. United States, 687 F. Supp. 874, 876 (E.D. Pa. 1988)(Broderick, J.)).  Rawers argues that

Congress cannot delegate to an agency the power to limit federal subject-matter jurisdiction.  See

Rawers Response at 11 (citing Miller v. FCC, 66 F.3d 1140, 1144 (11th Cir. 1995); Warren v. U.S.

Dep't of Interior, 724 F.2d 776, 778 (9th Cir. 1984)).  She asserts that, because her failure to follow

the regulations did not impede the United States' ability to investigate and she otherwise "'satisfied

the minimal notice requirements of 28 U.S.C. § 2675(a), jurisdiction is proper over the action.'"

Rawers Response at 12 (quoting Zywicki v. United States, CIV.A. No. 88-1501-T, 1991 WL

128588, at *3 (D. Kan. June 20, 1991)(Theis, J.)).

Rawers then argues that she satisfied 28 U.S.C. § 2675(a)'s jurisdictional requirements.

See Rawers Response at 12.  She contends that this statute requires only a written statement

describing the injury sufficient to allow the agency to begin its investigation and a sum certain

damages claim.  See Rawers Response at 12.  She argues that her SF-95 Form contains both of

these requirements.  See Rawers Response at 13.

Rawers also argues that the Court should not consider the September 28, 2018, settlement

letter an amendment for five reasons.  See Rawers Response at 13.  First, she argues that providing

new information and increasing the settlement demand does not constitute an amendment, and

Congress did not intend to make FTCA recovery so technical.  See Rawers Response at 13 (citing

Rosario-Gonzalez v. United States, 544 F. App'x 5, 7-8 (1st Cir. 2013)(unpublished); Dynamic

Image Technologies, Inc. v. United States, 221 F.3d 34, 40 (1st Cir. 2000)).  Second, Rawers

argues that the settlement letter does not suggest new facts or new theories of liability that required

the United States to alter its investigation.  See Rawers Response at 14.  Third, Rawers asserts that

the United States is not prejudiced or deprived of its six-month investigation period, because she

filed suit thirteen months after first submitting her SF-95 Form.  See Rawers Response at 14.
Fourth, Rawers argues that "the Government's 'amendment' argument cannot be reconciled with
the Government's own actions," because the United States continued to submit all communications
to Rawers' former counsel despite having notice Rawers had retained new counsel.  See Rawers
Response at 15.  Rawers argues that sending communications to her former attorney "establishes
that the Government really viewed the undersigned's letter as part of original claim, not an
amendment."  Rawers Response at 15 (emphasis in original).  Finally, Rawers argues that
construing the settlement letter as an amendment is contrary to Congress' purposes in enacting the
Federal Tort Claims Act: (i) easing court congestion while allowing the United States to fairly
settle claims; and (ii) providing plaintiffs with a fair system to deal with the government.  See
Rawers Response at 15-16 (citing Adams v. United States, 615 F.2d 284, 288 (5th Cir. 1980)).
Rawers argues that, if the United States is correct, whenever a claimant seeks to resolve the claim
by submitting additional medical expenses, he or she would have to wait an additional six months.
See Rawers Response at 16.  Rawers says that seriously injured claimants cannot afford this delay.
See Rawers Response at 16.

Next, Rawers argues that the United States misconstrues the law regarding amendments.
See Rawers Response at 16.  She argues that Estate of Trentadue, 397 F.3d 840, 852 (10th Cir.
2005), "does not mention 28 C.F.R. § 14.2(a)," that Weston v. United States does not hold that a
substantial increase in a sum certain claim constitutes an amendment, and that 28 C.F.R. § 14.2(a)
does not contain presentment requirements.  Rawers Response at 17 (emphasis in original).
Rawers also clarifies that 28 U.S.C. § 2675(a), and not 28 C.F.R. § 14.2, sets a jurisdictional
requirement of a sum certain figure.  See Rawers Response at 18.

Rawers also argues that the United States has waived its statute of limitations defense, because it did not serve either Rawers or her counsel with the denial letter. See Rawers Response at 19. This failure to serve, she argues, violates 28 U.S.C. § 2401(b), and "is fatal to the Government's Summary Judgment Motion." Rawers Response at 20 (citing Adams v. United States, 658 F.3d 928, 934 (9th Cir. 2011)). She asserts that the United States is hypocritical, because it argues that the Court should construe the Code of Federal Regulations' jurisdictional requirements strictly but construe the Federal Tort Claim Act's jurisdictional notice requirement loosely "depending on which is more advantageous to the Government's legal goal of dismissal." Rawers Response at 20. She argues that service on Rawers' former counsel was insufficient, because 28 U.S.C. § 2401 does not mention the term "legal representative," and the former counsel was not an attorney. See Rawers Response at 21.

Rawers then requests that the Court impose sanctions on the United States. See Rawers Response at 21. She argues that, in Stevens v. United States, No. CR 17-0688 WJ\SCY, 2019 WL 1386732 (D.N.M. March 27, 2019), the Honorable William Johnson, Chief United States District Judge for the United States District Court for the District of New Mexico, told the United States that he would have expected the United States to raise "an administrative exhaustion issue early in the case, before general discovery had taken place and sometime during the year and a half this case had been sitting on the Court's docket." 2019 WL 1386732, at *1. Rawers argues that the United States has once again waited until the case's end to argue both that she filed too early and that it is too late to refile. See Rawers Response at 22-23. She asserts that the United States knew about these jurisdictional arguments at the beginning of the case, but it chose not to address them until now. See Rawers Response at 23. Rawers argues that this conduct requires the Court to

impose sanctions to discourage the United States from acting similarly again.  See Rawers Response at 24.

> ### 4.    **The U.S. Response.**

The United States responds to the Rawers MSJ, and it argues that Rawers has failed to establish a prima facie case for summary judgment.  See Defendant's Response in Opposition to Plaintiff's Motion For Partial Summary Judgment, filed June 9, 2020 (Doc. 63)("U.S. Response"). First, the United States argues that, because Rawers does not plead negligence per se in her Complaint, the Court may not grant summary judgment.  See U.S. Response at 16.  The United States notes that "negligence per se" does not appear anywhere in the Complaint and that Rawers does not identify any statute that Skinner-Ramp violated.  U.S. Response at 16-17.  The United States then cites cases concluding that pleading requirements under rule 8 of the Federal Rules of Civil Procedure require plaintiffs to allege the statute relied on for negligence per se.  See U.S. Response at 17 (citing Estrada v. Indus. Transit Inc., No. 4:16-CV-013-DAE, 2016 WL 3360531, at *3 (W.D. Tex. June 14, 2016)(Ezra, J.); Holler v. Cinemark USA, Inc., 185 F. Supp. 2d 1242, 1244 (D. Kan. 2002)(Vratil, J.)).  The United States also notes, however, that some courts have held that the failure to identify specific statutes can be cured if the complaint alleges conduct that clearly violates a statute, see U.S. Response at 17 (citing Welch v. Loftus, 776 F. Supp. 2d 222, 226 (S.D. Miss. 2011)(Reeves, J.)), and it cites a case from the Court that so held, Leon v. FedEx Ground Package Systems, Inc., No. CIV 13-1005 JB/SCY, 2016 WL 1158079, at *10 (D.N.M. March 1, 2016)(Browning, J.), see U.S. Response at 17.  That case also concerned a car crash, and the United States argues that the Court concluded that the defendant was put on notice even though no statute was mentioned, because the Complaint alleged that the defendant had "'breached its

duty of care in a manner that was negligent per se.'"  U.S. Response at 18 (quoting Complaint to Recover Damages for Personal Injury & Wrongful Death (Jury Trial Demanded), filed June 9, 2020 (Doc. 63-1)).  The United States argues that, unlike Welch v. Loftus and Leon v. FedEx Ground Package Systems, Inc., Rawers has not provided notice of its negligence per se theory.  See U.S. Response at 19.  It asserts that there is no allegation that Skinner-Ramp violated any law and that it is unprepared to defend a summary judgment claim that was not pled.  See U.S. Response at 19.

The United States also argues that Rawers has not established a prima facie case supporting summary judgment.  See U.S. Response at 20.  It provides two reasons that Rawers has not established her case: (i) Rawers, the United States argues, relies on inadmissible hearsay; and (ii) the facts that she asserts do not prove every element of negligence per se.  See U.S. Response at 21.  The United States asserts that Rawers' support for her assertion that Skinner-Ramp violated a statute relies entirely on "the hearsay affidavit of Officer Allen" and that her causation proof is similarly based on four, unsworn hearsay expert reports.  U.S. Response at 21.

Regarding the elements of negligence per se, the United States argues that Rawers does not assert as undisputed material fact that Skinner-Ramp did not stop or was inattentive.  See U.S. Response at 22.  Instead, the United States notes that Rawers relies entirely on the Allen Report which states that Skinner-Ramp drove through the stop sign.  See U.S. Response at 22.  The United States asserts that Skinner-Ramp's statements in the Allen Report contradict this conclusion, because she states in the Allen Report that she stopped at the stop sign.  See U.S. Response at 22. The United States also says that Rawers' arguments that she is in the class of persons that the New Mexico Legislature seeks to protect with its safe-driving statutes are conclusory and insufficient.

<u>See</u> U.S. Response at 23.  The United States then asserts that Rawers has not proven with her expert medical reports that the incident caused her injuries, because doctors who did not witness the accident wrote all the reports.  <u>See</u> U.S. Response at 23.  Last, the United States clarifies that the IME panel concludes that Rawers' medical bills are reasonable, and not that they were attributable to the accident.  <u>See</u> U.S. Response at 24.

>    **5.    <u>The Rawers Reply</u>.**

Rawers replies to the U.S. Response and reaffirms that she has set forth a tenable basis for partial summary judgment on her negligence per se claim.  <u>See</u> Plaintiff's Reply to Motion for Partial Summary Judgment, filed June 12, 2020 (Doc. 64)("Rawers Reply").  After discussing issues surrounding the admissibility of her proposed witnesses' statements, <u>see</u> Rawers Reply at 8-18, Rawers argues that negligence per se is a subset of negligence and may be determined properly at the summary judgment stage, <u>see</u> Rawers Reply at 18.  She argues that the United States is insisting on a "hyper technical definition" to avoid summary judgment and cites cases suggesting that she does not need to allege specifically negligence per se when alleging negligence. <u>See</u> Rawers Reply a 19 (citing <u>Stafford v. DeSoto Acquisition & Dev. Corp.</u>, No. 3:15-CV-0140-DMB-JMV, 2017 WL 61941 (N.D. Miss. Jan. 5, 2017)(Brown, J.)("Though Stafford argues negligence per se in response to the summary judgment motion, no express negligence per se claim appears to be alleged in her complaint. However, 'negligence per se is a subset of negligence in general . . .'" (quoting <u>Snapp v. Harrison</u>, 699 So. 2d 567, 571 (Miss. 1997)); <u>Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.</u>, 1988-NMSC-014, ¶ 21, 750 P.2d 118, 124 ("Negligence per se, however, is a method of proving negligence where a cause of action already exists")).

Rawers notes that the United States District Court for the District of New Mexico has spoken on this issue.  See Rawers Reply at 19.  She asserts that the Honorable Gregory Wormuth, United States Magistrate Judge for the District of New Mexico, concluded that, "'[u]nder New Mexico law . . . as in many states, negligence per se is not technically a separate cause of action. Rather, it is a method of proving negligence where a cause of action already exists.'"  Rawers Reply at 19 (citing Gatewood v. Estate of Thompson, No. CIV 19-0573 GBW\CG, 2019 WL 4889161 (D.N.M. Oct. 3, 2019)(Wormuth, M.J.)).  Relatedly, Rawers argues that the United States misconstrues Leon v. FedEx Ground Package Systems, Inc., because it "stands for the proposition that Plaintiff was not required to plead strict, hyper technical allegations in order for negligence per se against the Government to be granted as a matter of law."  Rawers Reply at 20.  Rawers asserts that, as in Leon v. FedEx Ground Package Systems, Inc., she has pled facts giving rise to and supporting a negligence per se claim.  See Rawers Reply at 20-21.

### 6.   **The Hearing**.

The Court held a hearing on the U.S. MSJ and the Rawers MSJ on June 15, 2020.  See Clerk's Minutes at 1, filed June 15, 2020 (Doc. 69).  The parties argued the U.S. MSJ first.  See Transcript of Hearing at 2:23-3:6 (taken June 15, 2020)(Cunniff)("Tr.").[47]  The Court took the U.S. MSJ and the Rawers MSJ under advisement.  See Clerk's Minutes at 1-2.

### a.   **Argument Concerning the U.S. MSJ**.

The parties first addressed, for the U.S. MSJ, whether Rawers' September 28, 2018, letter constitutes an amendment  See Tr. at 2:23-3:6 (Cunniff).  The Court asked how changing only the

---

[47]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

amount sought constitutes an amendment, see Tr. at 3:11-4:5 (Court), and the United States noted that, although the injury's source remains the same, damages figures in administrative proceedings under the Federal Tort Claims Act are different than regular tort claims, see Tr. at 4:6-13 (Cunniff). The United States said that the damages in an SF-95 Form cap the amount a litigant can later recover in court and that, in this case, Rawers also added a new surgical procedure that she had had since her last communication with the Postal Service.  See Tr. at 5:4-21 (Cunniff).  The Court asked whether the letter altered the United States' decision-making process.  See Tr. at 6:12-13 (Court).  The United States replied that "the Government would see that administrative amendment and recognize that another six months was available to the Government under this regulation."  Tr. at 6:23-7:1 (Cunniff).  The United States added that, if it had received the Sept. 28 Letter without any previous SF-95 Form, it would have considered the Sept. 28 Letter a claim, which is further evidence that the Sept. 28 Letter is an amendment.  See Tr. at 8:11-9:3 (Cunniff).

The United States identified McNeil v. United States as its best case, see Tr. at 9:20-10:20 (Cunniff), and also cited Lopatina v. United States, Weston v. United States, and Robinson v. United States as very helpful, see Tr. at 10:20-23 (Cunniff).  The United States then characterized Weston v. United States, arguing that it holds that a substantial increase in the requested sum constitutes an amendment.  See Tr. at 11:2-9 (Cunniff).  The United States also argued that Rosario-Gonzalez v. United States, which Rawers cites in the Rawers Response, should be limited to its facts.  See Tr. at 11:10-12:12 (Cunniff).  The United States characterized the law in this area as "pretty cle[ar]" and said that, where a sum certain or description of injury changes, the agency is allowed to consider such new information an amendment.  Tr. at 12:13 (Cunniff).  See id. at 12:12-13:4 (Cunniff).

Next, the United States discussed 28 C.F.R. § 14.2(c).  See Tr. at 13:7 (Cunniff).  It argued that there is no reason under Tenth Circuit precedent that the regulation should not be enforced as written and that out-of-circuit authority suggesting that the regulation is not jurisdictional "isn't particularly helpful."  Tr. at 13:24 (Cunniff).  See id. at 13:7-14:2 (Cunniff).  It noted that the Tenth Circuit considers presentment regulations to be jurisdictional, see Tr. at 14:12-17 (Cunniff)(citing Hart v. Dep't of Labor, 116 F.3d at 1340-41), and argued that Seals v. United States, although on point, is only an application of an unpublished United States Court of Appeals for the Fifth Circuit opinion and is therefore unpersuasive, see Tr. at 14:23-15:7 (Cunniff).  The United States then distinguished Adams v. United States as concerning " a much different regulation with respect to the conduct of these administrative settlement processes" than 28 C.F.R. § 14.2(c).  Tr. at 17:25-2 (Cunniff).  To distinguish Seals v. United States, again, the United States argued that Rawers submitted the Sept. 28 Letter of her own volition, without the Postal Service requesting her to submit it.  See Tr. at 18:20-19:12 (Cunniff).

In response to the Court's inquiry how Rawers could have communicated the new information without amending her claim, the United States agreed that it would have been best if she had written on the letter that it was not an amendment.  See Tr. at 15:17-16:2 (Court, Cunniff).  The United States also agreed that, had Rawers not sent an increased amount but simply filed a lawsuit seeking her increased claim, she would be limited to seeking damages up to her original claim.  See Tr. at 16:3-17:4 (Court, Cunniff).  The United States also asserted that 28 U.S.C. § 2867(b) provides how a claimant should navigate changing circumstances of his or her claim.  See Tr. at 20:2-8 (Cunniff).  It also directed the Court to Redlin v. United States, 921 F.3d 1133,

1140 (9th Cir. 2019), for a persuasive method of interpreting congressional intent on this issue. See Tr. at 20:8-22 (Cunniff).

Next, the United States countered Rawers' argument that, because the agency denied her claim after her lawsuit, the United States is not entitled to summary judgment on its administrative exhaustion argument. See Tr. at 20:23-21:4 (Cunniff). The United States cited McNeil v. United, 508 U.S. at 111-12, to argue that the Court should assess jurisdiction as of the time the Complaint was filed and not consider what happened afterwards. See Tr. at 21:4-19 (Cunniff). Finally, regarding Rawers' request for sanctions, the United States asserted that Rawers had not discussed them in a motion, or at a meet-and-confer conference. See Tr. at 21:20-24 (Cunniff). The United States said that the facts necessary to support sanctions are not present in Rawers' brief, and it had acted in good faith throughout the litigation. See Tr. at 21:25-22:8 (Cunniff).

Rawers then responded and first addressed whether her Sept. 28 letter constitutes an amendment. See Tr. at 23:25-24:17 (Court, O'Connell). She argued that cases change all the time and parties ordinarily may amend complaints to seek increased amounts. See Tr. at 25:13-24 (O'Connell). Rawers added that she was trying only to resolve the administrative process, but the United States did not respond to new counsel and instead sent letters to Rawers' old counsel. See Tr. at 25:24-26:16 (Court, O'Connell). Rawers stated that she was trying only to inform the United States that she had had an unexpected surgery since her last filing that was related to her injury. See Tr. at 27:15-28:2 (O'Connell). Rawers also noted that the two courts that have considered this issue have both concluded that 28 C.F.R. § 14.2(c) is not jurisdictional. See Tr. at 29:1-17 (O'Connell)(citing Seals v. United States and Rosario-Gonzalez v. United States).

Rawers next discussed the amendment's plain meaning.  See Tr. at 29:25-30:8 (Court, O'Connell).  She argued that changing parties, and alleging different theories or causes of action, are traditionally considered amendments, see Tr. at 30:17-23 (O'Connell), but that the Court would not consider an increased demand from $1 million to $3.5 million to be an amendment under rule 15 of the Federal Rules of Civil Procedure, see Tr. at 30:23-31:14 (O'Connell).  The Court asked why it matters whether the regulation was jurisdictional, see Tr. at 32:6-19 (Court), and Rawers argued that caselaw says "that the jurisdictional authority for the United States courts is addressed solely in the statute, not in the regulations."  Tr. at 32:21-25 (O'Connell).  Rawers cited Zywicki v. United States and Warren v. United States Department of Interior as holding that similar regulations are jurisdictional.  See Tr. at 33:1-15 (O'Connell).  She also noted that more recent cases had reached a similar conclusion, see Tr. at 33:22-34:24 (O'Connell)(citing Estate of Trentadue, 397 F.3d at 852), although the Tenth Circuit has not squarely addressed this issue, see Tr. at 35:11-36:21 (O'Connell)(citing Draughon v. United States, 103 F. Supp. 3d 1266, 1276 (D. Kan. 2015)(Robinson, J.)).

Rawers then rebutted the Reply.  See Tr. at 37:3 (O'Connell).  She reiterated that the Tenth Circuit has not decided this issue, see Tr. at 37:3-23 (O'Connell), and added that the Ninth Circuit has concluded that similar regulations are not jurisdictional, see Tr. at 38:21-39:4 (O'Connell).  In response to a question from the Court, Rawers discussed the policy behind not considering administrative regulations to be jurisdictional.  See Tr. at 39:5-40:5 (Court, O'Connell).  Rawers stated that the reason is "very simple.  If Congress had wanted to delegate its ability to limit or expand subject-matter jurisdiction it would have given that [to the] agency directly."  Tr. at 40:17-

20 (O'Connell).  She concluded that these regulations were designed for settlement, not for limiting subject-matter jurisdiction and access to courts.  See Tr. at 40:20-41:3 (O'Connell).

The United States spoke again.  See Tr. at 41:17 (Cunniff).  It agreed that the Ninth Circuit has not concluded that the administrative regulations were jurisdictional, and it said that it cites to Redlin v. United States only for its discussion of the correlation between 28 C.F.R. § 14.2(c) and 28 U.S.C. § 2675(a).  See Tr. at 41:17-42:8 (Cunniff).  The United States then noted that district court cases, such as Zywicki v. United States and Robinson v. United States are not binding and concern a different regulation, 28 C.F.R. § 14.4(b).  See Tr. at 42:13-20 (Cunniff).  This regulation, the United States added, is less correlated to the statute from which the agency derived it.  See Tr. at 42:20-43:10 (Cunniff).  The United States also added that Federal Tort Claims Act litigation is very different than "garden variety torts" cases and that the Court should consider this context when evaluating the sum certain requirement in the regulations.  Tr. at 43:12-44:1 (Cunniff).  Finally, the United States argued that amending a claim often involves increasing the claim amount, and that alleging a different injury is making a new claim that requires a new SF-95 Form.  See Tr. at 44:2-18 (Cunniff).

### b.   Argument Concerning the Rawers MSJ.

The parties then turned to the Rawers MSJ.  See Tr. at 45:2-4 (Court, O'Connell).  Before entertaining argument, the Court stated its inclination that sanctions are not appropriate, because plaintiffs often want discovery to proceed and want the Court to not stay their cases when defendants file dispositive motions, and sometimes getting a dispositive motion such as this one at the end of discovery is beneficial to plaintiffs.  See Tr. at 47:25-48:3 (Court).  Rawers noted that a main reason she filed for sanctions was to remind the United States that, in situations such as

these, waiting to assert this affirmative defense is not beneficial to plaintiffs, and Chief Judge

Johnson recently criticized the United States for similar behavior.  See Tr. at 48:3-14 (O'Connell).

Rawers then argued the Rawers MSJ.  See Tr. at 49:13 (O'Connell).

Rawers stated that there is no significant dispute concerning the case's events, because the

medical experts all agree to her injuries' scope.   See Tr. at 49:13-23 (O'Connell).   She

characterized the United States' counterarguments as procedural rather than substantive.  See Tr.

at 49:23-50:2 (O'Connell).  Rawers admitted that the Court had previously stated that an expert

report without a declaration is not permissible in a summary judgment proceeding and that her

experts do not have a declaration.  See Tr. at 50:3-51:2 (O'Connell).  She argued, however, that

she could rely on the United States' experts to compensate for this deficiency and stated that the

question is whether the United States "can walk away from its own expert witnesses and their

reports in this case."  Tr. at 51:2-5 (O'Connell).  While Rawers stated that she had not seen this

issue addressed, she argued that the United States submitted its expert reports intending that she

rely on them and intending that they be the core of its defense.  See Tr. at 51:5-25 (O'Connell).

She noted that these experts were all on the United States' witness list in the pretrial order.  See

Tr. at 51:25-52:4 (O'Connell).

The United States then responded.  See Tr. at 52:15 (Cunniff).  The United States asserted

that, contrary to Rawers' argument, liability is at issue, because Skinner-Ramp and Rawers have

different accounts of the accident.  See Tr. at 52:24-53:4 (Cunniff).  It added that Rawers has the

burden at the summary judgment stage, and she has fallen short by providing evidence only from

a hearsay affidavit.  See Tr. at 53:4-15 (Cunniff).  The Court suggested that, in the past, it had

allowed experts to swear to the material in their expert reports at the summary judgment stage,

which avoids the hearsay issue.  See Tr. at 53:16-54:13 (Court).  The United States said that, "perhaps it does" work for Rawers' experts, but there is no affidavit for the IME panelists, and the Allen Aff. is not based on his personal observations and is therefore inadmissible.  Tr. at 54:14 (Cunniff).  See id. at 54:15-55:11 (Cunniff).  It argued that Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193 (10th Cir. 2006), held that this personal knowledge standard applies to police officers.  See Tr. at 55:16-21 (Cunniff).  The admissibility of the officer's testimony is, the United States argues, "an open and shut" issue.  Tr. at 57:18 (Cunniff).  The United States argued, therefore, that Rawers needs more than a hearsay affidavit to support negligence's breach and duty elements.  See Tr. at 56:2-18 (Cunniff).

The United States said that Rawers' "lackadaisical approach to substantiating summary judgment is carried through the motion."  Tr. at 56:19-20 (Cunniff).  The United States contends that almost all of Rawers' substantive paragraphs cite expert reports from the United States' IME panel.  See Tr. at 56:21-57:10 (Cunniff).  It argued that Rawers has the burden on her summary judgment motion, and she has not proven duty and breach.  See Tr. at 57:11-58:15 (Cunniff).  Regarding causation, the United States conceded that Rawers' argument is stronger, but it maintained that it was still based entirely on a hearsay affidavit.  See Tr. at 58:15-22 (Cunniff).

The United States then argued that Rawers was required to plead negligence per se.  See Tr. at 58:23-58:25 (Cunniff).  The Court indicated that it disagreed and suggested that a negligence per se theory, like a res ipsa loquitor theory, might need to be disclosed in a pretrial order, but would not need to be pled in a complaint.  See Tr. at 59:1-17 (Court, Cunniff).  The United States argued, nevertheless, that plaintiffs have a duty to plead these issues with specificity.  See Tr. at 59:18-22 (Cunniff).  It discussed Leon v. FedEx Ground Package Sys., Inc. and argued that the

Court held that the plaintiff's theory could survive because the plaintiff pled negligence per se, even though the specific statute was not pled. <u>See</u> Tr. at 60:16-21 (Cunniff). This ruling, the United States asserted, accords with "a number of other federal district courts." Tr. at 60:22-23 (Cunniff). In response to the Court's questioning, the United States admitted that it had not sent an interrogatory on this issue. <u>See</u> Tr. at 61:8-17 (Court, Cunniff). It argued in its defense that the Complaint did not notify it that this sort of interrogatory was necessary. <u>See</u> Tr. at 61:17-22 (Cunniff). Finally, it asserted that negligence per se presents "a different inquiry," Tr. at 61:22-23 (Cunniff), and that knowing these allegations would have changed how it took and defended depositions, <u>see</u> Tr. at 61:23-62:9 (Cunniff).

Rawers then presented her final arguments. <u>See</u> Tr. at 62:15 (O'Connell). First, she argued that the Allen Aff. is not based on hearsay evidence, because it relies on the statements of Rawers as well as Skinner-Ramp, who is a party opponent. <u>See</u> Tr. at 62:15-23 (O'Connell). She added that it is undisputed that Rawers was not acting negligently. <u>See</u> Tr. at 62:24-63:12 (O'Connell). Rawers stated that the United States' argument that she has pled negligence per se in the Complaint is not consistent with the Court's previous rule 8 opinions, which do not require pleading specific statutory support. <u>See</u> Tr. at 63:13-24 (O'Connell). Rawers added that she mentioned Skinner-Ramp's "failure to yield" at several points in the Complaint. Tr. at 63:24-64:12 (O'Connell). She noted that the Supreme Court of New Mexico in <u>Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.</u>, called negligence per se "a subset of negligence." Tr. at 64:17 (O'Connell). Rawers admitted that she had taken an unconventional and perhaps incorrect approach, but she said that she cited the United States' experts "because they can't controvert that." Tr. at 65:8 (O'Connell). Rawers

said that the opinions of the United States' experts showed that there was no issue of fact that requires a trial on all the elements.  See Tr. at 65:8-19 (O'Connell).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.) (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Sch.)).   See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[48]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary

---

[48]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party

opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at

1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that

summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's

version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*
> *Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).
> "[T]he mere existence of *some* alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*
> *Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different
> stories, one of which is blatantly contradicted by the record, so that no reasonable
> jury could believe it, a court should not adopt that version of the facts for purposes
> of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent
> was driving in such fashion as to endanger human life. Respondent's version of
> events is so utterly discredited by the record that no reasonable jury could have
> believed him. The Court of Appeals should not have relied on such visible fiction;
> it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8. Parties may allege new claims in motions for summary judgment. Evans v. McDonald's Corp., 936 F.2d at 1090-91. When this occurs, courts treat the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quotation marks omitted). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING RULE 56(C)(4)

Rule 56(c)(4) states that, when supporting a factual position for summary judgment's purposes' an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). After the 2010 revisions to the Federal Rules of Civil Procedure, parties are no longer required to prepare a formal affidavit, as 28 U.S.C. § 1746 "allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Generally, "'[t]he court and the parties have great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding.'" Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015), as amended (June 24, 2015)(quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (3d ed. 1998)).

Expert reports, as the Court has consistently concluded, are inadmissible hearsay. See, e.g., White v. Town of Hurley, No. CIV 17-0983 JB\KRS, 2019 WL 1411135, at *41 (D.N.M. March 28, 2019)(Browning, J.); Walker v. Spina, No. CV 17-0991 JB\SCY, 2019 WL 188544, at *18 (D.N.M. Jan. 11, 2019)(Browning, J.); Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013)(Browning, J.); Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LFG, 2007 WL 2219449, at *3 n.4 (D.N.M. May 14, 2007)(Browning, J.); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4 (D.N.M. Aug. 7, 2010)(Browning, J.). Unsworn affidavits are similarly inadmissible. See Navajo Health Found. -- Sage Memorial Hospital, Inc. v. Burwell, 256 F. Supp. 3d 1186, 1242 (D.N.M.

2015)(Browning, J.); <u>Coffey v. United States</u>, 2011 WL 6013611, at \*4 & nn.22, 26 (D.N.M. Nov. 28, 2011)(Browning, J.); <u>Aragon v. San Jose Ditch Ass'n</u>, No. CIV 10-0563 JB/RHS, 2011 WL 6013284, at \*25 (D.N.M. Nov. 22, 2011)(Browning, J.). Still, at summary judgment stage, parties need not present evidence in admissible form, so long as it can show that the evidence can be admitted at trial. <u>See</u> Fed. R. Civ. P. 56(c)(2). Swearing under penalty of perjury that the expert will testify to the contents of the expert report is an accepted method for the party to allow the court to consider these expert reports for summary judgment. <u>See Amer. Fed. of Musicians of U.S. and Canada v. Paramount Pictures Corp.</u>, 903 F.3d 968, 976-77 (9th Cir. 2018)(stating that for rule 56(c)(4)'s purposes, "there is no meaningful distinction between an expert report accompanied by a sworn declaration and an expert report that is itself sworn," and admitting an unsworn expert report attached to a declaration in which the expert "attested under penalty of perjury that he prepared the report," and would testify consistent with its conclusions and opinions); <u>DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach</u>, 576 F.3d 820, 826 (8th Cir. 2009); <u>Tanner v. McMurray</u>, 429 F. Supp. 3d 1047, 1136 n.176 (D.N.M. 2019)(Browning, J.). Even if a party initially submits an unsworn affidavit or declaration to substantiate a claim under rule 56, if a party attaches an unsworn expert report along with an expert's sworn declaration or deposition affirming the report, the unsworn report's deficiencies are cured. <u>See</u>, <u>e.g.</u>, Wright & Miller, Affidavits in Support of or in Opposition to Summary Judgment, <u>10B Fed. Prac. & Proc. Civ.</u>, § 2738 (4th ed. July, 2020)("Subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment." (citing <u>DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach</u>, 576 F.3d at 826)); <u>Humphreys v. Partners Architects, L.P. v.</u>

Lessard Design, Inc., 790 F.3d 532, 539 (4th Cir. 2015)(stating that a court can consider an unsworn expert's report on a summary judgment motion if a party subsequently affirms or verifies it with an expert's affidavit or deposition).  Although this swearing to the contents of an expert report will cure the hearsay problem of the expert's statements and conclusions, it will not settle the hearsay issues that other declarants' hearsay statements in the expert report pose.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(citing Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1082 n.5 (10th Cir. 1999)).

## NEW MEXICO LAW REGARDING NEGLIGENCE PER SE

To establish a negligence per se claim, a plaintiff must prove: (i) that there is a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly; (ii) that the defendant violated the statute; (iii) that the plaintiff must be in the class of persons which the statute seeks to protect; and (iv) that the harm or injury to the plaintiff must generally be that which the Legislature, through the statute, sought to prevent.  See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1204 (D.N.M. 2008)(Browning, J.)(citing Johnstone v. City of Albuquerque, 2006-NMCA-119, ¶ 16, 145 P.3d 76, 82[49]).  To hold a defendant liable under a claim of negligence per se, the plaintiff must show that the defendant violated a specific statute.  See Parker v. E. I. DuPont deNemours & Co., 1995-NMCA-086, ¶ 40, 909 P.2d 1, 12.  New Mexico Uniform Civil Jury Instruction UJI 13-1501 provides:

---

[49]The Court is confident that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statement in Johnstone v. City of Albuquerque, 2006-NMCA-119, ¶ 16, 145 P.3d at 82, of the elements required for a negligence per se claim under New Mexico law, based on the Supreme Court of New Mexico's decision in Archibeque v. Homrich, 1975-NMSC-066, 542 P.2d 820, in which the Supreme Court of New Mexico recited the same test for negligence per se in New Mexico.  1975-NMSC-066, ¶ 15, 542 P.2d at 825.

There [was a] [were] statute[s] in force in this state, at the time of the occurrence in question, which provided that:

> (Quote or paraphrase the applicable part of the statute in question. If more than one statute is in question, list each statute separately)

If you find from the evidence that _____ (party) violated [this] [any one of these] statute[s], then _____'s conduct constitutes negligence as a matter of law, [unless you further find that such violation was excusable or justified].

[To legally justify or excuse a violation of a statute, the violator must sustain the burden of showing that [s]he did that which might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.]

N.M.R.A. Civ. UJI 13-1501. This instruction appears in Chapter Fifteen, Statutes and Ordinances, and not in Chapter Sixteen, Tort Law -- Negligence. The "Directions for Use" for UJI 13-1501 notes that "UJI 13-1503 should be used in addition to this instruction when there is an issue of proximate cause." N.M.R.A., Civ. UJI 13-1501, Directions for Use. N.M.R.A., Civ. UJI 13-1503 provides:

> Negligence resulting from a violation of a[n] [statute] [or] [ordinance] is no different in effect from that resulting from other acts or omissions constituting negligence. In each case the negligence is of no consequence unless it was a cause of or contributed to, an injury found by you to have been suffered by the plaintiff.

N.M.R.A. Civ. UJI 13-1503.

## LAW REGARDING THE FEDERAL TORT CLAIMS ACT

As with any jurisdictional issue, the party bringing the suit against the United States bears the burden of proving that Congress has waived sovereign immunity. See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992). It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983). "Challenges to subject-matter jurisdiction can . . . be raised

at any time prior to final judgment." Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004)(citing Capron v. Van Noorden, 6 U.S. 126, 127 (1804)).

The terms of the United States' consent define the parameters of federal court jurisdiction to entertain suits brought against it. See United States v. Orleans, 425 U.S. 807, 814 (1976); Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985). When the United States waives its immunity from suit, a court should neither narrow the waiver nor "take it upon [itself] to extend the waiver beyond that which Congress intended." Smith v. United States, 507 U.S. at 203 (quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)).

In 1948, Congress enacted the Federal Tort Claims Act, which waives the United States' sovereign immunity for certain torts that federal employees commit. See Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994). Congress waives sovereign immunity only for certain torts that United States employees cause while acting within the scope of their office or of their employment. See 28 U.S.C. § 1346(b); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.).

### 1.  Exhaustion Requirements.

The Federal Tort Claims Act provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a) (emphasis added).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005)(quoting Bradley v. United States ex. rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  Staggs v. United States ex rel. Dep't of Health & Human Servs., 425 F.3d 881, 884 (10th Cir. 2005)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).  The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.  Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  See Staggs v. United States ex rel. Dep't of Health & Human Servs., 425 F.3d at 884; Warren v. United States, 244 F. Supp. 3d at 1213.

## 2. **Filing Deadlines.**

The Tenth Circuit has observed:

> [T]he FTCA has both an administrative-exhaustion requirement, set forth in 28 U.S.C. § 2675(a), and a statute of limitations, set forth in 28 U.S.C. § 2401(b). Combined, these provisions act as chronological bookends to an FTCA claim, marking both a date before which a claim may not be filed and a date after which any filing is untimely.

Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015)(Holmes, J.).  Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim

in writing to the appropriate federal agency.  See 28 U.S.C. § 2401(b)(explaining that claim is "forever barred" unless presented within two years).  If the agency denies the claim, the claimant has six months to file suit in federal court.  See 28 U.S.C. § 2401(b).  The Tenth Circuit has clarified that a party must satisfy both of § 2401's prongs: "28 U.S.C. § 2401(b) bars a tort claim against the United States 'unless it is presented to the proper agency within two years of its accrual *and* suit is commenced within six months of notice of the claim's denial by the agency.'"  Ponce v. United States, No. CIV 13-0334 JB/ACT, 2013 WL 6503535, at *14 (D.N.M. Nov. 25, 2013)(Browning, J.)(emphasis in Ponce v. United States)(quoting Indus. Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 968 (10th Cir. 1994)).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem . . . " that failure a "final denial of the claim," and proceed with his or her suit under the Federal Tort Claims Act.  28 U.S.C. § 2675(a).  In the Tenth Circuit, "(at least until there has been a final denial by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial."  Barnes v. United States, 776 F.3d at 1140-41.  An agency may "trigger . . . § 2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'"  Barnes v. United States, 776 F.3d at 1141.  See Warren v. United States, 244 F. Supp. 3d at 1213.

### 3.   **Effect of Failure to Exhaust.**

"[A]s a general rule, a premature 'complaint cannot be cured through amendment, but instead, plaintiff must file a new suit.'"  Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(internal quotation marks omitted).  This rule exists, because "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the

jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012).[50] Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint. See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(unpublished).

There is at least one limited exception to the general rule. Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action. 188 F.3d at 1199. See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(concluding that there is a new action where plaintiff "sought permission to file -- and, with the government's consent and district court's permission, did file -- an amended complaint"). See also Warren v. United States, 244 F. Supp. 3d at 1214.

---

[50]Ruppert v. Aragon is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Ruppert v. Aragon, 448 F. App'x 862 (10th Cir. 2012) and Stevens v. United States, 61 F. App'x 625 (10th Cir. 2003) has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

4.      **Definition of "Sufficient Notice".**

Courts define "sufficient notice" based on the facts of each case before them.  In Estate of Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs' administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval."  397 F.3d at 852.  The Tenth Circuit disagreed, holding that the "plaintiffs' administrative claim provided notice that [the United States Department of Justice ("DOJ")] should investigate the prison officials' conduct."  397 F.3d at 853.  The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Technologies., Inc. v. United States, where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate incidents.  221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."  221 F.3d at 40.  The First Circuit

thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, 692 F.3d 718 (7th Cir. 2012), a man receiving mental health treatment at a Veterans Administration ("VA") facility alleged that his therapist worsened his condition by initiating a sexual relationship with him.  See 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist."  692 F.3d at 722.  The United States Court of Appeals for the Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act."  692 F.3d at 722.  The plaintiff recognized this problem before filing his complaint and thus asserted a "special relationship" theory of liability instead.  692 F.3d at 723.  The Seventh Circuit affirmed the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability.  *Palay v. United States,* 349 F.3d 418, 425-26 (7th Cir. 2003); *Murrey v. United States,* 73 F.3d 1448, 1452-53 (7th Cir. 1996).  The plaintiff's claim didn't do that.  The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer.  We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

Glade ex rel. Lundskow v. United States, 692 F.3d at 722-23.  See Warren v. United States, 244 F. Supp. 3d at 1215.

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.  The APA states that district courts can:

(1)    compel agency action unlawfully withheld or unreasonably delayed; and

(2)    hold unlawful and set aside agency action, findings, and conclusions found to be--

(A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    contrary to constitutional right, power, privilege, or immunity;

(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)    without observance of procedure required by law;

(E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d at 1580. See Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 305 F.R.D. at 272.

### 1.    Reviewing Agency Factual Determinations.

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single substantive standard of review.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)).  See also id. at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies."

(emphasis in original)).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted.").  See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had.").  Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action.  See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing Fed. R. Evid. 201(b))("We take judicial notice of this document, which is included in the record before us in [another case]."); id. at 702 n.22.  In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record.  See Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Min. Ass'n v. Sec. of U.S.

Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review.  Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted).  The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172.  The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80 (1943).  While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(internal citations omitted).

## 2. **Reviewing Agency Legal Interpretations.**

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States of America, and Courts reviewing those

interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing.  See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  This is known as Chevron deference, named after the seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron"). [51]   Chevron deference is a two-step process[52] that first asks whether the statutory provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable.   See Maralex Resources, Inc. v. Barnhardt, 913 F.3d 1189 1198-99 (10th Cir. 2019).  As the Tenth Circuit has explained,

we must be guided by the directives regarding judicial review of administrative

---

[51]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years.  See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[52]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chrevron Step Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 . . . (1984).  Those directives require that we first determine whether Congress has directly spoken to the precise question at issue.  If the congressional intent is clear, we must give effect to that intent.  If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citation omitted).

A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States of America, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party followed them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is applied in the same manner as Chevron deference and is substantively identical.  The Court has previously expressed its concerns about Auer deference. See, e.g., Mohon v. Agentra, 400 F. Supp. 3d 1189, 1221-25 (D.N.M. 2019); Jarita Mesa Livestock

Grazing Ass'n v. U.S. Forest Service, 305 F.R.D. at 286-89.   The Supreme Court recently addressed whether it should overrule Auer deference in Kisor v. Wilkie, 139 S. Ct. 2400, 2408 (2019).   Although the Supreme Court declined to overrule Auer, the majority opinion took pains to "reinforce its limits."   139 S. Ct. 2408.   The Court noted that Auer deference is appropriate "only if a regulation is genuinely ambiguous," "even after a court has resorted to all the standard tools of interpretation."   139 S. Ct. 2414.   To earn deference in this scenario, the agency's interpretation must still be "'reasonable.'"   139 S. Ct. at 2415 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994)).   Auer deference is also "'unwarranted'" "when a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based 'fair, [or] considered judgment.'"   139 S. Ct. at 2414 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).   Deference is therefore not appropriate where the regulatory interpretation is not "the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views,"   139 S. Ct. at 2416 (quoting United States v. Mead Corp., 533 U.S. 218, 257-59 (2001)(Scalia, J., dissenting)), does not "in some way implicate [the agency's] substantive expertise," 139 S. Ct. at 2417, or is a convenient, post hoc rationalization to defend past agency action, see 139 S. Ct. at 2417.

Last, courts afford agencies no deference in interpreting the Constitution.   See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .   [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).   Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to

interpret -- the Constitution's content.  The presence of a constitutional claim does not take a

court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication

of constitutional issues -- and courts must still respect agency fact-finding and the administrative

record when reviewing agency action for constitutional infirmities; they just should not defer to

the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land

Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process

claim against the [agency] under the framework set forth in the APA.").

### 3.   <u>Waiving Sovereign Immunity</u>.

The APA waives sovereign immunity with respect to non-monetary claims.  See 5 U.S.C.

§ 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages
> and stating a claim that an agency or an officer or employee thereof acted or
> failed to act in an official capacity or under color of legal authority shall not be
> dismissed nor relief therein be denied on the ground that it is against the United
> States or that the United States is an indispensable party.  The United States may
> be named as a defendant in any such action, and a judgment or decree may be
> entered against the United States:

5 U.S.C. § 702.  Claims for money damages seek monetary relief "to <u>substitute</u> for a suffered loss."

Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir.

2009)(emphasis in original).  Claims that do not seek monetary relief or that seek "specific

remedies that have the effect of compelling monetary relief" are not claims for monetary damages.

Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1298.  To determine

whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and

asses the plaintiff's prime object or essential purpose; "'[a] plaintiff's prime objective or essential

purpose is monetary unless the non-monetary relief sought has significant prospective effect or

considerable value apart from the claim for monetary relief.'" <u>Normandy Apartments, Ltd. v. U.S.</u> <u>Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1296 (quoting <u>Burkins v. United States</u>, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. <u>See</u> <u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated? Second, does the Tucker Act expressly or impliedly forbid the relief that Normandy seeks, such that the APA's waiver does not apply?" <u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." <u>United States v. Christy</u>, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence defines hearsay: "a statement that: (1) the declarant

does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Courts deem hearsay generally unreliable and untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross examination quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination, see, e.g., United States v. Console, 13 F.3d at 656; it is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable, see Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.

"Hearsay within hearsay" is admissible only "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting, after concluding that rule 803(8) provides an exception for law enforcement reports, that a hearsay issue remains regarding the

statements within the reports); <u>Wood v. Millar</u>, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at

*4 (D.N.M. Feb. 19, 2015)(Brack, J.)(stating that witness statements in police reports, to which

rule 803(8) applies, may be admissible under hearsay exclusions other than rule 803(8)); <u>Montoya</u>

<u>v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31,

2012)(Browning, J.)(excluding medical records, which themselves were inadmissible hearsay,

although the statements within the medical records were opposing party statements).  A statement

that is otherwise hearsay, however, may be admissible for a purpose, such as impeachment, other

than to prove the truth of the matter asserted.  <u>See</u> <u>United States v. Caraway</u>, 534 F.3d 1290, 1299

(10th Cir. 2008)("We have already explained why the content of the statement, if used

substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however, it

is not hearsay.").  Likewise, "'[i]f the significance of an offered statement lies solely in the fact

that it was made, no issue is raised as to the truth of anything asserted, and the statement is not

hearsay.'"  <u>Echo Acceptance Corp. v. Household Retail Servs., Inc.</u>, 267 F.3d 1068, 1087 (10th

Cir. 2001)(quoting Fed. R. Evid. 801 advisory committee's note).  Statements in the latter category

include verbal acts --

> "statement[s] offered to prove the words themselves because of their legal effect
> (e.g., the terms of a will)."  Black's Law Dictionary (10th ed. 2014).  "A contract,
> for example, is a form of verbal act to which the law attaches duties and liabilities
> and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992).
> *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

<u>Farley v. Stacy</u>, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23,

2015)(Payne, J.), <u>aff'd</u>, 645 F. App'x 684 (10th Cir. 2016)(unpublished).

1.      **Rule 801(d)(2).**

An opposing party's statement is not hearsay.  See Fed. R. Evid. 801(d)(2).  Rule 801(d)(2) specifically excludes from hearsay a statement that

> is offered against an opposing party and:
>
> > (A)     was made by the party in an individual or representative capacity;
> >
> > (B)     is one the party manifested that it adopted or believed to be true;
> >
> > (C)     was made by a person whom the party authorized to make a statement on the subject;
> >
> > (D)     was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> >
> > (E)     was made by the party's coconspirator during and in furtherance of the conspiracy.
>
> The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2).  "The admissibility of opposing-party statements 'is not based on reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short, because the party said the words and should be stuck with them, regardless of their accuracy." United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen A. Saltzburg et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)).  "[T]he Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'"  United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)).

"Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other

than the party who made the statement, such as codefendants." United States v. DeLeon, 287 F. Supp. 3d 1187, 1256 (D.N.M. 2018)(Browning, J.)(citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)).  Statements made during closing argument by an attorney qualify as an admission by a party opponent under rule 801(d)(2)(A).  See United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 & 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v. McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)).  The Court has determined that rule 806 of the Federal Rules of Evidence, which permits attacking hearsay statements with "any evidence that would be admissible for those purposes if the declarant had testified as a witness," Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 878121, at *2 n.1 (D.N.M. Feb. 12, 2018)(Browning, J.).   "Party opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even though rule 806 does not apply.  If a party opponent admission is relevant, then anything that impeaches such a statement is also relevant." United States v. DeLeon, 2018 WL 878121, at *2 n.1.

## LAW REGARDING DIVERSITY JURISDICTION

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court]

must . . . predict how the Supreme Court of New Mexico would [rule]."  Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court."  Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[53]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

---

[53]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")).[54]  The Court may also rely on

---

[54]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30 (D.N.M. 2014)(Browning, J.).[55]  Ultimately, "the

---

465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions
of intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions." (emphasis and title case omitted)).

[55]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law -- at least provides consistency at the federal level, so long
as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest
court, on one end; and independently interpreting the state law, regarding the Tenth Circuit
precedent as no more than persuasive authority, on the other.  In striking this balance, the Court
notes that it is generally more concerned about systemic inconsistency between the federal courts
and the state courts than it is about inconsistency among federal judges.  Judges, even those within
a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal
advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district
judges in this and many federal districts; and, regardless, litigants cannot know for certain how a
given judge will interpret the state law, even if they could determine the identity of the judge pre-
filing or pre-removal.  All litigants know in advance is that whomever federal district judge they
are assigned will look to the entirety of the state's common law in making his or her determination
-- the same as a state judge would.  Systemic inconsistency between the federal courts and state
courts, on the other hand, not only threatens the principles of federalism, but litigants may more
easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state

---

law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state Supreme Court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is x. Its holdings are descriptive and not prescriptive -- interpretive and not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both

- 81 -

reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.   See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from

the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."   The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."   Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Court's task is to predict what the state supreme court would do." Wade v. EMCASCO Ins., 483

F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted).

## ANALYSIS

For the reasons stated below, the court denies the U.S. MSJ.  The Court also concludes that

Rawers has established that Skinner-Ramp was negligent per se for violating N.M. Stat. Ann.

§ 66-7-330(B).  It therefore grants the Rawers MSJ.

**I.  THE COURT DENIES THE U.S. MSJ, BECAUSE IT HAS JURISDICTION TO REVIEW THE CASE AND THE SEPT. 28 LETTER IS NOT AN AMENDMENT.**

The United States argues that Rawers' Sept. 28 Letter to the Postal Service constitutes an

amendment of her claim, that 28 C.F.R. § 14.2(c) states that agencies have six months after an

---

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

amendment to act on a claim before a party may seek relief in federal court, and that Rawers filed her lawsuit less than six months after September 28, 2019.  See U.S. MSJ at 5.  The United States argues that, because Rawers filed her lawsuit without exhausting her administrative remedies, the Court must dismiss for lack of subject-matter jurisdiction.  See U.S. MSJ at 9.  Rawers argues in response that violating 28 C.F.R. § 14.2(c) does not mean that the Court loses jurisdiction, see Rawers Response at 8, and that the Sept. 28 Letter was not an amendment, see Rawers Response at 13.

**A.    28 C.F.R. § 14.2(C) DOES NOT REPRESENT A JURISDICTIONAL BAR TO RAWERS' CASE.**

The parties spend much of their briefing on the jurisdictional effect of the regulations which the Attorney General of the United States has promulgated interpreting 28 U.S.C. § 2675(a).  This narrow question has long divided courts.  See Seals v. United States, 319 F. Supp. 2d at 745 (collecting cases).  Despite rulings on this issue from eight circuits, the Tenth Circuit has not decided the question.  See Mader v. United States, 654 F.3d 794, 804-04 (8th Cir. 2011)(en banc)(concluding that § 2675(a) requires a claimant to submit evidence of a representative's authority to act on the claimant's behalf); Kanar v. United States, 118 F.3d 527, 530-31 (7th Cir. 1997)(concluding that § 2675(a)'s regulations are not jurisdictional); Santiago-Ramirez v. Sec'y of Dep't of Def., 984 F.2d 16, 19 (1st Cir. 1993); Knapp v. United States, 844 F.2d 376, 378-79 (6th Cir. 1988); GAF Corp. v. United States, 818 F.2d 901, 919–20 (D.C. Cir. 1987); Warren v. U.S. Dep't of Interior Bureau of Land Mgmt., 724 F.2d 776, 779 (9th Cir. 1984)(en banc); Tucker v. U.S. Postal Serv., 676 F.2d 954, 960 (3d Cir. 1982); Adams v. United States, 615 F.2d 284, 289 (5th Cir. 1980); Lunsford v. United States, 570 F.2d 221 (8th Cir. 1977); Pennsylvania v. National Ass'n of Flood Insurers, 520 F.2d 11 (3d Cir. 1975)   See also Keene Corp. v. United States, 700

F.2d 836, 842 n.9 (2d Cir. 1983)(noting a split between Courts of Appeals and declining to address the issue).

The closest that the Tenth Circuit has come to addressing the question is its ruling in Bradley v. United States by Veterans Admin., 951 F.2d 268 (10th Cir. 1991).  In this case, the Tenth Circuit noted that 28 C.F.R. § 14.2 "requires that there be written notification, *plus a claim in a sum certain,* in order to be considered adequate notice."  Bradley v. U.S. by Veterans Admin., 951 F.2d at 271 (emphasis in original).  Earlier in the opinion, however, the Tenth Circuit located the sum certain requirement in § 2675(a) rather than in the regulations.  See 951 F.2d at 270 ("Section 2675(a) requires that claims for damages against the government be presented to the appropriate federal agency by filing '(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim.'" (quoting Warren v. United States Dep't of Interior Bureau of Land Mgmt., 724 F.2d at 780)).  Because the plaintiff had alleged only a vague claim for damages "in excess of $100,000.00," which did not satisfy the sum certain requirement, the plaintiff's claims were "jurisdictionally barred."  951 F.2d at 271.  The Tenth Circuit did not consider whether the Attorney General's regulations were an impermissible limit on federal court jurisdiction or otherwise explain its decision in great detail. See 951 F.2d at 270-72.

Without Tenth Circuit precedent to follow, district courts in the Tenth Circuit have reached differing conclusions.  Some courts adopt the majority rule and conclude that the "regulatory requirements are not jurisdictional, and failure to comply with the regulations or state laws does not deprive federal courts of subject matter jurisdiction."  Draughon v. United States, 103 F. Supp. 3d 1266, 1276 (D. Kan. 2015)(Robinson, J.).  See King v. United States, No. 12-CV-616-JED-

TLW, 2013 WL 1856472, at *3 (N.D. Okla. May 2, 2013)(Dowdell, J.); Zywicki v. United States,

No. CIV.A. 88-1501-T, 1991 WL 128588, at *2 (D. Kan. June 20, 1991)(Theis, J.).  Other courts

have issued opinions suggesting that the regulations are jurisdictional.  See Lucero v. United

States, No. CIV 17-0634 SCY\JHR, 2019 WL 2869059 (D.N.M. July 3, 2019)(Yarbrough,

M.J.)(concluding that a request for reconsideration, which is provided for in 28 C.F.R. § 14.9, is a

jurisdictional exhaustion requirement).

        All this lower court precedent -- much of it from before the turn of the century -- must be

considered against the broader backdrop of the Supreme Court's recent wave of decisions

regarding the jurisdictional effect of procedural requirements in statutes.  In the last few decades,

the Supreme Court has attempted to "bring some discipline to the use of the" term jurisdiction.

Henderson ex. Rel. Henderson v. Shinseki, 562 U.S. 428, 435 (2011).  See Scot Dodson,

Jurisdiction and its Effects, 15 Geo. L.J. 619, 620-21 ("Lamenting that '[j]urisdiction . . . is a word

of many, too many, meanings,' the Supreme Court recently has pressed a deliberate agenda to

brings sense to the word by circumscribing its application and calling for are and thoughtfulness

in using the term jurisdiction" (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90

(1998))).  In an effort to refocus the analysis, the Supreme Court has decried its past use of "drive-

by jurisdictional rulings," Steel Co. v. Citizens for a Better Env't, 523 U.S. at 91, and refocused

the jurisdictional analysis around whether Congress has made a clear statement that the statutory

requirements is jurisdictional, see e.g., United States v. Kwai Fun Wong, 575 U.S. 402, 409 (2015);

Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013)("To ward off profligate use of the

term 'jurisdiction,' we have adopted a 'readily admissible bright line' for determining whether to

classify a statutory limitation as jurisdiction." (quoting Arbaugh v. Y & H Corp., 546 U.S. 500,

514 (2006))); Gonzalez v. Thaler, 565 U.S. 134, 141 (2012).  This doctrinal shift has also spurred a notable change in results.  Although federal courts have historically treated procedural requirements like exhaustion as jurisdictional, "[i]n case after case, the modern [Supreme] Court has abandoned its treatment of procedural requirements as presumptively jurisdictional."  Erin Morrow Hawley, The Supreme Court's Quiet Revolution: Redefining the Meaning of Jurisdiction, 56 Wm. & Mary L. Rev. 2027, 2030 (2015)("Quiet Revolution").

Among the rules most in need of reconsideration under the Supreme Court's revamped approach are "claim-processing rules," which "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. at 435.  Claim-processing rules, the Supreme Court has stated, do not "reduce the adjudicatory domain of a tribunal and [are] ordinarily 'forfeited if the party asserting the rule waits too long to raise the point.'"  Union Pac. R.R. Co. v. Bhd. Of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Reg., 558 U.S. 67, 81-82 (2009)(quoting Kontrick v. Ryan, 540 U.S. 443, 456 (2004)).[56]  This principle is true even if the claim-processing rule is "important and mandatory."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. at 435.  See United States v. Kwai Fun Wong, 575 U.S. 402, 410 (2015).

The Tenth Circuit has stated that it will "look to a restriction's 'textual, contextual, and historical backdrop'" to determine whether Congress has made a clear jurisdictional statement.

---

[56]But see Jurisdiction and its Effects, 105 Geo. L.J. at 628, for Professor Dodson's argument that "I have yet to see any conceptual feature that distinguishes claim-processing rules from jurisdictional limits.  Justice Scalia was correct in his dissent in Gonzalez v. Thaler: the dichotomy is not between jurisdictional limits and claim-processing rules but between jurisdictional limits and nonjurisdictional limits."

United States v. McGaughy, 670 F.3d 1149, 1156 (10th Cir. 2012)(quoting Gonzalez v. Thaler, 565 U.S. at 148 n.8).  See United States v. Spaulding, 802 F.3d 1110, 1120 (10th Cir. 2015). Meanwhile, "statutes that speak 'to the rights or obligations of parties to a lawsuit,' rather than 'speak[ing] clearly to the courts' statutory or constitutional power to adjudicate the case,' establish 'claim processing rules, and should not be treated as jurisdictional prescriptions.'"  Gad v. Kan. State Univ., 787 F.3d 1032, 1038 (10th Cir. 2015)(quoting Barnes v. United States, 776 F.3d 1134, 1146 (10th Cir. 2015)).  Recent Tenth Circuit opinions suggest that it would likely consider the regulations in 28 C.F.R. §14.2 to be claim-processing rules rather than jurisdictional requirements.

In several instances, the Tenth Circuit has acknowledged the Supreme Court's modernization of its jurisdiction jurisprudence as it noted that it would now reach different conclusions.  In Barnes v. United States, for example, the Tenth Circuit analyzed the Federal Tort Claims Act statute of limitations in 28 U.S.C. § 2401(b) and strongly suggested that it would conclude that this limitation was not jurisdictional if prior precedent did not bind it.[57]  See Barnes v. United States, 776 F.3d at 1139.  The Tenth Circuit noted that its previous decisions concerning the Federal Tort Claims Act's timing requirements "have not involved rigorous analysis" and stated that, in light of recent Supreme Court decisions, it questioned "whether our caselaw accurately reflects the current state of the law."  Barnes v. United States, 776 F.3d at 1143-44.  It

---

[57]This statute provides:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).

noted that, since the Supreme Court's decision in <u>Sebelius v. Auburn Regional Medical Center</u> in 2013, three other Courts of Appeals had reviewed 28 U.S.C. 2401(b) and concluded that their previous decisions holding that the Federal Tort Claims Act's timeliness requirements were jurisdictional were likely incorrect.  <u>See</u> 776 F.3d at 1146-47.  Nevertheless, despite its grave concerns regarding its precedent, the Tenth Circuit stated that it could not

> conclude that the collective message of <u>Irwin [v. Department of Veterans Affairs]</u> and <u>Auburn Regional</u> is so indisputable and pellucid in the FTCA context that it constitutes intervening (i.e., superseding) law that would permit us to hold (without en banc consideration) that § 2401(b)'s limitations provisions -- and, in particular, the six-month provision -- are <i>non</i> jurisdictional.

<u>Barnes v. United States</u>, 776 F.3d at 1147 (emphasis in original).  Thus, the Tenth Circuit affirmed the district court's dismissal of the plaintiff's lawsuit for failure to file in federal court until ten months after the agency denied the plaintiff's claim.  <u>See</u> 776 F.3d at 1148.  A few months later, in <u>United States v. Kwai Fun Wong</u>, the Supreme Court concluded that 28 U.S.C. § 2401(b) was not jurisdictional.  <u>See</u> <u>United States v. Kwai Fun</u> Wong, 575 U.S. at 410-11. and In two other cases, the Tenth Circuit also has raised questions about its own precedent in light of recent Supreme Court decisions regarding statutory limits on jurisdiction.  <u>See</u> <u>Robles-Garcia v. Barr</u>, 944 F.3d 1280, 1283-84 (10th Cir. 2019)(dismissing for lack of jurisdiction "with some reluctance," only because of its precedent that it may not hear arguments unexhausted before the Board of Immigration Appeals); <u>Big Horn Coal Co. v. Sadler</u>, 924 F.3d 1317, 1325 (10th Cir. 2019)(suggesting that the Supreme Court has created reason to doubt its past precedent concluding that issue exhaustion is jurisdictional under the Black Lung Benefits Act).

In <u>Martinez-Perez v. Barr</u>, 947 F.3d 1273, the Tenth Circuit interpreted the jurisdictional effect of 8 C.F.R. § 1003.14.  <u>See</u> 947 F.3d at 1277.  This regulation states that the Immigration

Court's "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court."  8 C.F.R. § 1003.14.  See 947 F.3d at 1277.  The Tenth Circuit agreed with other Courts of Appeals which had concluded that this is a claim-processing rule, because there was no clear statutory statement from Congress suggesting that his rule is jurisdictional.  See 947 F.3d at 1279.  It reached this conclusion, because the statute that 8 C.F.R. § 1003.14 is based on "says nothing about the agency's jurisdiction . . . [and] merely sets out the information that must be included in the notice to appear."  947 F.3d at 1279.  See Arbaugh v. Y&H Corp., 546 U.S. at 516 ("But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."); Robles-Garcia v. Barr, 944 F.3d at 1284 (suggesting that the Tenth Circuit considers whether a statute uses the word "jurisdiction" as strong evidence in this analysis).  The Tenth Circuit further noted that the regulation's discussion of jurisdiction "carries no weight," because, "'[w]hile an agency may adopt rules and processes to maintain order, it cannot define the scope of its power to hear cases.'"  947 F.3d at 1279 (quoting Ortiz-Santiago v. Barr, 924 F.3d 956, 963 (7th Cir. 2019)).

In light of the Supreme Court's recent decisions and Tenth Circuit guidance on jurisdictional requirements, the regulation at issue in this case, 8 C.F.R. § 14.2(c), is not jurisdictional.  There is no "clear statement" in its text suggesting Congress intended it be jurisdictional.  Sebelius v. Auburn Reg. Med. Ctr., 568 U.S. at 153.  Section 2675(a) is not framed in terms of a courts' "adjudicatory authority," Kontrick v. Ryan, 540 U.S. at 455, but rather "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," Henderson ex rel. Henderson v. Shinseki, 562 U.S. at 435.  It requires that a plaintiff wait at least six months after presenting his or her claim to an

agency before filing suit in federal court.  See 28 U.S.C. § 2675(a).  Neither the statute nor the regulation specifically mentions the federal court or jurisdiction.  See 28 U.S.C. § 2675(a)-(c); 28 U.S.C. § 14.2.  See also Robles-Garcia v. Barr, 944 F.3d at 1284.  Although the Tenth Circuit has interpreted 28 U.S.C. § 2675(a) to be jurisdictional in the past, see Bradley v. U.S. by Veterans Admin., 951 F.2d at 271, it would likely not extend this consideration to the regulations given recent Supreme Court precedent, see Martinez-Perez v. Barr, 947 F.3d at 1279.  The Tenth Circuit has indicated that it is sticking to its precedent for stare decisis concerns rather than because they are correct.  See Barnes v. United States, 776 F.3d at 1146-47; Robles-Garcia v. Barr, 944 F.3d at, 1283-84; Big Horn Coal Co. v. Sadler, 924 F.3d at 1325 (10th Cir. 2019).  If the foundation of its decision in Bradley v. United States by Veterans Administration is, as the Court believes, incorrect, there is no reason to extend its incorrect statutory interpretation to the regulations.  The Tenth Circuit has not yet declared § 14.2(c) to be non-jurisdictional, and so the Court will not do so now. Accordingly, the Court concludes that 28 C.F.R. 14.2(c) is a non-jurisdictional claim-processing rule.

Concluding that 28 C.F.R. § 14.2(c) is a claim-processing rule rather than a jurisdictional rule does not necessarily mean that the regulation has no effect on this case.  Failure to comply with this claim-processing rule is a legitimate ground for dismissal.  See Malouf v. Sec. & Exch. Comm'n, 933 F.3d 1248, 1258 n.10 (10th Cir. 2019)("We thus would need to enforce the statutory exhaustion requirements regardless of whether they are jurisdictional."); Ortiz-Santiago v. Barr, 924 F.3d at 963; United States ex rel. Little v. Triumph Gear Systems, Inc., 870 F.3d 1242, 1251 ("If the first-to-file rule were non-jurisdictional, Little and Motaghed's violation of the rule would nevertheless afford a basis for dismissal.").  A party may argue, however, that dismissal is

improper, because the agency has waived or forfeited this argument.  See Hamer v. Neighborhood Hous. Servs. of Chi., 138 S. Ct. 13, 17-18 (2017).  When the rule at issue is not jurisdictional, a court may also equitably toll the deadlines.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121 (2002).  The question becomes, therefore, whether the United States has waived or forfeited this challenge.  See United States v. Olano, 507 U.S. 725, 733 (1993)(noting that forfeiture is the "failure to make the timely assertion of a right," while waiver is the intentional relinquishment or abandonment of a right).

### B.   THE UNITED STATES HAS NOT FORFEITED ITS RIGHT TO CHALLENGE RAWERS' FAILURE TO FOLLOW 28 C.F.R. § 14.2(C).

The Supreme Court has stated that "a claim-processing rule . . . even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point."  Kontrick v. Ryan, 540 U.S. 443, 456 (2004).  See Fort Bend Cty, Tex. v. Davis, 139 S. Ct. 1843, 1849 (2019); In re Latture, 605 F.3d 830, 834 (10th Cir. 2010).  It is not self-evident how long is "too long," Kontrick v. Ryan Kontrick v. Ryan, 540 U.S. at 456, although the Supreme Court held subsequently that "[h]ere, where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense." Eberhart v. United States, 546 U.S. 12, 19 (2005).  The Tenth Circuit, in an unpublished decision, read Eberhart v. United States as representing a timeliness limit rather than an example of untimeliness, stating that "[o]rdinarily, a party does not forfeit an objection to the timeliness of a motion unless the court has ruled on the merits of the motion."  Sky Harbor Air Serv., Inc. v. Reams, 491 F. App'x 875, 891 (10th Cir. 2012).

Even if <u>Ebenhart v. United States</u> stands for the proposition that parties may invoke claim-processing rules at the summary judgment stage,[58] an affirmative defense may be raised for the first time at summary judgment only in the absence of a showing of prejudice.  See <u>Ahmad v. Furlong</u>, 435 F.3d 1196, 1201-02 (10th Cir. 2006); <u>Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.</u>, 61 F. Supp. 3d 1013, 1080 (D.N.M. 2014)(Browning, J.), <u>amended in part,</u> No. CIV. 12-0069 JB/KBM, 2015 WL 5138286 (D.N.M. Aug. 26, 2015)(Browning, J.)(concluding that a statutory exhaustion requirement "is not subject to exception, so long as the agency asserts exhaustion as an affirmative defense").  "[A]bsence of prejudice to the opposing party is not the only proper consideration in determining whether to permit an amended answer; a motion to amend may also be denied on grounds such as 'undue delay, bad faith or dilatory motive . . . , or repeated failure to cure deficiencies by amendments previously allowed.'" <u>Ahmad v. Furlong</u>, 435 F.3d at 1202 (quoting <u>Harris v. Sec'y U.S. Dep't of Veterans Affairs</u>, 126 F.3d 339, 344 (D.C. Cir. 1997)).  See <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  The United States did not bring forth this affirmative defense at any point before the U.S. MSJ.  Rawers filed her Complaint on January 15, 2019.  The United States did not raise this issue in the Defendant's Answer to Plaintiff's Complaint, filed May 31, 2019 (Doc. 12)("Answer").  In the Answer, the United States sets forth eleven affirmative defenses.  See Answer at 6-7.  None of these affirmative defenses mention the regulations.  While the United States broadly asserts in the Answer that the "Court lacks

---

[58]In addition to <u>Eberhart v. United States</u>, the Tenth Circuit also cited <u>Wilburn v. Robinson</u>, 480 F.3d 1140 (D.C. Cir. 2007), to support its conclusion that a court must rule on the merits of a decision before a timeliness argument is forfeited.  See <u>Sky Harbor Air Serv., Inc. v. Reams</u>, 491 F. App'x at 891.  That case, however, suggests that ruling on the merits is sufficient, but not necessary, to forfeit a timeliness objection.  See <u>Wilburn v. Robinson</u>, 480 F.3d at 1147 ("A party indisputably forfeits a timeliness objection based on a claim-processing rule if he raises the issue after the court has issued a merits decision.").

jurisdiction over some or all of Plaintiff's claims," Answer at 6, the Court has already concluded above that 28 C.F.R. § 14.2 is a claim-processing rule and not jurisdictional.

Five weeks after filing the Answer, the parties submitted the Joint Status Report and Provisional Discovery Plan, filed July 5, 2019 (Doc. 16)("JSR").  The United States again set forth "defenses."  JSR at 3.  These defenses are identical to the defenses the United States lists in the Answer and do not mention 28 C.F.R. § 14.2.  See JSR at 3-4.  On August 21, 2019, the United States filed a motion to dismiss claims against Skinner-Ramp on the grounds that parties may bring Federal Tort Claims Act against the United States but not individual employees.  See Unopposed Motion to Dismiss Claims against Defendant Clarissa Skinner-Ramp, filed August 21, 2019 (Doc. 28)("MTD").  It did not file a motion to dismiss based on 28 C.F.R. § 14.2.  Discovery continued throughout the fall of 2019, and the winter and spring of 2020, and the United States filed the U.S. MSJ on May 18, 2020, asserting for the first time that Rawers violated 28 U.S.C. § 2675's regulations.

The foregoing information is represented on the case's docket, but an intervening opinion in the District of New Mexico adds more context to the United States' delay in arguing 28 C.F.R. § 14.2(c) as a reason to dismiss this case.  Between the time that Rawers filed her Complaint and the United States filed its Answer, Chief Judge Johnson issued an opinion in Stevens v. United States, No. CIV 17-0688 WPJ/SCY, 2019 WL 1386732 (D.N.M. March 27, 2019), dismissing a plaintiff's Federal Tort Claims Act case for failing to satisfy 28 U.S.C. § 2675(a)'s presentment requirements.  See Stevens v. United States, 2019 WL 1386732, at *3-4.  Chief Judge Johnson noted his "displeasure with the handling of this case by counsel for both parties but particularly with counsel for the United States," Stevens v. United States, 2019 WL 1386732, at *4, for failing

to raise the jurisdictional issue earlier.  The United States had not raised the issue at all, and it

addressed the issue only when the plaintiff raised it in its own summary judgment motion five

months after the deadline for pre-trial motions.  See 2019 WL 1386732, at *4.  Chief Judge Johnson

stated:

> The Court cannot help but wonder that if Plaintiff's Counsel had not raised
> subject matter jurisdiction in the instant motion, was the Government going to raise
> the issue at trial after all those concerned had prepared for trial and witnesses had
> been subpoenaed and testified?  Or better yet, was the Government going to wait
> and possibly raise subject matter jurisdiction at the appellate level?  Either of these
> scenarios amounts to nothing more than a huge waste of time and resources for all
> involved in this case.

2019 WL 1386732, at *4.  He further warned that he would likely assess sanctions "if this type of

situation occurs again."  2019 WL 1386732, at *4.

Two of the three Assistant United States Attorneys litigating Stevens v. United States,

Christopher Jeu and Roberto Ortega, have been attorneys of record in this case.  See Notice of

Substitution of Counsel, filed January 8, 2020 (Doc. 42); Notice of Entry of Appearance, filed

May 17, 2019 (Doc. 9).  Even though the United States had in its head Chief Judge Johnson's

warning in Stevens v. United States, Mr. Ortega, Mr. Jeu, and Assistant United States Attorney

Sean Cunniff did not raise this issue until discovery was complete and the case had been pending

for sixteen months.  The United States, in response to Rawers' sanctions request, notes in its

defense that it raised this issue at the deadline for pre-trial motions and that it raised the potential

jurisdictional defect this time.  See U.S. Reply at 12 ("The instant motion was filed prior to the

deadline for pre-trial motions."); Order on Unopposed Motion to Extend Case Deadlines, filed

February 26, 2020 (Doc. 47)(setting the pretrial motions deadline for May 18, 2020).  It also notes

that "there will be instances where these jurisdictional defects are detected later, and that does not absolve a litigant of the duty to bring these issues to the attention of the court."  U.S. Reply at 12.

Because the United States did not raise Rawers' alleged violation of 28 C.F.R. § 14.2(c) until summary judgment, the question becomes whether this delay prejudices Rawers.  Rawers would not face prejudice if the Court reviewed the United States' argument.  28 U.S.C. § 2401(b) bars tort claims against the United States "unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."  The Postal Service issued its final agency action in this case on March 20, 2019, when it denied Rawers claim.  Until recently, Rawers would have been jurisdictionally barred from bringing this case again, because it is nearly a year past 28 U.S.C. § 2401(b)'s six-month filing deadline of September 20, 2019.  See Barnes v. United States, 776 F.3d at 1141-42, 1147 (concluding that 28 U.S.C. § 2401(b)'s requirements are jurisdictional, and that dismissal was appropriate, because a plaintiff did not file suit within six months of a final agency's denial even though plaintiff had a suit pending for five of those months).  The Supreme Court has since concluded that § 2401(b) is not jurisdiction and courts may equitably toll its deadlines.  See United States v. Kwai Fun Wong, 575 U.S. at 412.  Equitable tolling is available in many situations, including "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 & n.3 (1990).  See Burnett v. N.Y. Cent. R.R. Co., 380 U.S. 424, 425 (1965). Cf. Celestine v. Veterans Admin. Hosp., 746 F.2d 1360, 1363 (8th Cir. 1984)(agreeing with other courts that "when the plaintiff files an administrative claim after filing in district court, and the claim is subsequently denied, refiling is not necessary and objections for failure to exhaust administrative remedies are

moot."); Kubrick v. United States, 581 F.2d 1092, 1098 (3d Cir. 1978), rev'd on other grounds 444 U.S. 111 (1979).  But cf. Jerves v. United States, 966 F.2d 517, 521 (9th Cir. 1992)(declining to follow Celestine v. Veterans Admin. Hosp. because of its conclusion that 28 U.S.C. § 2675(a) is jurisdictional); McNeil v. United States, 964 F.2d 647, 648 (7th Cir. 1992).  The Federal Tort Claims Act's statute of limitations does not, therefore, bar Rawers from filing this case again in federal court.  Nor does 28 U.S.C. § 2675 bar Rawers' claim, even if the Tenth Circuit continues to hold that this statute is jurisdictional.  Section 2675 provides the date after which Rawers may file her suit, after final agency action or within six months of filing a claim, see 28 U.S.C. § 2675(a), and these dates have passed.[59]  The Court concludes that the United States has not forfeited its argument that Rawers violated 28 C.F.R. § 14.2(c)'s requirements.[60]

---

[59]The Court also notes that plaintiffs frequently request that their case not be dismissed before discovery on technical issues such as the regulation here.  In this case, discovery is complete and Rawers would have all the information she needs to settle the case with the agency.

[60]Having concluded that 28 C.F.R. § 14.2(c) is a claim-processing rule rather than a jurisdictional bar, it is difficult to see how a claimant in Rawers' position would have her claim dismissed entirely.  The purpose of the administrative exhaustion requirements in 28 C.F.R. § 14.2(c) and 28 U.S.C. § 2675 is "to 'allow the agency to expedite the claims procedure and avoid unnecessary litigation by providing a relatively informal nonjudicial resolution of the claim.'" Begay v. United States, 188 F. Supp. 3d 1047, 1094 (D.N.M. 2016)(Browning, J.)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005)).  Had the United States raised this issue between the time Rawers filed her Complaint in January, 2020, and the Postal Service's final denial in March, 2020, the Court would have dismissed the case, because "[e]very premature filing of an action under the FTCA imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions."  McNeil v. United States, 508 U.S. at 112 (footnote omitted).  After the Postal Service issued its denial, however, Rawers suit was no longer improperly before the Court.  To dismiss after the agency has issued its final decision would not reasonably relieve any "unnecessary congestion in the courts," as plaintiffs would merely refile again.  McNeil v. United States, 508 U.S. at 112 n.8.  Dismissing cases brought by plaintiffs who could no longer refile would ease the federal court's burden, but "Congress manifested no interest whatsoever in restricting claimants' rights under the Federal Tort Claims Act or in restricting their access to the courts.  To the contrary, Congress identified private

- 98 -

### C.     RAWERS' SEPT. 28 LETTER IS A SUPPLEMENT TO RAWERS SF-95 FORM RATHER THAN AN AMENDMENT.

The Court concludes that Rawers' Sept. 28 Letter was not an amendment under 28 C.F.R.

§ 14.2(c) and therefore denies the U.S. MSJ.  This regulation states:

> A claim presented in compliance with paragraph (a) of this section may be amended by the claimant at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. 2675(a).  Amendments shall be submitted in writing and signed by the claimant or his duly authorized agent or legal representative.  Upon the timely filing of an amendment to a pending claim, the agency shall have six months in which to make a final disposition of the claim as amended and the claimant's option under 28 U.S.C. 2675(a) shall not accrue until six months after the filing of an amendment.

28 C.F.R. § 14.2(c).  The statute on which this regulation is based, 28 U.S.C. § 2675(a), discusses

plaintiffs' presentment requirements but does not mention amendments.  See 28 U.S.C. § 2675(a);

Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852.

The United States argues that the Court must defer to the agency's conclusion that the Sept.

28 Letter is amendment.  See U.S. MSJ at 6.  The case that the United States cites for this

conclusion, Wright v. City of Santa Cruz, 2014 WL 3058470, at *5, supports its own deference

argument, ultimately, with language from Auer v. Robbins, 519 U.S. 452, 461 (1997).  The

Supreme Court recently reconsidered Auer v. Robbins in Kisor v. Wilkie, however, and although

it did not overrule this case, it did explicitly limit the circumstances in which deference to agency

interpretations of its regulations is warranted.  See Kisor v. Wilkie, 139 S. Ct. 2400, 2414-18

(2019).  One notable limitation here is that any interpretation warranting deference "must at least

emanate from those actors, using those vehicles, understood to make authoritative policy in the

---

litigants as the primary beneficiaries of the amendments."  GAF Corp. v. United States, 818 F.2d
at 917.

relevant context." Kisor v. Wilkie, 139 S. Ct. at 2416.  Staff attorneys for the Postal Service issuing case-by-case decisions on whether an updated claim constitute an amendment are not the actors understood to make this sort of authoritative policy for the agency, and their decisions therefore deserve no deference.

Because "amendment" has a familiar legal meaning, it is appropriate to consider what that word means in the federal system in evaluating whether the United States has appropriately labeled the Sept. 28 Letter an amendment.  See McGuire v. Nielsen, _ F. Supp. 3d _, 2020 WL 1332582, at *33-34 (D.N.M. March 23, 2020)(Browning, J.)(reviewing federal court opinions concerning excusable neglect to determine whether the U.S. Customs and Immigration Service appropriately defined "through no fault of his own" in 8 U.S.C. § 1255(c)(2)).  The Federal Rules of Civil Procedure distinguish between amendments to pleadings and supplements to pleadings.  See Fed. R. Civ. P. 15.  Supplemental pleadings "set[] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  See Walker v. United Postal Serv., Inc., 240 F.3d 1268, 1278-79 (10th Cir. 2001).  A supplemental pleading "may set forth new facts in order to update the earlier pleading, or change the amount or nature of the relief requested in the original pleading."  6A C. Wright, A. Miller & M. Kane, Fed. Prac. & Proc. Civ. § 1504 (3d ed. 2020)(footnotes omitted).  See 28 A.L.R. Fed. 129 § 9 "Changing amount or nature of relief requested")(originally published in 1976)(collecting cases).  Amended pleadings, on the other hand, "relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading."  Fed. Prac. & Proc. Civ. § 1504.  Section 14.2(c), which discusses amendments to pleadings, allows parties to supplement claims with information about events that occurred after their claim's submission.  Parties may not provide

information about events that took place before their claim's submission, however, without triggering that regulation and allowing the agency another six months to review the claim.  With this in mind, Federal Tort Claims Act claimants hoping for a speedier resolution to their cases must carefully review any additional information they provide to the United States to ensure the information only supplements their claim rather than amending it.

The Sept. 28 Letter cannot be characterized soundly as an amendment to Rawers' initial claim.  It makes no additional claims or statements concerning the accident or events before Rawers' initial Form SF-95 filing.  See Sept. 28 Letter 1-4.  It notes that the initial claim was submitted "*prior* to Ms. Rawers requiring the second surgery" and provides an update that Rawers has since required a third surgery.  Sept. 28 Letter at 1 (emphasis in original).  See id. at 2.  These are all events that occurred after Rawers Form SF-95 filing.  Rawers' letter providing additional that occurred after she first filed her claim is therefore not an amendment under 28 C.F.R. § 14.2.  Rawers' claims against the United States survive.[61]

## II.   THE COURT GRANTS THE RAWERS MSJ, BECAUSE, IN THE LIGHT MOST FAVORABLE TO THE UNITED STATES, THE UNDISPUTED MATERIAL FACTS SHOW THAT SKINNER-RAMP WAS NEGLIGENT PER SE.

The Rawers MSJ argues that Rawers is entitled to summary judgment on liability and causation, because she has proven that Skinner-Ramp was negligent per se.  See Rawers MSJ at

---

[61]Rawers also argues that, because the United States mailed its final denial to Rawers' former counsel rather than Rawers, the United States may not assert 28 U.S.C. § 2401(b)'s statute of limitations.  See Rawers Response at 3-4.  Although technical violations of 28 U.S.C. § 2401 will bar the United States from asserting the Federal Tort Claims Act's statute of limitations in other Courts of Appeals, see, e.g., Adams v. United States, 658 F.3d 928, 934 (9th Cir. 2011), the Tenth Circuit will overlook technical violations if the plaintiff received actual notice, see Pipkin v. U.S. Postal Service, 951 F.2d 272, 274 (10th Cir. 1991).  The parties have not addressed Rawers' actual notice in either the Rawers MSJ or in the U.S. MSJ's fact section, and, accordingly, the Court cannot rule on Rawers' argument.

7-10.  The United States argues that, because Rawers did not plead negligence per se in her Complaint, the Court cannot grant summary judgment in her favor.  See U.S. Response at 16-19. The United States also argues that Rawers has not demonstrated that Skinner-Ramp was negligent per se.  See U.S. Response at 22-24.  The Court concludes that Rawers is entitled to pursue her negligence per se claim and that she has established that Skinner-Ramp was negligent per se.

### A.   RAWERS IS ENTITLED TO PURSUE HER CLAIM OF NEGLIGENCE PER SE AT THE SUMMARY JUDGMENT STAGE.

The United States first contends that the Court may not rule in Rawers' favor at summary judgment on a negligence per se theory, because she did not plead this in the Complaint and the United States was not on notice as to this claim.  See U.S. Response at 16-19.  There is some legal support for this argument, as federal courts frequently dismiss negligence per se claims when plaintiffs have not specified which statutes the defendant violated.  See Estrada v. Indus. Transit Inc., 2016 WL 3360531, at *3; Holler v. Cinemark USA, Inc., 185 F. Supp. 2d at 1244; Megino v. Linear Fin., No. 2:09-CV-00370-KJD, 2011 WL 53086, at *8 (D. Nev. Jan. 6, 2011)(Dawson, J.); Estate of Jessie P. Contreras v. Cty. of Glenn, No. 2:09-CV-2468-JAM-EFB, 2010 WL 4983419, at *6 (E.D. Cal. Dec. 2, 2010)(Mendez, J.); Anchundia v. Ne. Utilities Serv. Co., No. CV 07-4446 (AKT), 2010 WL 2400154, at *5 (E.D.N.Y. June 11, 2010)(Tomlinson, M.J.); Pincetich v. Jeanfreau, 699 F. Supp. 1469, 1477 (D. Or. 1988)(Frye, J.).  On the other hand, Rawers notes that one federal court outside New Mexico has concluded that a negligence claim includes negligence per se, so plaintiffs need not plead negligence per se in complaints to argue this issue on summary judgment.  See Rawers Response at 19 (citing Stafford v. DeSoto Acquisition & Dev. Corp., No. 3:15-CV-0140 DMB/JMV, 2019 U.S. Dist. LEXIS 171982, at *12 n.7 (N.D. Miss. 2017)(Brown, J.)).  See also Welch v. Loftus, 776 F. Supp. 2d 222, 225-26 (S.D. Miss. 2011)(Reeves, J.).

Notably, in New Mexico, "negligence per se is not technically a separate cause of action." Gatewood v. Estate of Thompson, 2019 WL 4889161, at *2. Negligence per se is, instead, "a method of proving negligence where a cause of action already exists." Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 21, 750 P.2d at 763.

The Court previously has addressed a similar issue in Leon v. Fedex Ground Package System, Inc. In that case, the Court concluded that plaintiffs are not required to "identify the specific statutory violations that will support [their] negligence per se theory." 2016 WL 1158079, at *9. The Court noted that all that rule 8 of the Federal Rules of Civil Procedure requires is a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "'[t]he Federal Rules of Civil Procedure do not require a plaintiff to set out the legal theories underlying his claims for relief,'" 2016 WL 1158079, at *9 (quoting Strickland v. Jewell, 562 F. Supp. 2d 661, 670 (M.D.N.C. 2007)(Eliason, M.J.). It further noted the Supreme Court's decision in Johnson v. City of Shelby, Miss., 574 U.S. 10 (2014)(per curiam), in which the Supreme Court reversed the United States Court of Appeals for the Fifth Circuit for entering summary judgment against plaintiffs who had not specifically invoked 42 U.S.C. § 1983 in their complaint. See 2016 WL 1158079, at *9. After reviewing the complaint's allegations, the Court concluded that the "Complaint's facts and mention of negligence per se give sufficient notice to FedEx Ground." 2016 WL 1158079, at *10.

Rawers has not, like the plaintiff in Leon v. Fedex Ground Package System, Inc., included the magic language "negligence per se" in the Complaint. Still, Rawers' Complaint has sufficient details to put the United States on notice of this "method of proving negligence." Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 21, 750 P.2d at 763. The Complaint

states in its factual allegation section that "Skinnerramp was required to bring her USPS vehicle to a complete stop at the Hoagland/Chateau intersection and to ensure Hoagland was clear of traffic prior to crossing."   Complaint ¶ 11, at 3.   Next, it alleges that "Skinnerramp failed to yield to oncoming traffic and proceeded to dive through the intersection and pulled out into the path of Plaintiff's vehicle."   Complaint ¶ 12, at 3.   Although Rawers' allegations do not state a statute Skinner-Ramp violated, they imply that some law "required" her to stop at the stop sign and to pull out into a clear lane.   In light of the fact that negligence per se is not an independent cause of action in New Mexico, see Gatewood v. Estate of Thompson, 2019 WL 4889161 (D.N.M. Oct. 3, 2019); Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 21, 750 P.2d at 763, these allegations are sufficient to put the United States on notice of her negligence per se theory of recovery, and Rawers may pursue this theory at summary judgment and trial.

## B. RAWERS HAS ESTABLISHED THAT SKINNER-RAMP ACTED NEGLIGENTLY PER SE.

Rawers has demonstrated that Skinner-Ramp acted negligently per se.   Four elements comprise a negligence per se cause of action in New Mexico.   See Heath v. La Mariana Apartments, 2008-NMSC-017, ¶ 7, 180 P.3d 664, 666 (citing Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d 820, 825).

> "(1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent."

Heath v. La Mariana Apartments, 2008-NMSC-0017, ¶ 7, 180 P.3d at 666 (quoting Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d 820, 825).   Rawers alleges that Skinner-Ramp violated three New Mexico statutes: N.M. Stat. Ann. §§ 66-8-114, 66-7-345, and §§ 66-7-330.   See Rawers

MSJ at 7.  First, violations of § 66-8-114 are not proper predicates for negligence per se claims, because this statute sets forth a negligence standard rather than specific conduct.  Rawers thus cannot establish the first element of a negligence per se claim based on this statute.  Second, the undisputed material facts do not demonstrate that Skinner-Ramp violated § 66-7-345, and so Rawers cannot establish the second element of her negligence per claim based on this statute.  Finally, the facts show that Skinner-Ramp violated § 66-7-330(B), and the Court will grant the Rawers MSJ.

### 1.    Section 66-8-114.

Although Rawers states that a "violation of a traffic statute constitutes negligence *per se*," Rawers MSJ at 9 (citing Lozoya v. Sanchez, 2003-NMSC-009, ¶ 35, 66 P.3d 948, 959), the Court may not find negligence per se for every traffic statute in the books, see Heath v. La Mariana Apartments, 2008-NMSC-017, 180 P.3d 664.  In Heath v. La Mariana Apartments, the Supreme Court of New Mexico adopted the approach that the Honorable Harris Hartz, then Judge of the Court of Appeals of New Mexico and now United States Circuit Judge for the Tenth Circuit, set forth in Abeita v. Northern Rio Arriba Electric Co-op., 1997-NMCA-097, 946 P.2d 1108.  See Heath v. La Mariana Apartments, 2008-NMSC-017, ¶ 1, 180 P.3d at 658.  In that case, Judge Hartz concluded that statutes which set forth a reasonable care standard are too general to serve as the basis for a negligence per se claim.  See Abeita v. N. Rio Arriba Elec. Co-op., 1997-NMCA-097, ¶ 21,  946 P.2d at 1116.  The statute or regulation must instead define the duty "with specificity." Abeita v. N. Rio Arriba Elec. Co-op., 1997-NMCA-097, ¶ 21,  946 P.2d at 1116.  The Supreme Court of Mexico agreed that, "'where duties are undefined, or defined only in abstract or general terms,' leaving it to the jury to evaluate the factual circumstances of the particular case to

determine whether the defendant acted reasonably, then a negligence per se instruction is not warranted."  Heath v. La Mariana Apartments, 2008-NMSC-017, ¶ 9, 180 P.3d at 666 (quoting Abeita v. Northern Rio Arriba Electric Co-op., 1997-NMCA-097, ¶ 21,  946 P.2d at 1116).

Rawers allegation that Skinner-Ramp violated § 66-8-114 does not demonstrate negligence per se, because this statute sets forth a standard of care that is indistinguishable from a negligence standard, and, to the extent it sets forth a specific standard, Rawers has not proven Skinner-Ramp did not follow this standard.  Notably, § 66-8-114 has a general title: "Careless driving."  N.M. Stat. Ann. § 66-8-114.  Rawers does not specify which subsection of the careless driving statute Skinner-Ramp violated.  See Rawers MSJ at 9.  Subsection A of the statute states that "[a]ny person operating a vehicle on the highway shall give his full time and entire attention to the operation of the vehicle."  N.M. Stat. Ann. § 66-8-1114(A).  This language is not sufficiently specific to elevate it from a simple negligence standard, but even if it was Rawers has not established that Skinner-Ramp did not give her full time and attention to her driving.  Rawers also cannot rely on subsection B, because it states that "[a]ny person who operates a vehicle in a careless, inattentive or imprudent manner, without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances is guilty of a misdemeanor."  N.M. Stat. Ann. § 66-8-114(B).  This subsection is a straightforward negligence standard, forbidding "careless" and "inattentive or imprudent" driving."  N.M. Stat. Ann. § 66-8-114(B).

### 2.    Section 66-7-345.

Rawers also alleges that Skinner-Ramp violated N.M. Stat. Ann. § 66-7-345.  Subsection 66-7-345(C) states:

> Except when directed to proceed by a police officer or traffic-control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk on the near side of the intersection or, in the event there is no crosswalk, shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway before entering the intersection.

N.M. Stat. Ann. § 66-7-345(C).  This subsection's requirement that drivers stop at designated intersections sets forth a clear, specific standard of conduct that satisfies Heath v. La Mariana Apartments, 2008-NMSC-017, ¶ 9, 180 P.3d at 666.  Rawers has not established, however, that Skinner-Ramp violated §66-7-345(C), because the undisputed material facts do not show that Skinner-Ramp did not stop at the stop sign.

The undisputed material facts before the Court demonstrate that: (i) Rawers had the right of way as she drove east on Hoagland Road going through the intersection with Chateau Drive, (ii) Skinner-Ramp was driving northbound on Chateau Drive towards its intersection with Hoagland Road and approached the stop sign that is on Chateau, right before it intersects Hoagland Road; and (iii) Skinner-Ramp's vehicle sustained damage to its front left side, while the front of Rawers' vehicle was damaged in the crash.  The facts do not demonstrate that Skinner-Ramp did not stop at the stop sign.  There is even evidence in the record that Skinner-Ramp stopped; Allen noted in the Allen Report that Skinner-Ramp told him that "she stopped at stop sign" and "looked both ways."  Allen Report at 2.  Rawers therefore is not entitled to summary judgment on her negligence per se claim based on § 66-7-345.

### 3. Section 66-7-330.

Rawers also argues that she is entitled to summary judgment on negligence per se for Skinner-Ramp's violation of § 66-7-330.  Subsection B section states:

> Except when directed to proceed by a police officer or traffic-control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign

> shall stop as required by Section 66-7-345 C [NMSA 1978] and after having stopped shall yield the right-of-way to any vehicle which has entered the intersection from another highway or which is approaching so closely on the highway as to constitute an immediate hazard during the time when the driver is moving across or within the intersection.

N.M. Stat. Ann. § 66-7-330(B).  As with § 66-7-345(C), this statute sets forth a clear standard of conduct.  Here, however, the undisputed material facts show that Skinner-Ramp violated the statute.

The undisputed material facts before the Court show that Skinner-Ramp was negligent per se.  These facts demonstrate that: (i) Rawers had the right of way as she drove east on Hoagland Road going through the intersection with Chateau Drive; (ii) Skinner-Ramp was driving northbound on Chateau Drive towards its intersection with Hoagland Road and approached the stop sign that is on Chateau, immediately before it intersects Hoagland Road; and (iii) Skinner-Ramp's vehicle sustained damage to its front left side, while the front of Rawers' vehicle was damaged in the crash.  The facts are bare, and the Court views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in his or her favor.  See Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014).  Given Skinner-Ramp's statement in the Allen Report that she stopped at the stop sign, the Court will not conclude that Rawers has established Skinner-Ramp's negligence per se based on N.M. Stat. Ann. § 66-7-330(B)'s prohibition against driving through stop signs.  Nevertheless, there is no inference the Court can draw or factual dispute to resolve that could establish that Skinner-Ramp yielded the right of way to Rawers.  Every imagined scenario concludes with Skinner-Ramp pulling out into Rawers' path.  Even after drawing inferences in the United States' favor, the Court concludes that

Skinner-Ramp violated N.M. Stat. Ann. § 66-7-330(B) and failed to yield to Rawers even though Rawers has the right of way.

Rawers also satisfies negligence per se's third and fourth prongs: that Rawers was in the class of people the legislature intended to protect with N.M. Stat. Ann. § 66-7-330(B), and that her injuries were of the type the legislature intended to prevent.   See Archibeque v. Homrich, 1975-NMSC-066, ¶ 15, 543 P.2d 820, 825.   Rawers was a motorist who had the right of way as she travelled down Hoagland Road, and Skinner-Ramp's decision to pull into the right of way without yielding in violation of the statute caused a collision between the two cars.   In addition, the Court has found that the crash (i) caused Rawers' spinal cord stimulator to malfunction; (ii) caused Rawers' asymptomatic cervical degenerative disk disease at C4-5, C5-6, and C6-7 to become permanently symptomatic (iii) damaged Rawers' spinal cord stimulator, necessitating its replacement and revision; and (iv) will cause cervical pain and left upper extremity pain for Rawers, which will require medication and physical therapy to control.   The crash was the proximate cause of these injuries; they are the natural results of collisions on the road. Accordingly, Rawers has satisfied all of negligence per se's elements and the Court will grant the Rawers MSJ.

**IT IS ORDERED** that: (i) the Defendant's Motion for Summary Judgment and Memorandum in Support, filed May 18, 2020 (Doc. 56), is denied, and the Plaintiff's Motion for Partial Summary Judgement, filed May 18, 2020 (Doc. 57), is granted.

UNITED STATES DISTRICT JUDGE

*Counsel*:

Jess R. Lilley
Jerome O'Connell
Lilley & O'Connell, P.A.
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

John C. Anderson
  United States Attorney
Roberto D. Ortega
Christoper F. Jeu
Sean M. Cunniff
  Assistant United States Attorneys
United States Attorneys Office
Albuquerque, New Mexico

      *Attorneys for the Defendant*