**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KAREN RAWERS,

       Plaintiff,

vs.                                        No. CIV 19-0034 JB/CG

UNITED STATES OF AMERICA and
CLARISSA SKINNER-RAMP

       Defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on a two-day bench trial on damages held on September 10, 2020, and September 11, 2020. <u>See</u> Transcript of Bench Trial (held September 10, 2020), filed September 28, 2020 (Doc. 98)("Sept. 10 Tr."); Transcript of Bench Trial (held Sept. 11, 2020) filed September 28, 2020 (Doc. 99)("Sept. 11 Tr."). The primary issues are the amount of damages Plaintiff Karen Rawers should receive for: (i) medical expenses incurred as a result of a vehicle accident between Rawers' vehicle and a United States Postal Services ("USPS") truck, in which the USPS driver, Clarissa Skinner-Ramp, was negligent; and (ii) damages for pain and suffering and loss of enjoyment of life, fully reflecting the nature extent, and duration of her injuries. The Court concludes that Rawers is entitled to (i) $382,379.62 in medical expenses, because Rawers has incurred or will incur $382,379.62 in medical costs as a result of the April 5, 2016, motor vehicle accident; and (ii) $764,759.24 for pain and suffering, because (a) Rawers experienced significant pain as a result of the motor vehicle accident and the surgeries required by the accident, loss of enjoyment of life; and (b) Rawers' ability to enjoy the same activities that she did before the motor vehicle accident, including cooking, exercising, bead work, and chores, has been curtailed seriously as a result of the accident, and this amount of damages is necessary to

reflect fully the nature, extent, and duration of her injuries, because Rawers is likely to experience neck limitations related to the accident for the rest of her life. Personal injury cases often settle for approximately three times the amount of medical expenses, which the Court considered a good guide in its calculations. Consequently, the Court awards judgment in Rawers' favor against the Defendant United States of America in the amount of $1,147,138.86.

## FINDINGS OF FACT

Rawers and the United States have submitted proposed findings of fact. See Plaintiff's Proposed Findings of Fact and Conclusions of Law at 1, filed October 30, 2020 (Doc. 105)("Rawers FOFs"); Defendant United States of America's Proposed Findings of Fact and Conclusions of Law at 1, filed October 30, 2020 (Doc. 106)("United States FOFs"). The Court has considered carefully Rawers' and the United States' sets of facts, and accepts some of those facts, rejects some, and finds some facts that no party brought to its attention. See Rawers FOFs at 1; United States FOFs at 1.[1] The Court sets forth its findings below.[2]

**1.      Rawers' Pre-Accident Medical History.**

1.      Rawers first injured her back when she sneezed while bending over to kiss her dog in 2005 and thereby ruptured discs in the lumbar region of her back. See Sept. 10 Tr. at 14:8-23

---

[1]Although the parties express many of the background facts differently, they do not dispute many of those facts. The Court has, throughout its findings, synthesized the parties' proposed findings where they are fully compatible. In many cases, the Court adopts one party's finding and declines to adopt the other's finding for stylistic reasons: for example, where one party's proposed findings more completely discuss a fact than another party, the Court generally has adopted the more thorough discussion. Where the Court has determined the proposed facts differ, the Court analyzes the applicable evidence and makes a finding.

[2]Where the Court adopts one party's finding and declines to adopt an opposing party's finding for a substantive reason -- that is, because the evidence better supports one finding than another -- the Court explains the reason for that conclusion in the footnotes.

(Lilley; Rawers); Rawers FOFs ¶ 1, at 1; United States FOFs ¶¶ 6-7, at 2; United States' Closing Argument at 1, filed September 25, 2020 (Doc. 96)("United States Closing")(stating that "[i]t is also undisputed that the origins of Plaintiff's pain, particularly her chronic back ailments, predate the April 5, 2016 motor vehicle accident (the 'accident') at issue in this case")(no citation for quotation).

2.     Rawers describes this experience as "the most pain I ever felt . . . in my life." Sept. 10 Tr. at 14:14 (Rawers).  See United States FOFs ¶ 6, at 2.

3.     Following her initial injury, "after less invasive measures failed to alleviate her pain," Rawers received a surgical fusion at the bottom two levels of her lumbar spine, L4-5 and L5-S1, in 2007.  United States FOFs ¶ 8, at 2.  See Sept. 10 Tr. at 207:8-12 (Ravessoud); id. at 15:21-24 (Rawers); Radiographs (x-rays)(Saiz) at 1 (dated December 4, 2019)(admitted at Trial on September 10, 2020, as Rawers' Ex. 97)("Radiographs"); Rawers FOFs ¶ 294, at 45 (noting that the lumbar fusion "was not related to the MVA").

4.     Rawers also had a titanium cage implanted in her lower lumbar region.  See Sept. 10 Tr. at 15:4-7 (Rawers); Radiographs; United States FOFs ¶ 8, at 2; United States Closing at 1.

5.     After these surgeries, Rawers was able to return to work.  See Sept. 10 Tr. at 18:4-8 (Rawers)(stating that, "after the cage was put in, I went back to twelve-hour workdays"); United States FOFs ¶ 9, at 2-3.

6.     Until 2009, Rawers worked at Le Cordon Bleu in Pasadena, California, as a culinary instructor.  See Sept. 10 Tr. at 21:1-17 (Rawers); Rawers FOFs ¶ 2, at 1; United States FOFs ¶ 9, at 2.

7.     In 2009, Rawers fell from a stool while at work at Le Cordon Bleu and has not worked since her fall from the stool.  See Sept. 10 Tr. at 129:3-6 (Rawers); id. at 123:11-12

(Rawers); Rawers FOFs ¶ 3, at 1; United States FOFs ¶ 11, at 3; United States' Closing at 1.

8.      The fall from the stool exacerbated Rawers' existing back pain and created constant pain in her left hip which radiated down her left leg.  See Sept. 10 Tr. at 22:15-23:4 (Rawers); Rawers FOFs ¶ 3, at 1; United States FOFs ¶ 11, at 3.

9.      Rawers "has been unable to work since she feel off the stool in 2009" because the "accident imposed physical limitations that made it difficult to perform her work as a chef and culinary school instructor," including "an inability to lift more than 15 pounds, stand for long periods of time, or bend over to place food in the oven."  United States Closing at 2.  See Sept. 10 Tr. at 124:7-16 (Cunniff, Rawers).

10.      In 2011, Rawers moved to New Mexico from California.  See Sept. 10 Tr. at 25:7 (Rawers); Rawers FOFs ¶ 2, at 1.

11.      On July 4, 2013, Rawers had a neurostimulator device implanted in her back.  See Timothy Davis, MD, SCS Implantation at 1-2 (dated July 4, 2013)(admitted at Trial on September 10, 2020, as Rawers' Ex. 93)("SCS Implantation"); Radiographs at 1; Rawers FOFs ¶ 4, at 1; United States FOFs ¶¶ 12-13, at 3; United States' Closing at 1.

12.      A neurostimulator is implanted only in "a patient who has had prior surgery" -- in Rawers' case "laminectomies," and "pains that are above 6, 7, especially pains that are between 7 and 8."  Sept. 10 Tr. at 211:5-13 (Ravessoud).  Rawers FOFs ¶ 123, at 5.

13.      The device had three components: (i) a St. Jude eon mini internal pulse generator; (ii) a St. Jude tripole lamitrode -- a paddle implanted along her thoracic spine; and (iii) a St. Jude Swiftlock anchor.  See SCS Implantation at 2; Radiographs at 1; United States FOFs ¶ 14, at 3.

14.      The neurostimulator delivered electric impulses to the nerves in Rawers' spine, helping to alleviate the pain in her leg and back.   See Sept. 11 Tr. at 310:3-25-311:3

(Shelley)(stating that neurostimulators "tend to be used for . . . intractable or hard-to-treat leg pain that comes out of the spine"); id. at 490:12-491:10 (Saiz); United States FOFs ¶¶ 15-16, at 3-4; Rawers FOFs ¶ 4, at 1.

15.     The neurostimulator diminished, but did not eliminate, Rawers' pain. See Sept. 10 Tr. at 34:13-16 (Rawers)(testifying that her pain was between two and four out of ten which "was uncomfortable but livable"); id. at 133:13-134:25; Sept. 10 Tr at 253:14-23 (Rauck)(explaining that, before the 2016 accident, Rawers' "spinal cord stimulator seemed to be working reasonably well," although "there were several [problems] she had had within . . . the twelve months prior to April 5, 2016" which is "typical"); Sept. 11 Tr. at 310:23-311:15 (Shelley)(noting that Rawers had a "manageable" pain level after implantation, "on average, three to four out of ten," and that, "after having much, much worse pain," Rawers "was happy that she had that device"); Rawers FOFs ¶ 30, at 7; Rawers FOFs ¶ 149, at 29 (explaining that "Rawers suffered from chronic back pain prior to the accident but her stimulator seemed to be working reasonably well to control pain"); United States FOFs ¶ 16, 18, at 4 (stating that "Rawers continued to suffer pain after the implantation of the device, however, and she experienced limitations in the activities she could undertake"); United States Closing at 2.

16.     Rawers would "set and forget" her spinal cord stimulator, because it decreased her pain level. Panel Independent Medical Examination Report at 12, filed May 18, 2020 (Doc. 57-6)("IME Report"). See Rawers FOFs ¶ 5, at 2.

17.     With the assistance of the spinal cord stimulator, Rawers was able to walk two miles at a time and to sleep five hours at a time uninterrupted. See IME Report at 12; Rawers Closing at 2; Rawers FOFs ¶ 5, at 2.

18.     Rawers did not experience any difficulties with the spina-cord stimulator before the

motor vehicle accident on April 5, 2016.  See Sept. 10 Tr. at 38:18-39:13 (Rawers); Rawers FOFs ¶ 31, at 7.

19.     Rawers had an ischemic stroke[3] on the left side of her brain in December, 2014. See Sept. 10 Tr. at 136:19-137:2 (Cunniff, Rawers); Neurology Associates of Mesilla re Dr. Iqbal at 1 (dated May 18, 2016)(admitted at Trial on September 10, 2020, as Rawers' Ex. 15)(stating that Rawers "reports having a stroke in 2014"); Rawers FOFs ¶ 291, at 54; United States FOFs ¶ 17, at 4; United States Closing at 2.

20.     As a result of the stroke, Rawers' left leg became weaker, and she took Xarelto[4] for less than one year.  See Neurology Associates of Mesilla re Dr. Iqbal at 1 (stating that, "since" the ischemic stroke, "her left leg is weaker, sensitive and having more difficulties"); Sept. 10 Tr. at 138:8-10 (Rawers)(testifying that "after I had the stroke . . . I had significant blood clots in my left leg, and I had them removed"); United States Closing at 2 (stating that the stroke "resulted in additional leg sensitivity and other difficulties").

21.     The stroke was transient, and, therefore, did not cause a permanent change to her left leg.  See Sept. 11 Tr. at 524:14-17 (Saiz); Rawers FOFs ¶ 291, at 45.

22.     Rawers did not experience neck pain or headaches before the accident; although

---

[3]There are two types of stroke: ischemic and hemorrhagic.  See Ischemic Stroke, Medline Plus (July 24, 2020), https://medlineplus.gov/ischemicstroke.html.  An ischemic stroke "is the most common type. It is usually caused by a blood clot that blocks or plugs a blood vessel in the brain. This keeps blood from flowing to the brain. Within minutes, brain cells begin to die." Ischemic Stroke, Medline Plus (July 24, 2020), https://medlineplus.gov/ischemicstroke.html. Ischemic strokes may also be caused by "stenosis, or narrowing of the artery. This can happen because of atherosclerosis, a disease in which plaque builds up inside your arteries."  Ischemic Stroke, Medline Plus (July 24, 2020), https://medlineplus.gov/ischemicstroke.html.

[4]Xarelto, or rivaroxaban, "is an oral anticoagulant (blood thinner) that is used to prevent and treat blood clots."  Omudhome Ogbru, rivaroxaban (Xarelto), MedicineNet, https://www.medicinenet.com/rivaroxaban/article.htm (last visited Jan. 12, 2021).

she had a degenerative neck condition, it was not symptomatic. See Sept. 11 Tr. at 338:1-23 (Lilley, Shelley); United States Closing at 2 ("As for Plaintiff's neck, the experts agree that there was no indication that her preexisting degenerative disk disease was symptomatic preceding the accident."); Rawers FOFs ¶¶ 172-23, at 32.

23.     Rawers' pain medication regimen included Tramadol, twenty-five micro grams of Fentanyl, and Lyrica. See Sept. 10 Tr. at 45:11-46:13 (O'Connell, Rawers); United States FOFs ¶ 19, at 4.[5]

24.     Rawers had asymptomatic cervical degenerative disc disease. See Sept. 10 Tr. at 260:22-261:9 (Rauck); Sept. 11 Tr. at 477:15-24 (Saiz); United States FOFs ¶ 20, at 4.

## 2.     **The Accident.**

25.     On April 5, 2016, Rawers was driving eastbound along Hoagland Road in Las Cruces, New Mexico. See Stipulated Pretrial Order ¶ IV(A)(2), at 4, filed June 26, 2020 (Doc. 77)("Stipulated Facts"); Las Cruces Police Department Uniform Crash Report at 2 (dated April 5, 2016)(admitted at Trial on September 10, 2020, as Rawers' Ex. 5)("Police Report"); United States FOFs ¶ 1, at 1.

26.     Skinner-Ramp, a USPS employee, was driving a USPS delivery vehicle northbound

---

[5]At trial, Rawers indicated that she was using tramadol, twenty-five micrograms of fentanyl, and had a Narcan pen before the accident. See Sept. 10 Tr. at 45:11-46:13 (O'Connell, Rawers); id. at 100:20-23 (Rawers)("I did get a Narcan pen because I was receiving the fentanyl. Eventually, if you got fentanyl, you had to have a Narcan pen. Now, it's Narcan nasal spray."). Rawers' medical records also note that she was taking fentanyl, hydrocodone, tramadol, Xanax, Xarelto, Zanaflex, and Lyrica before the accident. See Health Care Solutions (HCS), Multiple Events at 4, (dated Dec. 2, 2015)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 94). In her FOFs, Rawers states that, following the accident, "[b]ecause of the significant increase in pain (from a daily 2 to a daily 8) Rawers was required to increase her reliance on medications, including taking 25 micrograms of Fentanyl, taking Lyrica, a muscle relaxant, gabapentin, along with other prescription drugs." Rawers FOFs ¶ 41, at 8. The Court concludes, however, based on Rawers' medical records and her testimony at trial, that Rawers' heavy reliance on medications predated the accident.

on Chateau Drive towards its intersection with Hoagland Road. <u>See</u> Stipulated Facts ¶ IV(A)(3), at 4; Police Report at 1-2; United States FOFs ¶ 2, at 1.

27.    Skinner-Ramp stopped at the intersection, but did not notice Rawers' vehicle. <u>See</u> Police Report at 2; United States FOFs ¶ 2, at 1.

28.    Skinner-Ramp collided with Rawers' vehicle after proceeding through the intersection. <u>See</u> Police Report at 2; United States FOFs ¶ 2, at 1.

29.    Rawers was driving approximately fifteen miles per hour at the time of the collision. <u>See</u> Las Cruces Emergency Medical Associates at 2 (dated April 6, 2016, 8:30 p.m.)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 4)("Nurse Chart"); United States FOFs ¶ 3, at 2; United States Closing at 2 (explaining that Rawers "collided at low speed with a United States Postal Service Carrier").

30.    The collision occurred at approximately 4:50 p.m. <u>See</u> Stipulated Facts ¶ IV(A)(3), at 1.

31.    Rawers was able to exit her vehicle after the crash. <u>See</u> Patient Care Report at 1 (stating that the "patient [sic] is able to self-ambulate to gurney"); Sept. 10 Tr. 32:5-7 (Rawers)(explaining that, after the collision, "I pulled to the right, parked my car, and went to see if the lady in the postal truck was okay"); <u>id.</u> at 132:23-25 (Cunniff, Rawers); United States FOFs ¶ 4, at 2; United States FOFs ¶ 21, at 4.

32.    Rawers was experiencing lower back pain immediately following the crash. <u>See</u> Police Report at 2; American Medical Response -- Dona Ana County Patient Care Report at 1 (dated April 5, 2016)(admitted at Trial on September 10, 2020, as Rawers' Ex. 6)("Patient Care Report"); Rawers FOFs ¶ 6, at 2; Rawers FOFs ¶ 33, at 2.

33.    An ambulance transported Rawers to the hospital. <u>See</u> Patient Care Report at 1;

Rawers FOFs ¶ 34, at 7; Sept 10. Tr. at 40:3-4 (Rawers); United States FOFs ¶ 21, at 4.

34.     Rawers' vehicle was slightly damaged on the left front side.  See Police Report at 1; Patient Care Report at 1 (noting that the "patient's vehicle shows minimum damage sustained"); Sept. 10 Tr. at 139:15-17 (Rawers)(explaining that "it was not a direct frontal crash"), United States FOFs ¶ 5, at 2.

35.     The vehicle's airbags did not deploy, and the vehicle remained operational following the accident.  See Patient Care Report at 1 (noting that "air bags did not deploy"); Sept. 10 Tr. at 139:15-17 (Cunniff, Rawers); id. at 140:1-8 (Cunniff, Rawers)(testifying that Rawers drove the vehicle back and forth from Las Cruces, New Mexico, to Albuquerque, New Mexico, several weeks after the accident to attend a dog show); United States Closing at 2 (noting that Rawers' "airbag did not deploy" and that "the vehicle was drivable"); United States FOFs ¶ 5, at 2.

### 3.     Rawers' Condition Following the Accident.

36.     Immediately after the accident, Rawers had pain at an eight out of ten in her neck, her leg, and her back.[6]  See Patient Care Report at 1 (stating that the "patient rates her pain 8/10 at this time"); id. at 3 (stating that Rawers reported pain at an eight out of ten at 4:55 p.m.);  id. at 2 (same); Rawers FOFS ¶¶ 32-34, at 7; United States FOFs ¶¶ 21-22, at 3-4.[7]  See also Sept. 10 Tr.

---

[6]Medical professionals commonly use "[s]tandardized scales that measure pain."  Section 26:23, Rating scales that measure pain, 2 Attorneys Medical Deskbook.  The parties rely on pain scale measurements to describe Rawers' pain and the Court uses these measurements throughout its opinion.

[7]The United States insists that Rawers "twice reported during the ride to the hospital that her pain equaled 6 on a scale of 1 to 10."  United States FOFs ¶¶ 22-23, at 4.  Rawers, by contrast, states that the pain "she experienced following the collision was about as painful as any she has ever felt and believed it to be a 9 out of 10."  Rawers FOFs ¶ 96, at 19 (citing Sept. 10 Tr. at 144:11-145:4 (Rawers)).  The source upon which the United States relies -- the Patient Care Report -- however, indicates that Rawers reported initially her pain at an eight out of ten, and reported her

at 37:9-11 (Rawers)(stating that, "[i]mmediately after the accident, when they called the police and the EMTs, the ambulance . . . I was complaining of my back hurting"); Sept. 10 Tr. at 37:9-11 (Rawers)(testifying that, after the accident "my back and my left leg hurt so much . . . . It was my biggest complaint when I was put in the ambulance."); Sept. 10 Tr. at 163:3-5 (Rawers)(recalling that, "when I talked to the EMTs[,] . . . my whole back hurt, my neck, my lower back"). Cf. Patient Care Report at 3 (stating that Rawers reported pain at a six out of ten at 5:22 p.m., approximately thirty minutes after the accident); id. at 2 (same).

37.     When Rawers arrived at the emergency room at Memorial Medical Center in Las Cruces, she also was experiencing back and neck pain. See Emergency Room Report at 11 (noting that Rawers reported "pain, that is moderate of the low back area," "tenderness, that is moderate, of the left mid-cervical area, right mid-cervical area, and lower cervical area" as well as "neck . . . pain, that is moderate"); MMC MVA notes and new pain (dated April 5, 2016)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 7)("Emergency Department Record")(stating that Rawers "sustained neck injury, pain, injury to the low back, pain"); Sept. 10 Tr. at 165:25-166:24 (Rawers); Sept. 10 Tr. at 319:7-12 (Shelley); Sept. 11 Tr. at 474:9-11 (Saiz)(testifying that Rawers "was fairly consistent in the emergency room that she had cervical, thoracic, and lumbar pain"); Sept. 11 Tr. at 571:24-572:4 (Crawford)(testifying that Rawers "complained of neck issues immediately after the accident and at the emergency room visit," although "it was initially overshadowed because of the severe back and leg pain that she was having from failure of the spinal cord stimulator"); Rawers FOFS ¶ 34, at 7; id. ¶ 101, at 20; id. ¶ 70, at 32; id. ¶ 273, at 42, id. ¶ 310, at 47; United States FOFs ¶¶ 21-22, at 3-4; United States FOFs ¶ 104, at 19 (stating that

---

pain at a six out of ten nearly half an hour later. See Patient Care Report at 2. Accordingly, the Court will find that her pain was higher shortly after the accident.

Rawers "had suffered from neck pain from the time of the accident").

38.    Rawers received pain medication in the emergency room.   See Las Cruces Emergency Medical Associates at 8 (dated April 5, 2016)(admitted at Trial on September 10, 2020, as Rawers' Ex. 4)("Emergency Room Report")(noting that "Toradol[8] markedly relieved the patient's pain, hydrocodone,[9]" and prescribing "hydrocodone-acetaminophen" and "ibuprofen 800 mg").

39.    At the emergency room, Rawers received CT scans of her lumbar spine and neck. See Emergency Room Report at 9-10; MMC CT of Lumbar (dated April 5, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 8); MMC CT of Neck (dated April 5, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 9).

40.    Hospital personnel at the emergency room were not able to assist Rawers with her neurostimulator.   See Sept. 10 Tr. at 147:9-11 (Rawers)(stating that the emergency room doctor "had never heard of a neurostimulator; had never seen a neurostimulator; had never comprehended one");   id. at 40:7-8 (Rawers)(same); Rawers FOFS ¶ 34, at 7.

---

[8]Toradol (generic name kertolac)

is a member of a class of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs) that are used for treating inflammation and pain.  Other drugs in this class include ibuprofen (Motrin) and naprosyn (Naprosyn, Aleve), but ketorolac is more effective than other NSAIDs in reducing pain from both inflammatory and non-inflammatory causes. Ketorolac reduces the production of prostaglandins, chemicals that cells of the immune system make that cause the redness, fever, and pain of inflammation and that also are believed to be important in the production of non-inflammatory pain.

Omudhome Ogbru, kertolac (Toradol), MedicineNet, medicinenet.com (last visited Jan. 7, 2021).

[9]Hydrocodone is "[a] potent analgesic derivative of codeine used as an antitussive" or to suppress coughing, "and analgesic" or to reduce pain, which is "[o]ften used combined with aspirin or acetaminophen." Hydrocodone, Stedmans Medical Dictionary 419100 (Nov. 2014).

41.     Rawers left the emergency room at 8:17 p.m. with a friend on the same day.  See Emergency Room Report at 4.

42.     Rawers' spinal cord stimulator stopped working correctly following the accident. See Sept 10 Tr. at 39:1-13 (Rawers); id. at 52:23-53:4 (testifying that, after the accident, the neurostimulator "at least gave me some relief," but "didn't take it away like it did before the accident"); Sept. 10 Tr. at 259:10-15 (Rauck)(explaining that Rawers "had a fracture of her spinal cord stimulator system such that it could not provide relief . . . which . . . then exacerbated her lower back pain significantly"); Sept. 11 Tr. at 474:1-5 (Shelley); Sept. 11 Tr. at 318:1-17 (Saiz)(testifying that, "clearly, she had a functioning spinal cord stimulator prior to the accident, and she didn't after"); Sept. 11 Tr. at 326:5-10 (Cunniff, Saiz); Sept. 11 Tr. at 569:2-11 (Crawford); United States Closing at 3 (admitting that the fact "[t]hat the neurostimulator malfunctioned at some point after the accident is undisputed"); Rawers FOFS ¶ 32, at 7; Rawers FOFs ¶ 149, at 29; Rawers FOFs ¶ 178, at 33; Rawers FOFs ¶ 272, at 43 ("Rawers' spinal cord stimulator was damaged in the automobile collision"); Rawers FOFS ¶ 313, at 48; United States FOFs ¶ 29, at 6 (stating that "the experts agreed the cause of the malfunction was the April 5, 2016 accident").

43.     The motor vehicle accident caused Rawers' spinal cord stimulator to malfunction. See IME Report at 19; Sept. 10 Tr. at 259:10-15 (Rauck); Sept. 11 Tr. at 336:17-20 (Lilley, Shelley); Sept. 11 Tr. at 569:2-11 (Crawford); Rawers FOFs ¶¶ 18-21, at 7-8; Rawers FOFs ¶ 152, at 29; Rawers FOFs ¶ 169, at 32.

44.     The motor vehicle accident "did not affect the titanium cage and related spinal fusion in her lower lumbar region."  United States Closing at 3.

45.     A malfunctioning neurostimulator "has damaging effects" regarding patients' "ability to get out and do other things and keep muscles toned up" and "can be quite disruptive to

them from a pain standpoint."  Sept. 10 Tr. at 260:6-12 (Rauck).  <u>See</u> Rawers FOFs ¶ 150, at 29.

46.      As a result of the spinal cord stimulator malfunction, Rawers experienced a jolting pain that shot up through her spine into her head.  <u>See</u> Sept. 10 Tr. at 42:22-43:5 (Rawers)(describing this physical difficulty as a "significant change" in pain in comparison to her pain before the motor vehicle accident); Sept. 11 Tr. at 312:1-5 (Shelley)("She described the spinal cord stimulator shutting itself off, and then when it was turned on again or turned itself back on, malfunctioning and basically causing jolts throughout her body."); Sept. 11 Tr. at 569:2-11 (Crawford)(explaining that "there was a malfunction in the spinal cord stimulator where" it "shut itself off and . . . spontaneously turned itself back on; and from that point, it was no longer effective in helping her pain"); Rawers FOFs ¶ 37, at 7; Rawers FOFs ¶ 168, at 32; Rawers FOFS ¶ 314, at 48 (stating that "Rawers reported problems with her stimulator after the accident, and it was not effective in controlling her pain").

47.      These jolts caused Rawers to behave "almost . . . like I had a tic"; she would "sometimes . . . close my eyes and wink" or "shake or bobble" her head, "all day, every day, constantly."  Sept. 10 Tr. at 43:6 (Rawers).  <u>See</u> Rawers FOFs ¶ 38, at 8.

48.      The jolts also caused Rawers' leg to spasm, often disturbing her sleep.  <u>See</u> Sept. 10 Trial Tr. at 52:8-19 (Rawers)(stating that her leg "would almost dance around; it would move and I wasn't controlling it"); Rawers FOFs ¶ 45, at 9.

49.      Rawers also experienced "elevated pain and discomfort in Plaintiff's lower lumbar region; in particular, the discomfort radiated to her lower leg, causing pain and other unwelcome sensations."  United States Closing at 3.  <u>See</u> Sept. 10 Tr. at 138:15-17 (Rawers).

50.      The new pain Rawers began experiencing "was not due to a new injury, but rather to loss of the pain management benefits from the neurostimulator."  United States Closing at 3.

<u>See</u>, <u>e.g.</u>, Sept. 10 Tr. at 165:24-166:4 (Rawers).

51.    A neurostimulator "doesn't really fix the problem in the lower back; it just scrambles the pain signal as it travels through the cord"; Rawers' malfunctioning neurostimulator was no longer successfully "scrambl[ing]" the pain signal. Sept. 10 Tr. at 208:6-19 (O'Connell, Ravessoud). <u>See</u> Rawers Closing at 3 (noting that Rawers' pain "had been largely held at bay *only* because the neurostimulator had been doing its job")(emphasis in original); Rawers FOFs ¶ 122, at 24.

52.    Shortly after the accident, Rawers visited repeatedly her primary care doctor, Dr. Stefan Shaefer. <u>See</u> Dr. Schaefer Records re headaches at 1 (dated April 12, 2016)(admitted at trial on September 10, 2020, as Rawers' Exhibit 10); Healthcare Solutions Dr. Schaefer re low back pain at 1 (dated April 27, 2016)(admitted at trial on September 10, 2020, as Rawers' Exhibit 14); Health Care Solutions re Dr. Schaefer Eval at 1 (dated May 23, 2016)(admitted at trial on September 10, 2020, as Rawers' Exhibit 16); Sept. 10 Tr. at 40:22-41:6 (O'Connell, Rawers); Rawers FOFS ¶ 35, at 7; United States FOFS ¶ 24, at 5.

53.    Following the accident, Rawers also began receiving physical therapy in May, 2016. <u>See</u> LC Comprehensive Rehab re pain and headaches at 1 (dated April 18, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 11); LC Comprehensive PT notes at 1 (dated May 4, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 13)("PT Notes"); Sept. 10 Tr. at 166:7-10 (Rawers); <u>id.</u> at 42:6-9 (Rawers); Rawers FOFS ¶ 35, at 7; United States FOFS ¶ 27, at 6.

54.    Rawers felt "defeated" after the accident. Sept. 11 Tr. at 344:15-345:4 (Shelley). <u>See</u> Rawers FOFs ¶ 204.

55.    Rawers' pain increased as a result of the neurostimulator malfunction and continued

to worsen before she received surgery in the summer of 2017. See United States FOFs ¶ 30, at 6.

56.     Rawers' increased pain disrupted Rawers' sleeping and her ability to do activities -- including beadwork, cooking, and baking -- in comparison to before the accident. See Sept. 10 Tr. at 145:1-146:6 (Rawers); United States FOFs ¶ 31, at 6-7.

57.     Following the accident, Rawers became less able to assist her elderly father, visit the grocery store, exercise, and do laundry. See Sept. 10 Tr. at 49:1-11 (Rawers); Rawers FOFs ¶ 42, at 9; Rawers FOFs ¶ 93, at 19.

58.     Several weeks after the accident, Rawers attended a dog show and participated with her dogs. See PT Notes at 5 (noting that Rawers' "busy weekend with dogs result[ed] increased stiffness soreness cervical thoracic and lumbar"); Sept. 10 Tr. at 140:4-141:12 (Cunniff, Rawers); United States Closing at 2; United States FOFS ¶ 32, at 7. But see Rawers FOFs ¶ 94, at 19.[10]

59.     Following the accident, it became more difficult and more painful for Rawers to travel and attend dog shows. See supra FOFs ¶ 59.

60.     Rawers experienced significant pain while walking; she felt: (i) pins and needles radiating from her foot to her hip; (ii) stiffness and soreness in her back; and (iii) a stabbing sensation in her hip. See Sept. 10 Trial Tr. at 49:12-25 (O'Connell, Rawers)(stating that, when Rawers walked, "after too many steps . . . it literally felt like someone took an ice pick and went right through the center of my hip"); Rawers FOFs ¶ 43, at 9.

61.     In December, 2016, Rawers began receiving care from Dr. Eduardo Vazquez at the

---

[10]In the Rawers FOFs, Rawers asserts that "her post accident life and plans are far different . . . . She cannot travel long distances . . . she cannot attend . . . dog shows . . . ." Rawers FOFs ¶ 94, at 19. Rawers testified, however, that she attended a dog show in Albuquerque, 220 miles from Las Cruces, several weeks after the accident. Sept. 10 Tr. at 140:4-141:12 (Cunniff, Rawers). The Court, therefore, does not adopt Rawers' assertion that she "cannot" travel or attend dog shows, although those activities are more difficult or painful for Rawers post-accident. Rawers FOFs ¶ 94, at 19.

Las Cruces Pain Center for her increased pain.  See Las Cruces Pain Center re Dr. Vazquez at 1 (dated December 7, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 22); Sept. 10 Tr. at 45:1-4 (Rawers); Rawers FOFs ¶ 49, at 10; United States FOFs ¶ 35, at 7.

62.    Rawers made unsuccessful efforts to reprogram her malfunctioning neurostimulator.  See Las Cruces Pain Center re Dr. Vazquez reprograming stimulator (dated January 10, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 23); Sept. 10 Tr. at 51:10-17 (O'Connell, Rawers)(explaining that although she "got it reprogrammed at least three or four times" it was "never" successful); Sept. 11 Tr. at 326:1-25 (Lilley, Shelley)(explaining that Rawers' attempts to reprogram the neurostimulator were "unsuccessful[]"); Sept. 11 Tr. at 569:15-20 (Crawford)(explaining that "there were attempts to reprogram the stimulator, but these were unsuccessful on many attempts"); Rawers FOFs ¶¶ 44-49, at 9-10; Rawers FOFs ¶ 98-99, at 19-20; Rawers FOFs ¶ 128, at 26; Rawers FOFs ¶ 140, at 28; Rawers FOFs ¶ 179, at 33; Rawers FOFs ¶ 315, at 48; United States FOFs ¶ 26, at 5; United States FOFs ¶ 37, at 8.  See also Sept. 10 Tr. at 215:23-26 (Ravessoud).

63.    Neurostimulators are expensive medical devices that typically last for many years. See Sept. 10 Tr. at 237:25-238:4 (Cunniff, Ravessoud)(stating that neurostimulators "are designed to last for years" and are "very expensive"); Rawers FOFs ¶ 139, at 28; United States FOFs ¶ 52, at 10.

64.    After Rawers' unsuccessful attempts to reprogram the neurostimulator, she contacted Dr. Timothy Davis, the neurosurgeon who had implanted Rawers' first neurostimulator in 2013.  See Timothy Davis, MD, SCS Implantation at 1-2 (dated July 4, 2013)(admitted at Trial as Rawers' Exhibit 93)(stating that Rawers' surgeon on a "permanent implantation of Dorsal Column St. Jude Tripole Lamitrode" and an "Internal Pulse Generator Implantation" was Dr.

Timothy T. Davis); Sept. 10 Tr. at 54:25-55:20 (O'Connell, Rawers); Rawers FOFs ¶ 167, at 31 (stating that "Rawers' first spinal cord stimulator was implanted in 2013").

65.     Although Dr. Davis' office forwarded Rawers' medical records to her doctor in New Mexico, Rawers decided not to seek further care from Dr. Davis, because Rawers could not afford the costs of traveling regularly to California and Dr. Davis' fees, which her insurance company would not cover.  See Sept. 10 Tr. at 55:11-20 (O'Connell, Rawers)(explaining that she did not "have the money to pay for a top neurosurgeon, especially one in California").

66.     Rawers also considered seeking treatment from a doctor in Albuquerque, because he was on a list of doctors recommended by St. Jude -- the company that manufactured Rawers' neurostimulator -- but Rawers never visited the Albuquerque doctor because her insurance did not cover him.  See Sept. 10 Tr. at 55:23-56:7 (Rawers)(explaining that although "[t]here was a doctor in Albuquerque" she "never met him.  I never even called his office"); Rawers FOFs ¶ 48, at 10.

67.     Rawers instead decided to seek treatment in Las Cruces from Drs. Ravessoud and Vasquez for the malfunctioning neurostimulator.  See Sept. 10 Tr. at 56:4-7 (Rawers); Rawers FOFs ¶ 49, at 10.

68.     Rawers did not know, in 2016, that she would need the ACDF surgery.  See Sept. 10 Tr. at 168:20-174:2 (Rawers).[11]

_____

[11]The United States asserts that, "in the late summer of 2016, Plaintiff's physicians began to contemplate surgical options for her neck and back issues."  Rawers FOFs ¶ 33, at 7.  In support of this contention, the United States relies upon four exhibits from Rawers' visits with Dr. Michael Murphy at Health Care Solutions.  See Health Care Solutions re Dr. Murphy at 1 (dated August 31, 2016)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 18); Health Care Solutions re Dr. Murphy at 1 (dated September 29, 2016)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 19); Health Care Solutions re Dr. Murphy at 1 (dated October 18, 2016)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 20); Health Care Solutions re Dr. Murphy at 1 (dated November 11, 2016)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 21).  Rawers, however, testified that she did not recall discussing any "plan . . . to have a cervical procedure" at these appointments.  E.g., Health Care Solutions re Dr. Murphy at 1 (dated August

69.     When repeated efforts to reprogram the neurostimulator were unsuccessful, on May 1, 2017, Dr. Vasquez implanted a temporary neurostimulator system in Rawers.  See Las Cruces Pain Center re Dr. Vazquez Operative Report at 1 (dated May 1, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 28); Las Cruces Pain Center re follow up with Haydee Fiske at 1 (dated May 5, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 29)(stating that the temporary stimulator "greatly alleviated" Rawers' pain); Sept. 10 Tr. at 61:11-15 (Rawers)(stating that the trial stimulator "significantly reduced" her pain "from the post-accident machine, but it didn't take me all the way back to pre-accident"); Sept. 11 Tr. at 337:2-11 (Lilley, Shelley)(agreeing that it was "reasonable . . . to have a trial run on the new stimulator" although "not necessarily needed, because she'd already had a stimulator and benefited from it"); Sept. 11 Tr. at 569:15-20 (Crawford)(explaining that Rawers "subsequently underwent another trial" stimulator "and . . . required revision surgery"); Rawers FOFs ¶¶ 49-50, at 10; Rawers FOFs ¶ 180, at 33.

70.     Rawers visited the Las Cruces Pain Center to have the trial stimulator removed in preparation for surgery with Dr. Ravessoud to replace the malfunctioning neurostimulator.  See Las Cruces Pain Center re follow up with Haydee Fiske at 1; Rawers FOFs ¶ 50, at 10.

71.     After efforts to reprogram the neurostimulator were unsuccessful, Rawers and

---

31, 2016).  The records from the four exhibits are evidently copy and pasted from one exhibit to the next, and contain other errors.  For example, her October 18, 2016, state that she was injured in a motor vehicle accident "nine months ago," although the accident occurred on April 5, 2016. Health Care Solutions re Dr. Murphy at 1 (dated October 18, 2016).  Moreover, elsewhere, Health Care Solutions incorrectly states that Rawers has a husband and has Harrington rods in her back. See Health Care Solutions (HCS), Multiple Events, (dated June 9, 2014 to December 2, 2015)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 94).  Further, although at times Rawers had lapses in memory, the Court generally found that she was a reliable and truthful witness.  By contrast, the Health Care Solutions records contain frequent errors.  Accordingly, the Court credits Rawers testimony that she was not aware of the possibility of neck surgery in 2016.

Dr. Ravessoud agreed that Dr. Ravessoud would perform surgery to replace her malfunctioning neurostimulator. See Sept. 10 Tr. at 63:1-2 (Rawers); Rawers FOFs ¶ United States FOFs ¶ 38, at 8.

72.     "From the time the stimulator malfunctioned until the second stimulator brought Rawers some relief, all the pain and suffering and medical treatment she endured" related to the neurostimulator malfunction "was related to the auto accident." Rawers FOFs ¶ 202, at 35. See Sept. 11 Tr. at 341:9-14 (Shelley).

73.     Dr. Ravessoud revised and replaced Rawers' neurostimulator on August 1, 2017. See MMC Dr. Ravessoud procedure report at 1 (dated August 1, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 33); United States Closing at 4; Rawers FOFs ¶ 10, at 10; Rawers FOFs ¶ 181; United States FOFs ¶ 39, at 8. See also Memorial Bone and Joint re Evaluation by Dr. Ravessoud (dated July 17, 2017)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 31)(indicating that Rawers' "neurostimulator is no longer working properly" and that Rawers "is eager to have the revision"); Las Cruces Pain Center re follow up with Haydee Fiske at 12 (dated May 5, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 29)(stating that Rawers "reports good relief with the neurostimulator trial").

74.     Rawers had an infection at the incision site after the surgery, which healed eventually after continued wound care. See Memorial Bone and Joint re follow up with Dr. Ravessoud at 1 (dated August 8, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 38); United States Closing at 4; Rawers FOFs ¶ 121, at 24; United States FOFs ¶ 40, at 8.

75.     After the wound healed, Rawers' back and left leg pain improved temporarily to an average of three or four out of ten, which was comparable to her baseline pain level before the

accident.[12]  See Memorial Bone and Joint re Dr. Ravessoud follow up at 1 (dated Sept. 13,

2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 43)(stating that Rawers' "Pain

Scale" was a "4"); Las Cruces Pain Center re follow up with Fiske at 1 (dated September 28,

2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 44)(providing the following

numbers regarding Rawers' pain level: "Pain Scale (1-10 scale) Current Pain: 4/10; Least Pain

4/10, Max Pain 8/10, Average Pain: 7/10, Acceptable Pain: 3/10"); Memorial Bone and Joint re

Dr. Ravessoud at 1 (dated October 13, 2017)(admitted at Trial on September 10, 2020, as Rawers'

Exhibit 46)(stating that Rawers' "Pain Scale" was a "3-4"); Las Cruces Pain Center re NP Johnston

at 1 (dated November 11, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit

47)(providing the following numbers regarding Rawers' pain level: "Pain Scale (1-10 scale)

Current Pain: 5, Least Pain: 1, Max Pain: 10, Average Pain: 3, Acceptable Pain: 2"); Sept. 11 Trial

Tr. at 328:1-7 (Shelley)(explaining that "at some point after the stimulator was placed, she reported

pain at a 3 to 4 out of 10, which is similar to what she told us in the IME that her baseline was

---

[12]In her FOFs, Rawers maintains that the replacement neurostimulator brought "her average daily pain down from an 8 to a 6."  Rawers FOFs ¶ 51, at 10.  This assertion is based upon Rawers' testimony at trial.  See Sept. 10 Tr. at 64:16-23 (Rawers).  Rawers' medical records, however, contradict this statement and demonstrate that, after her wound healed, Rawers' pain levels were an average four out of ten.  See Memorial Bone and Joint re Dr. Ravessoud follow up at 1 (dated Sept. 13, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 43); Las Cruces Pain Center re follow up with Fiske at 1 (dated September 28, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 44); Memorial Bone and Joint re Dr. Ravessoud at 1 (dated October 13, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 46); Las Cruces Pain Center re NP Johnston at 1 (dated November 11, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 47).  Rawers reported present pain levels between three and five during her four doctors' visits following the neurostimulator surgery.  The Court concludes that medical records are more accurate than Rawers' memory several years later, because they were recorded contemporaneously.  Further, although some of Rawers' medical records contain errors that appear to be copied and pasted incorrectly, the pain levels in these medical records differ slightly in each entry, demonstrating that the record of Rawers' pain levels were updated during each visit.  Accordingly, the Court concludes that Rawers' average pain level was four out of ten following her first neurostimulator replacement after she recovered from her post-operation wound.

before that," and stating that, although "there were other complications," Rawers "had a period where she experienced," her previous baseline pain level"); United States Closing at 4; United States FOFs ¶ 41, at 8. But see Sept. 10 Tr. at 64:16-23 (Rawers)(stating that "the new stimulator took me down to 6 with an average day, and 4 was a good day"); Rawers FOFs ¶ 51, at 10 (stating that the surgery brought Rawers' "average daily pain down from an 8 to a 6").

76.     After implantation, Rawers' new neurostimulator initially functioned well. See Sept. 10 Tr. at 233:8-17 (Ravessoud)(stating that "I thought it was working well," but noting that "I think it was two months later, three months later, she started having problems with the charge"); United States Closing at 4 (noting that "ultimately, the new device functioned"; United States FOFs ¶ 42, at 8-9.

77.     With the new neurostimulator functioning correctly, Rawers was again able to engage in recreational activities, albeit to a lesser degree. See Sept. 10 Tr. at 65:3-20 (Rawers)(stating that Rawers "went back to beading at the bead store, but instead of taking classes every day, I was only taking classes two times a week or three times a week"); United States Closing at 4 (stating that Rawers had "a marked improvement in . . . lumbar-related pain after the new device was implanted"). See also Sept. 11 Trial Tr. at 328:1-7 (Shelley). Cf. Rawers FOFs ¶ 52, at 10.[13]

---

[13]In her proposed FOFs, Rawers states that she "was not able to return to any semblance of her pre-accident lifestyle and was not able to see friends or cook or engage in the same levels of activity." Rawers FOFs ¶ 52, at 10. The Court finds that this is not accurate, because Rawers testified that she was able to engage in the same activities she did before the accident, albeit to a lesser degree. See Sept. 10 Tr. at 65:3-20 (Rawers). In the portion of the trial transcript to which Rawers' FOFs cite, Rawers also testified that "if I was at 100 percent activity-wise . . . before the accident . . . after the accident, maybe 75 percent with the new" neurostimulator. Sept. 10 Tr. at 66:5-8 (Rawers). Regarding cooking and socializing, Rawers testified that she "didn't go out as much as" she had before the accident and that her "cooking lessened" in comparison to before the accident. Sept. 10 Tr. at 66:11-20 (O'Connell, Rawers). Accordingly, the Court concludes that Rawers was able to "return to" a "semblance of her pre-accident lifestyle" after the new

78.     The new neurostimulator also began malfunctioning, and Rawers reported her difficulties with the neurostimulator to Dr. Ravessoud on October 13, 2017.  See Memorial Bone and Joint re Dr. Ravessoud at 1 (dated October 13, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 46)(stating that Rawers was "having problems with recharging the battery and there is a rapid loss of battery life with activities and early morning walks [sic]"); Sept. 10 Tr. at 196:20-22 (testifying that the neurostimulator "was taking longer to charge and it would just randomly turn off"); id. at 216:4-6 (Ravessoud)(explaining that Rawers "was unable to recharge" the neurostimulator "and that was unexpected"); id. at 216:4-6 (testifying that Rawers was "having problems getting it to charge, and then she's having interruptions in the stimulation where the system turns itself off"); Rawers FOFs ¶¶ 53-54, at 11; Rawers FOFs ¶ 126, at 25; Rawers FOFs ¶ 182, at 33 (stating that "the stimulator implanted on August 1, 2017, later malfunctioned as it would not hold a charge"); United States FOFs ¶ 44, at 9.

79.     The neurostimulator would turn on and off unexpectedly, because of issues with recharging its battery; these incidents caused Rawers pain and inconvenience, because, when the neurostimulator turned off, it no longer provided Rawers pain relief, and thereby disrupted her ability to sleep, drive, and engage in other daily activities.   See Sept. 10 Tr. at 67:9-11 (Rawers)(stating that, when the neurostimulator turned off her "pain level goes up . . . .  When it turns off, it's having zero relief"); id. at 67:17-3 (Rawers)(explaining that, if the neurostimulator "turned off while I was driving, I would literally pull over to the side of the rode because . . . I didn't feel safe to keep driving"); Sept. 11 Tr. at 337:15-20 (Shelley)("[W]e know that it was an issue of the battery not holding a charge. . . .  [I]t would run out of a charge quickly, so it would

---

neurostimulator's implantation because Rawers characterized her activity level post-implantation as "75 percent with the new" neurostimulator.

have to be recharged a lot, which is not practical"); United States Closing at 4 (noting that "three months after implantation, in October 2017, the device's rechargeable battery began to fail"); Rawers FOFs ¶¶ 53-54, at 11; Rawers FOFs ¶ 125, at 25; United States FOFs ¶ 44, at 9.

80.     Rawers made multiple unsuccessful attempts to reprogram the new neurostimulator to fix its ongoing problems.  See Sept. 10 Tr. at 68:10-20 (Rawers); Sept. 10 Tr. at 239:9-25 (Cunniff, Ravessoud); Rawers FOFs ¶ 44, at 9; Rawers FOFs ¶ 55, at 11; United States FOFs ¶ 45, at 9.

81.     Rawers knew that her neurostimulator would need replacement on January 15, 2018.[14]  See MMC re Dr. Ravessoud a 1 (dated January 15, 2018)(admitted at Trial on September

_____

[14]The United States argues that Rawers "learned two months prior to filing the administrative claim that she would likely require a second replacement device."  United States Closing at 8.  The United States, therefore, contends that Rawers knew, following her meeting with Dr. Ravessoud on October 13, 2017, that she would require a neurostimulator replacement surgery.  See United States Closing at 8.  See also United States FOFs ¶ 45, at 9.  By contrast, Rawers insists that, before her meeting with Dr. Ravessoud on January 15, 2018, she "had no idea if the device was going to [be] replaced or fixed or modified or anything beyond regular programming efforts."  Rawers FOFs ¶ 119, at 24.

The Court concludes that, although Rawers knew there was some possibility of surgery on October 13, 2017, she did not know to a substantial degree of certainty whether she would require surgery until January 15, 2018.  The notes from Rawers' meeting with Dr. Ravessoud on October 13, 2017, indicate that Dr. Ravessoud "discussed with the patient the possibility that the rechargeable generator system may be failing and may need to be revised or converted to a non-rechargeable generator system."  Memorial Bone and Joint re Dr. Ravessoud at 2.  Rawers also acknowledges that the October 13, 2017 meeting was "the first time Dr. Ravessoud brought up, 'hey, if it's taking longer to charge and we can't dial in the program, we might have to change this thing.'"  Sept. 10 Tr. at 197:4-12 (Cunniff, Rawers).  Dr. Ravessoud testified that, at the October 13 meeting, he wanted to implement "conservative treatment," which "must be documented."  Sept. 10 Tr. at 210:14-18 (Ravessoud).  Specifically, Dr. Ravessoud would conduct surgery only if "[t]he pain can't be treated by another simpler method."  Sept. 10 Tr. at 210:17-18 (Ravessoud).  Dr. Ravessoud also testified that the neurostimulator's malfunctioning was "an unexplained problem with the device," further demonstrating his uncertainty that surgery would be necessary at the October meeting.  Sept. 10 Tr. at 213:25-215:1 (Ravessoud).

The Court concludes that, during the October 13 meeting, Dr. Ravessoud warned Rawers that surgery could occur in the future if other, more conservative treatment methods -- like reprogramming the device -- were not successful.  That Rawers underwent multiple subsequent attempts to reprogram the device bolsters this conclusion.  See Sept. 10 Tr. at 197:11-12

10, 2020, as Rawers' Exhibit 48); Rawers FOFs ¶ 56, at 11; Rawers FOFs ¶¶ 119, 121, 123-29,

132, at 24-26; United States Closing at 4 (stating that "[b]y January 2018, Dr. Ravessoud and

Plaintiff made the final decision to replace the battery"); United States FOFs ¶ 46, at 9 (stating that

"in January, 2018, Plaintiff and Dr. Ravessoud finalized a plan to replace the 2017

neurostimulator"); United States FOFs ¶ 101, at 19.

82.     It is unclear why Rawers' 2017 neurostimulator malfunctioned. See Sept. 10 Tr. at

69:24-70:4 (Rawers)(stating that Dr. Ravessoud told her that he thought the neurostimulator was

the "bad one in the batch"); id. at 160:20-25 (Cunniff, Rawers); id. at 206:8-11 (Ravessoud)("For

---

(Rawers)(testifying that, after the October 13, 2017 meeting, Rawers "saw the St. Jude rep[resentative] a lot" to reprogram the neurostimulator).    Rawers and Dr. Ravessoud were hopeful that these efforts would be successful, so that surgery would be unnecessary.  Moreover, as Dr. Ravessoud testified, the neurostimulator's manufacturer, St. Jude, does not want malfunctioning devices removed immediately.   See Sept. 10 Tr. at 216:13-18 (O'Connell, Dr. Ravessoud)(testifying that St. Jude "absolutely" does "not" want devices replaced immediately).  Dr. Ravessoud explained that "they want to make it work.  They want to try to reprogram it, to take away the software, to reload the software."  See Sept. 10 Tr. at 216:13-18 (Ravessoud).  During Rawers' January 15, 2018, appointment with Dr. Ravessoud, Dr. Ravessoud "started the authorization process . . . by writing surgical orders." Sept. 10 Tr. at 217:10-12 (Ravessoud).  Both Rawers and Dr. Ravessoud testified that it was on January 15, 2018, that they made the decision to conduct surgery.  See Sept. 10 Tr. at 70:5-15 (O'Connell, Rawers); Sept. 10 Tr.  at 217:13-17 (O'Connell, Dr. Ravessoud).  The language in Dr. Ravessoud's notes from his January 15, 2018, meeting with Rawers is also more definitive about surgery than the language in his October 13, 2017, notes.  Compare MMC re Dr. Ravessoud at 1-2, with Memorial Bone and Joint re Dr. Ravessoud at 2.  Instead of stating that Rawers' neurostimulator "may need to be revised," as he did on October 13, 2017, MMC re Dr. Ravessoud at 2, Dr. Ravessoud wrote that he would "need to remove the rechargeable generator for the large MRI compatible generator system . . . see Surgical Orders,"  Memorial Bone and Joint re Dr. Ravessoud at 2.  Moreover, Rawers indicates that, when "Dr. Ravessoud would submit for the replacement," or "once the decision was made," it "seemed to go through quickly" after Dr. Ravessoud received insurance approval. Sept. 10 Tr. at 70:5-15 (O'Connell, Rawers).  The surgery occurred on February 1, 2018, approximately two weeks after Rawers' meeting with Dr. Ravessoud on January 15, 2018.  The surgery thus took place more than three-and-a-half months after Rawers' October 13, 2017 meeting with Dr. Ravessoud.  This timing further indicates that decision to undergo surgery took place at the January 15, 2018 meeting, because the surgery occurred shortly thereafter. Consequently, the Court concludes that, although Rawers was aware of some possibility of future surgery at the October 13, 2017, meeting, she did not know whether she would need a surgical neurostimulator replacement until January 15, 2018.

reasons that we still don't know today, the generator that we -- that I implanted, which was a rechargeable system, would not hold a charge, and she'd spend hours trying to get it charged."); Sept. 11 Tr. at 328:15-20 (Shelley)("Why it malfunctioned? I don't know. I know they [-- the neurostimulators --] do, and we know that it was an issue of the battery not holding a charge."); Rawers FOFs ¶ 137, at 27; United States FOFs ¶ 51, at 10.

83. After removing the malfunctioning neurostimulator, Dr. Ravessoud returned the device to St. Jude for further analysis. See Sept. 10 Tr. at 234:10-235:10 (O'Connell, Ravessoud)(explaining that "it's our custom and practice to have the device sort of looked at by our pathologist, and then returned to the manufacturer for further evaluations" and that the device "was not returned to the patient in this instance"); id. at 236:2-12 (Ravessoud)(stating that "I'm pretty sure we asked the rep" from St. Jude "to look at that"). But see MMC Operative Report at 1 (dated Feb. 1, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 50)(stating that the "malfunctioning rechargeable unit was removed, submitted for gross inspection, and returned to the patient").

84. Dr. Ravessoud replaced Rawers' neurostimulator on February 1, 2018. See MMC Operative Report at 1-2 (dated January 15, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 50); Sept. 10 Tr. at 159:4-6 (Cunniff, Rawers); Sept. 11 Tr. at 328:23-25 (Cunniff, Shelley); Rawers FOFs ¶ 130, at 26; Rawers FOFs ¶ 183, at 33; United States FOFs ¶ 47, at 9.

85. The February 1, 2018, surgery replaced successfully Rawers' neurostimulator, and reduced her pain in her lower back and left leg, returning her to her pre-accident baseline status with respect to pain in those areas -- approximately four out of ten on the pain scale. See Sept. 10 Tr. at 72:1-7 (Rawers)(stating that, regarding the new neurostimulator, "the moment it was turned on, the relief was almost instant"); id. at 162:6-9 (Cunniff, Rawers)(testifying that the new

neurostimulator continues to function "perfectly fine"); Sept. 11 Tr. at 329:4-330:5 (Cunniff, Shelley)(explaining that Rawers "got back to more or less her baseline from before the accident. It worked well. She didn't need any further care for the stimulator itself," and stating that all experts in the case are "in alignment on that topic"); <u>Rawers v. United States</u>, No. CIV 19-0034 JB/CG, 2020 WL 5663427, at *8 (D.N.M. Sept. 23, 2020)(Browning, J.)(stating that this is an undisputed fact)("<u>Rawers I</u>"); United States Closing at 4 (stating that "experts agree that the February 2018 implantation restored Plaintiff to her pre-accident baseline as it pertains to the benefits of the neurostimulator"); United States Closing at 7 (same); Rawers FOFs ¶¶ 57-58, at 11; Rawers FOFS ¶ 157, at 30; Rawers FOFs ¶ 184, at 34; Rawers FOFs ¶ 292, at 45; United States FOFs ¶¶ 47-49, at 9-10.

86.     With her lower back and left leg pain more manageable, Rawers became increasingly aware of pain in her cervical spine that radiated to her left shoulder and arm. <u>See</u> Sept. 10 Tr. at 72:25-73:6 (Rawers)(stating that, after the February 1, 2018 neurostimulator implantation, "it's like my back became symptom two, and my neck became symptom one," and that, "once the back was finally soothed, I started feeling the weakness in my left arm, the headaches, other issues"); <u>id.</u> at 220:10-16 (Ravessoud)(discussing Rawers' neck complaints); <u>id.</u> at 264:20-265:7 (Rauck)(testifying that Rawers experienced a phenomenon called "unmasking of pain," common in cancer patients, because "the brain can only process . . . so much pain" and "in this case . . . her cervical pain became more of an issue to her once the low back was back at baseline"); Rawers FOFs ¶ 58, at 11; United States FOFs ¶ 55, at 11.

87.     Rawers had experienced chronic neck pain since the accident, but the pain became more prominent, because the new neurostimulator relieved her lower back and neck pain, and thereby "unmask[ed]" Rawers' neck pain. Sept. 10 Tr. at 264:20-265:7 (Rauck). <u>See</u> Sept. 10 Tr.

at 2016:17-18 (Ravessoud)("[A]t the time of her accident, she did have an injury to her neck.");

Rawers FOFs ¶ 155, at 30; United States FOFs ¶ 54, at 11 (stating that Rawers' "neck pain

persisted throughout 2016, 2017 and 2018).

88.    Dr. Ravessoud ordered that Rawers undergo an MRI, which revealed that Rawers

had herniating and bulging discs in her neck. See MVRMC re MRI of cervical spine (dated June

26, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 58)(stating that Rawers'

"cervical spine demonstrate degenerative spurring[15] C4 through 6[16]" as well as "bulging disc[s]");

---

[15]Bone spurs may appear in the neck, and are defined as "a tiny pointed outgrowth of bone. Bone spurs are usually caused by local inflammation, such as from degenerative arthritis (osteoarthritis) or tendonitis. Bone spurs develop in areas of inflammation or injury of nearby cartilage or tendons." William C. Shiel, Bone Spurs (Osteophytes), MedicineNet, http://www.medicinenet.com/ (last visited Jan. 8, 2021).

[16]"Spinal anatomy is divided into 4 major sections, typically defined by the number of vertebrae . . . in each section." Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The four spinal sections are the cervical spine (neck), the thoracic spine (upper back), the lumbar spine (lower back), and the sacral region (bottom of the spine). See Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The cervical spine is "comprised of 7 cervical vertebrae (termed C1 to C7), starting with C1 at the top of the spine and ending with C7 at the bottom of the cervical portion of the spine." Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The thoracic spine is "made up of 12 thoracic vertebrae (known as T1 to T12), which are attached to the rib bones and sternum (breast bone)." Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The lumbar spine "typically include[es] 5 vertebrae (known as L1 to L5), which have a great deal of motion and flexibility. Because this section of the spine bears most of the body's weight and allows for the most motion (which stresses the anatomical structures), this is the area associated with most back problems." Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The sacral region is

    located below the lumbar spine, the *sacrum* is a series of 5 bony segments
    fused together (known as S1 to S5) that create a triangular-shaped bone that serves
    as the base of the spine and makes up part of the pelvis. The segment where the

Dr. Ravessoud Visit (dated July 30, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 96)(stating that Rawers MRI "shows spondylitic[17] changes at multiple levels[.]  At C4-5 and C5-6 there is osteophyte[18] bulging and displacement of the nerve roots.  At C6-7 there is moderate central canal stenosis[.][19]   All three levels are pathologic."); Sept. 10 Tr. at 73:15-22 (O'Connell, Rawers); Rawers FOFs ¶ 59, at 12; United States FOFs ¶ 56, at 11.

89.     At a visit to Dr. Ravessoud's office on July 30, 2018, Rawers and Dr. Ravessoud decided that Dr. Ravessoud would perform ACDF surgery on Rawers at C4-5, C5-6, and C6-7. See Sept. 10 Tr. at 189:6-13 (Cunniff, Rawers)(responding "yes" to the question "[i]s it fair to say that this is when you found out you were going to have a cervical fusion"); Sept. 11 Tr. at 482:1-10 (Saiz); United States FOFs ¶ 57, at 11; Rawers FOFs ¶ 278, at 43 (noting that Rawers "had a three-level fusion at 4-5, 5-6, 6-7")

90.     Rawers had ACDF surgery on September 11, 2018.  See Sept. 10 Tr. at 78:16-20 (O'Connell, Rawers); Sept. 11 Tr. at 330:11-12 (Shelley); Sept. 11 Tr. at 482:9-10 (Saiz); United States Closing at 4 ("Plaintiff's chronic post-accident neck pain culminated in September of 2018 with spinal fusion surgery in Plaintiff's cervical spine at C4-5, C5-6, and C6-7."); Rawers Closing at 4; Rawers FOFs ¶ 60, at 12; Rawers FOFs ¶ 185, at 33; United States FOFs ¶ 58, at 11.

---

lumbar spine meets the sacral region, L5-S1, is an area that is prone to degenerate and create back problems.

Pamela Verkuilen, Normal Spinal Anatomy, Spine-Health (Nov. 18, 2005), https://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy.

[17]Spondylitis is "inflammation of one or more of the vertebrae."  840270 spondylitis, Stedmans Medical Dictionary.

[18]Osteophyte means "a bony outgrowth or protuberance."  638450 osteophyte, Stedmans Medical Dictionary.

[19]Stenosis is "a narrowing," or "a stricture of any canal or orifice."  848930 stenosis, Stedmans Medical Dictionary.

91.    During the ACDF surgery, Dr. Ravessoud removed Rawers' damaged cervical disks to replace them with PEEK spacers affixed to her bones by screws. See MMC Operative Report at 1 (dated September 11, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 64)("Sept. 11 Operative Report"); Radiographs at 2-4, 7-10 (images of current hardware in Rawers' neck); Sept. 10 Tr. at 74:20-21 (Rawers); Rawers Closing at 4; United States FOFs ¶ 58, at 11; Rawers FOFs ¶ 65, at 13. See also Pillar AL Peek Spacer System, Orthofix, https://www.orthofix.com/ifus/pillar-al-peek-spacer-system/ (last visited June 25, 2021)(describing PEEK spacers).

92.    Rawers' recovery from the ACDF surgery was very painful, and she adhered to a soft foods diet for approximately three months after the surgery. See Sept. 11 Operative Report at 1; Sept. 10 Tr. at 82:7-21 (Rawers)("[I] was the most painful surgery to recover from . . . .  It was the roughest of all my surgeries."); id. at 82:22-83:6 (Rawers); Rawers Closing at 4 (noting that Rawers "experienced incredible pain and difficulty swallowing" and "still has trouble swallowing"); Rawers FOFs ¶¶ 65-66, at 13; United States FOFs ¶ 59, at 12.

93.    The ACDF surgery reduced Rawers' neck-related pain and eliminated the headaches that she had experienced since the accident. See Sept. 10 Tr. at 174:3-6 (Cunniff, Rawers)(agreeing that the ACDF surgery diminished her neck pain and "got rid of the headaches"); Sept. 11 Tr. at 331:7-10 (Shelley)("[W]hat's notable is, after the fusion, her headaches resolved, which is great and kind of proves the point that those headaches were coming from the neck."); United States FOFs ¶ 59, at 12.

94.    In sum, Rawers underwent three surgeries following the motor vehicle accident: (i) a surgery revision and replacement of her neurostimulator on August 1, 2017; (ii) a second revision and replacement of her neurostimulator on  February 1, 2018; and (iii) a cervical discectomy and

fusion surgery ("ACDF") on September 11, 2018; the motor vehicle accident was the proximate

cause of the first neurostimulator revision and the ACDF.  See IME Report at 13; Rawers FOFs

¶ 7, at 2.

      **5.**      <u>**Rawers' Current Medical Condition**</u>.

      95.      "Rawers is expected to have cervical pain and left upper extremity pain despite

future treatment, related to the accident, and she will need future medication and physical therapy

to maintain her current level of functioning."  <u>Rawers v. United States</u>, 2020 WL 5663427, at *9

(citing Rawers MSJ ¶ 25; at 6, IME Report at 26; Rauck Report at 9)(stating that this fact is

undisputed).  <u>See</u> Rawers Closing at 1; Rawers Closing at 4 (explaining that Rawers "has pain

that . . . radiates along her left arm," and, that, as a result, "engaging in tasks such as vacuuming,

dusting, picking up items hurts and eventually causes pain to travel up into her neck forcing her to

stop whatever it is that she is doing in order to rest and try to recover"); Rawers FOFs ¶ 91, at 18.

      96.      Rawers has surgical scars from the neurostimulator revision surgeries and from the

ACDF.  <u>See</u> Sept. 11 Tr. at 573:1-14 (Crawford)(stating that Rawers has a scar from "revision of

the neurostimulator" and "a well-healed cervical scar in the anterior aspect of the lower neck");

Rawers FOFs ¶ 317, at 48.

      97.      Rawers has limited neck mobility after the ACDF surgery: she neither can turn her

head fully from side to side nor can she turn her chin over her shoulder.  <u>See</u> Sept. 10 Tr. at 81:25-

82:4 (Rawers)(stating that "not looking over my shoulder versus living in neck pain?  I'd rather

not look over my shoulder"); <u>id.</u> at 84:3-7 (Rawers)(testifying that the "biggest limitation I have

from the neck surgery is my ability to look over my shoulder or turn my head left and right," and

that "I can't get my chin directly over my shoulder like most people can"); <u>id.</u> at 84:25-86:2 ( "[T]o

look over my shoulder, I literally have to turn my whole body from my trunk, so I'm moving from

the waist"); United States Closing at 6 (stating that, regarding Rawers' neck, it "will not -- and cannot -- be restored to its pre-accident stated" and that she will experience "lifelong diminution in . . . range of motion"); Rawers Closing at 4 (noting that Rawers' limited neck mobility impacts a variety of activities that involve turning her head, including: "looking left and right, crossing the road, driving, looking at the clock, seeing whatever is behind her, listening to someone speak" and emphasizing that an "average person swivels at the neck and turns their heads quite literally hundreds of times a day without ever giving it a second thought"); Rawers FOFs ¶ 67, at 13; Rawers FOFs ¶ 311, at 47; United States FOFs ¶ 62, at 12.

98.     At times, Rawers feels as though she has "a twenty-five-pound weight sitting right at the base of my spine," causing her neck to "throb." Sept. 10 Tr. at 106:20-107:2 (Rawers)(describing this as an "after-accident issue"). <u>See</u> United States Closing at 6-7 (stating that Rawers "sometimes experiences stiffness in her head, and the sensation that her head feels heavy"); Rawers FOFs ¶ 84, at 16.

99.     Activities that involve tilting her head down, including reading a book, cooking, bead work, and baking, are more difficult for Rawers since her neck surgery. <u>See</u> Sept. 10 Tr. at 86:3-12 (Rawers)(explaining that tilting her head down "puts stress on the fusion.  It also feels like . . . my neck is tired and it's been put under a bunch of stress and it just becomes painful after a while . . . .  So it's easier to look straight"); <u>id.</u> at 86:15-16  ("I can't look down for long periods of time.  I can barely look down . . . .  The pain builds.  It starts out irritating, then it becomes sore, then it becomes aggravating, and then it becomes too much."); Sept. 11 Tr. at 330:22-331:3 (Shelley)(testifying that Rawers "would get pain and stiffness if she was in prolonged flexion, which is leaning forward . . . .  It meant she couldn't read for a long time or cook for a long time consecutively"); United States Closing at 7 (stating that Rawers "has been able to resume many of

the activities of daily living she performed prior to trial, although sometimes with limitations"); Rawers Closing at 4 (noting that when Rawers "wants to turn to the side . . . she has to stop, rotate the entire upper half of her body and turn it with her head in a union because a failure to do that will result in pain and discomfort in her neck"); Rawers Closing at 6-7 (explaining that cooking difficulties were particularly devastating for Rawers, because "[c]ooking was far more than a hobby or passion for her, it was her art. While she was not working as a chef or instructor prior to the accident, she was using her skills daily to bring joy . . . . [B]aking and cooking helped her feel better"); Rawers FOFs ¶¶ 69-71, at 13; Rawers FOFs ¶ 195, at 34 (stating that Rawers "now has to cook in stages due to chronic pain"); United States FOFs ¶ 62, at 12; United States FOFs ¶ 64, at 13.

100.    Rawers enjoys attending baseball games, but, since the accident, she typically leaves by the third or fourth inning -- although she can sometimes "make it to the seventh inning," -- because she feels "super stiff and sore," and experiences significant pain. Sept. 10 Tr. at 113:8-114:3 (O'Connell, Rawers).  See Rawers Closing at 3; Rawers Closing at 5 (stating that, for Rawers, "attending a baseball game . . . is a monumental effort and requires virtually no activity at all beforehand and it's straight to bed and rest when she gets home"); Rawers FOFs ¶ 90, at 18.

101.    Rawers has difficulty driving since the accident, because "she can no longer simply twist her head to glance to see if a car is in another lane," but, instead "has to twist the entire upper half of her body in the direction she needs to look." Rawers Closing at 5.  See Sept. 10 Tr. at 84:3-13 (Rawers)("I can't get my chin directly over my shoulder like most people can.  So driving, I try, the moment I get into the street, I try to be in whatever lane so I know I can turn left and right later.").

102.    It is more difficult for Rawers to attend social engagements and to maintain

friendships than it was before the accident, because of the pain she experiences.  See Sept. 10 Tr. at 109:13-110:4 (Rawers)(explaining that she "lost quite a few friends . . . because I couldn't go out anymore, couldn't go to karaoke night, couldn't go out to dinner, couldn't go to lunch.  Not saying I couldn't," but "because I hurt"); Rawers Closing at 5 (noting that her "additional pain occasionally causes her to have a short fuse with the people she loves and puts a further strain on her relationships"); Rawers FOFs ¶ 86, at 16-17.

103.    Rawers currently experiences difficulty sleeping.  See Sept. 10 Tr. at 191:9-20 (Rawers)("[T]his accident has . . . affected how I sleep . . . .  What's comfortable for my neck to sleep isn't comfortable for my back."); Sept. 11 Tr. at 67:8-18 (Lilley, Shelley)(agreeing that Rawers' testimony about her difficulty sleeping is typical of a patient with chronic pain, "and it's consistent with what she told me . . . .  I believe her"); Rawers Closing at 6, 7 (noting "how difficult it is for her to function on limited sleep and how this changes her mood and outlook"); Rawers FOFs ¶ 116, at 23; Rawers FOFs ¶ 197, at 34; Rawers FOFs ¶ 226, at 37 (stating that Rawers' neck pain is "a painful reality"); Rawers FOFs ¶ 312, at 47; United States FOFs ¶ 62, at 12.

104.    Rawers cannot walk at the same speed or for the same duration as she could before the accident.  See Sept. 10 Tr. at 102:21-105:11 (testifying that, while before the accident she could walk two miles in forty-five minutes, it now takes her an hour to walk a mile); id. at 107:21-22 (stating that, each day, she "walk[s] my dog, not nearly as far, not nearly as fast," as she did before the accident); Sept. 11 Tr. at 366:15-367:6 (Lilley, Shelley); Rawers FOFs ¶¶ 79-80, at 15-16; Rawers FOFs ¶ 191, at 34; United States FOFs ¶ 64, at 13.

105.    After Rawers walks, she needs to rest for at least two hours, because her "back gets tight," her "leg gets a little weak . . . unstable," and her "neck is sore" and "stiff . . . ."  Sept. 10 Tr.

a t104:21-105:6 (Rawers).  <u>See</u> Rawers Closing at 5-6; Rawers FOFs ¶ 81, at 16.

106.    In general, Rawers must "plan her day appropriately and limit her activities to one or two tasks" otherwise "her body will explode in pain . . . ."  Rawers Closing at 8.  <u>See</u> Sept. 10 Tr. at 107:13-108:15 (O'Connell, Rawers).

107.    Rawers now walks with a "slightly wide-based gait," but can still "walk heel-to-toe without any difficulty"; her gait is not a "painful-type gait," and "people who have had injuries to the spinal cord . . . can sometimes walk with a wide-based type gait for balance."  Sept. 11 Tr. at 573:20-574:3 (Crawford, Ortega).  <u>See</u> Sept. 11 Tr. at 364:15-365:3 (Shelley); Rawers FOFs ¶ 192, at 48; Rawers FOFs ¶ 318, at 48.

108.    Rawers uses a support dog, a Kuvasz,[20] and has done so since 2009.  <u>See</u> Sept. 10 Tr. at 89:1-91:2 (O'Connell, Rawers); Sept. 11 Tr. at 351:15-352:2 (Lilley, Shelley); Rawers FOFs ¶ 72, at 14 ("Rawers requires the use of service dog[s] for ambulation and stability and has used such dogs since 2009"); Rawers FOFs ¶ 188, at 34.

109.    Rawers has difficulties with bathing, dressing, defecating, and speaking following the accident.  <u>See</u> Sept. 10 Tr. at 105:20-106:19 (Rawers)(explaining that, because of the pain that she experiences, "I speak significantly faster than normal" and explaining that this makes her feel

---

[20]A Kuvasz:

is a large white working dog of keen intelligence, imposing and majestic. Originally bred to guard livestock, they have adapted to guarding property and family members as well as successfully competing in various canine activities. They are 26-30 inches tall at the shoulder and approximately 80 to 120 pounds. Despite their size and strength, Kuvaszok can be gentle with children, but quick and agile to intervene and protect loved ones.  They are capable of problem solving as well as having a great sense of humor.

<u>Kuvasz</u>, American Kennel Club, https://www.akc.org/dog-breeds/kuvasz/ (last visited June 16, 2021).

embarrassed); Sept. 11 Tr. at 354:25-355:10 (Lilley, Shelley); Rawers FOFs ¶ 183, at 16; Rawers FOFs ¶ 192, at 35.

110.    Rawers' dating life has become more difficult since the accident, because she often shifts in her seat because of the pain, which her dates misinterpret as boredom, and she feels uncomfortable sharing her medical history with her dates.   See Sept. 10 Tr. at 110:5-22 (Rawers)("Dating is really rough"); Rawers Closing at 6; Rawers FOFs ¶ 87, at 17.

111.    Rawers has been unable to have a normal sexual relationship following the accident, because she has difficulty orgasming, and "sexual activity . . . lead[s] to body spasms." Sept. 11 Tr. at 357:10-13 (Shelley).   See Sept. 10 Tr. at 110:25-112:25 (Rawers)(describing unpleasant sexual encounters and relationships since the accident, and explaining that it "sucks, knowing I'm fifty and I may never have a physical intimate relationship again," because of the pain sex causes her); Rawers Closing at 6 (stating that "the notion of having any sort of normal sexual relationship is entirely out of the equation for her"); Rawers FOFs ¶¶ 88-89, at 17; Rawers FOFs ¶ 194, at 34.

112.    Rawers' pain may improve, worsen, or remain constant, because chronic pain often waxes and wanes.   See Sept. 11 Tr. at 353:14-354:16 (Lilley, Shelley)(noting that, although Rawers' pain in her left leg and food is typically a three or four, it may go as high as a seven out of ten); Sept. 11 Tr. at 361:20-21 (Shelley)(explaining that, as a pain specialist "we see . . . waxing and waning on a daily basis.  You see this over years, as well"); id. at 361:23-362:2 ("[S]ometimes these conditions improve somewhat.  I wouldn't expect complete resolution, however. . . .  I think she'll have similar pain indefinitely.  But it can get worse, it could get better, it could stay the same."); Rawers FOFs ¶ 190, at 34; United States FOFs ¶ 62, at 12; United States FOFs ¶ 68, at 14.

113.    Rawers will continue to have some neck pain related to the accident in the future, because it has "become a chronic condition."  Sept. 10 Tr. at 266:20-267:1 (Rauck).  <u>See</u> Sept. 11 Tr. at 358:19-360:5 (Lilley, Shelley); Rawers Closing at 1; Rawers FOFs ¶ 156, at 30; Rawers FOFs ¶ 198, at 34; Rawers FOFs ¶ 174, at 32.

114.    Rawers also will continue to have back pain, but any continued back pain is unrelated to the motor vehicle accident.  <u>See</u> Sept. 10 Tr. at 266:21-23 (Rauck)("She was going to have some problems, I think, from her low back pain irrespective of the motor vehicle accident."); Rawers FOFs ¶ 157, at 30.

115.    Regarding Rawers' mental health, she is not depressed because of her ongoing neck difficulties.  <u>See</u> IME Report at 11, 31; Sept. 10 Tr. at 344:15-345:4 (Shelley)(noting that Rawers felt defeated at times, "but wasn't depressed. . . .  She didn't meet clinical criteria for depression"); United States FOFs ¶ 67, at 13.[21]

116.    Rawers spinal fusion is incomplete at levels C4-5 and C5-6, she has a "stable nonunion.  <u>See</u> IME Report at 21; Sept. 11 Tr. at 372:14-373:1 (Shelley); <u>id.</u> at 494:18-494:12 (Saiz); <u>id.</u> at 581:7-9 (Ortega, Crawford); United States Closing at 5 (stating that "there is evidence of non-union with respect to the fused vertebrae"); Rawers FOFs ¶ 220 at 36; Rawers FOFs ¶¶ 282-

---

[21]At trial, Rawers testified that "I'm sure if you sent me to a psychologist, they would say I'm depressed, I'm guessing."  Sept. 10 Tr. at 121:14-16 (Rawers).  In her FOFs, Rawers asserts that "if she were tested, she would probably be considered depressed . . . ."  Rawers FOFs ¶ 95, at 19.  The Court finds that Rawers is not depressed, however, because Dr. Shelley testified that she is not depressed, and Dr. Shelley treats patients with chronic pain and must discuss and evaluate whether all of his chronic pain patients are depressed.  <u>See</u> Sept. 11 Tr. at 343:2-7 (Lilley, Shelley)(explaining that he "always screen[s] people for anxiety and depression" as "part of [his] job as an expert in pain management").  Moreover, in contrast to Rawers' conclusory assertion, for which the Court cannot discern a basis, that she would "probably be considered depressed," Dr. Shelley conducted an analysis upon which he based his finding that Rawers is not depressed, and noted that she had a "normal score" on a scale "which is a valid measure of depression."  Sept. 11 Tr. at 344:17-25 (Shelley).  Accordingly, the Court finds that Rawers is not depressed.

83, at 43; Rawers FOFs ¶ 323-25, at 48; United States FOFs ¶¶ 74-75, at 14. <u>See also</u> Sept. 10 Tr. at 222:22-25 (Ravessoud)(explaining that, "with single-level procedures, fusion rates are very high, 95%. With three-level fusions," like Rawers' "they're lower, maybe down around 65-75%").

117. There is also "space," known as a luceny, "between the fused vertebrae." United States Closing at 5. <u>See</u> Rawers Closing at 1.

118. At least one screw used in the ACDF surgery has broken. <u>See</u> Radiographs at 9; Sept. 10 Tr. at 230:8 (Ravessoud)(testifying that "there is at least one broken screw"); Sept. 11 Tr. at 493:6 (Saiz)(stating that, "obviously, she broke the screws"); <u>id.</u> at 579:20:23 (Crawford)(explaining that "the radiographs . . . clearly indicate broken screws at the C5-6 level. And there is a possibility of a broken screw at the C4-5 level, as well."); United States Closing at 5; Rawers Closing a t1; Rawers FOFs ¶ 16, at 4; Rawers FOFs ¶ 134, at 27; Rawers FOFs ¶ 280, at 43; Rawers FOFs ¶ 323, at 49; United States FOFs ¶ 75, at 14.

119. Rawers also has a "significant collapse along her cervical spine." Rawers FOFs ¶ 280, at 43. <u>See</u> Sept. 11 Tr. at 492:18-493:9 (Saiz).

120. Rawers has "a little bit of loss of sensation diminished in the left forearm and the left hand, and a little bit of diminished pinch grip and grip strength on the left when compared to the right." Sept. 11 Tr. at 574:10-13 (Crawford). <u>See</u> Rawers FOFs ¶ 200, at 34; Rawers FOFs ¶ 319, at 48.

121. The "little bit of diminished pinch and grip strength" is indicative of "nerve damage . . . in the cervical spine . . . in the C6 dermatome." Sept. 11 Tr. at 574:10-13 (Crawford). Rawers FOFs ¶ 320, at 48.

122. Rawers' motor strength in her legs "were five out of five and equal and symmetric. Her reflexes were equal and symmetric as well. She did have sensation grossly intact;" in other

words, "she can feel, but it's slightly different from one side to the other." Sept. 11 Tr. at 574:10-13 (Crawford, Ortega).

123.    There is a "slight decrease in the sensitivity of light touch in the right lateral thigh, right lateral calf, and the dorsum of the right foot." Sept. 11 Tr. at 574:10-13 (Crawford, Ortega). Rawers FOFs ¶ 321, at 48.

124.    Rawers has the following diagnoses, which resulted from the motor vehicle crash: (i) "Neck pain, from aggravation of previously asymptomatic spinal degeneration; canal stenosis and nerve impingement required three-level ACDF"; (ii) "Numbness and tingling in the thumb, index, and long fingers, left hand (residual radiculopathy vs. carpal tunnel syndrome); and (iii) "Low back pain and left lower extremity pain, from exacerbation of preexisting condition; requiring removal and replacement of spinal cord stimulator, with wound complications." IME Report at 23. See Rawers FOFs ¶ 12-14, at 3; Rawers FOFs ¶ 277, at 42 (stating that the accident "caused permanent aggravation of Rawers' cervical degenerative disc disease").

125.    The average life expectancy for a woman in the United States is around eighty-one years old. See Sept. 11 Tr. at 361:8-10 (Schofield); Rawers FOFs ¶ 212, at 36.

126.    Based upon average women's lifespans, Rawers will have approximately twenty-nine years of chronic pain. See Sept. 11 Tr. at 361:11-15 (Schofield); Rawers FOFs ¶ 213, at 36.

**5.    Rawers' Administrative Filings.**

127.    On December 18, 2017, Rawers filed a claim for her injuries with the USPS on a Standard Form 95 ("SF-95"). See Claim for Damage, Injury, or Death at 1 (dated Dec. 18, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 92)("SF-95"); Sept. 10 Tr. at 178:1-17 (Cunniff, Rawers); Rawers FOFs ¶ 105, at 21; United States FOFs ¶ 98, at 18.

128.    In the SF-95, Rawers requested $953,179.75 in damages: she asked for $8,613.51

in "property damage" and $944,566.44 in "personal injury." SF-95 at 1. See Sept. 10 Tr. at 179:1-10 (Cunniff, Rawers); United States FOFs ¶ 99, at 18.

129.     Rawers had undergone one post-accident surgery when she submitted the SF-95 -- the first spinal cord stimulator replacement surgery. See MMC Dr. Ravessoud procedure report at 1 (dated August 1, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 33); United States FOFs ¶ 39, at 8; United States FOFs ¶ 100, at 18.

130.     When Rawers filed the SF-95, she was aware that the neurostimulator was malfunctioning and might require replacement. See Memorial Bone and Joint re Dr. Ravessoud at 1 (dated October 13, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 46); Sept. 10 Tr. at 179:10-21 (Cunniff, Rawers); Sept. 10 Tr. at 215:1-216:22 (O'Connell, Ravessoud)(explaining that he, Dr. Ravessoud, and the neurostimulator manufacturer still hoped at the October 13, 2017 meeting to "make it work . . reprogram it . . . reload the software); Rawers FOFs ¶ 101, at 19; Rawers FOFs ¶ 127, at 25 (stating that Dr. Ravessoud "did not issue any surgical orders nor make any plans for surgery on October 13, 2017").

131.     Rawers did not inquire directly with her doctors regarding the potential costs associated with her injuries before filing the SF-95. See Sept. 10 Tr. at 18:12-22 (Cunniff, Rawers)(stating that, before filing the SF-95, Rawer did not "remember discussing monetary costs with physicians," but explaining that her "lawyer might have"); Rawers FOFs ¶ 106, at 21; United States FOFs ¶ 102, 105, at 19.

### 6. **Rawers' Future Medical Needs**.

132. Rawers will need an ACDF revision[22] surgery.[23]  See Sept. 10 Tr. at 106:22-24

---

[22]Dr. Saiz described the process involved in a future ACDF revision surgery:

Now, thankfully, the front of the neck doesn't have a lot of muscle, so pain levels typically are not as high as a posterior procedure. But I almost liken it to a plane ride. It could be very boring. But if something goes wrong, something really goes wrong. Because you have a carotid, which bleeds a lot. You have an esophagus, which having swallowing issues post the surgery is common, but in multi-level surgeries, it's an even higher risk; much less a revision surgery, which increases your risk even more. The end game is, the esophagus for some reason stops working, and you have to put a PEG tube into someone's stomach, you have to feed them through the stomach as opposed to the mouth. When you take out these implants, they are basically wrapped in scar. So they just don't come out. You remove the screws with a screwdriver. But that plastic device is encased in scar. To get it out, you typically have to get a burr. This is a metal-cutting burr. And you put it into the neck and you're basically destroying the PEEK device to be able to get it out. The bone in regards to the implant is moving. And that causes osteolysis or basically loss of bone density. So when you remove these implants, you lose bone.

Sept. 11 Tr.at 502:1-503:4 (Saiz).

[23]The Court has surveyed the relevant testimony whether Rawers will require revision surgery, and concludes that she will. First, Dr. Saiz is an orthopedic spine surgeon, the only board-certified spine surgeon in New Mexico. See Saiz Report at 14. Dr. Saiz testified that he "operate[s] on anywhere from 200 to 300 patients a year. My practice has morphed into revision spine surgery, so I would say as far as fusion levels, they're in the thousands." Sept. 11 Tr. at 467:14-17 (Saiz). Dr. Saiz noted that "spine surgery is a very unique specialty." Sept. 11 Tr. at 47-:3 (Saiz). Based upon this background, the Court concludes that Dr. Saiz' testimony related to Rawers' spine is reliable. Dr. Saiz testified that the chance of Rawers' cervical non-union "becoming symptomatic in the future is high. Medically probable, if we want to use greater than 50 percent." Sept. 11 Tr. at 501:5-7 (Saiz). Likewise, Dr. Saiz continued: "Do I think she's likely to undergo, greater than 50 percent, a revision procedure? The answer is yes at 4-5 and 5-6. And I think the chances are high at 3-4, as well." Sept. 11 Tr. at 505:8-12 (Saiz). Dr. Saiz reiterated that "I think the risks are high, especially if we look down the road for her."

Rawers also testified that Dr. Ravessoud indicated that she "may need a revision" of the ACDF, as she "will have lot of arthritis in my neck as I get older." Sept. 10 Tr. at 117:7-8 (Rawers). See Sept. 10 Tr. at 175:20-23 (Rawers)(stating that "the only conversations I've had" about a revision surgery with Dr. Ravessoud "was, 'in a few years from now or eventually you might need additional surgeries due to the fusion points'"). Rawers also testified that she "think[s]" revision surgery "will happen," although she "hope[s] it will be many, many, many, many, many, many years in the future, because I'm not looking forward to having more arthritis and more restrictions

to my neck . . . ." Sept. 10 Tr. at 176:10-14 (Rawers). Dr. Ravessoud confirmed that "I told her that further surgery on her neck was possible." Sept. 10 Tr. at 245:11-12 (Ravessoud). Dr. Ravessoud, who performed Rawers' first ACDF, also testified that there is a medical probability Rawers will require revision surgery. See Sept. 10 Tr. at 232-9-12 (Cunniff, Ravessoud). Dr. Ravessoud continued that, although "there is a probability that she'll need additional surgery," the need depends upon "the patient's level of pain, ability to manage it, the informed consent process." Sept. 10 Tr. at 231:14-18 (Ravessoud). He explained that, "in treating a symptomatic nonunion, it is very common to have to treat surgically, and surgical rates are pretty good, but they're not 100 percent successful." Sept. 10 Tr. at 247:13-16 (Ravessoud).

The United States' experts, Dr. Shelley and Dr. Crawford, agreed that Rawers has a heightened risk of needing an ACDF revision surgery, although they did not testify specifically that revision was medically probable. First, Dr. Shelley agreed that Rawers is more likely to need a revision surgery than a patient who underwent a single level ACDF. See Sept. 11 Tr. at 379:10-15 (Lilley, Shelley). Dr. Shelley testified that, "the longer the fusion, the more you can have problems above and below it." Sept. 11 Tr. at 379:10-15 (Lilley, Shelley). Next, Dr. Crawford explained that Rawers may need revision surgery, but noted that revision surgery "is significantly more difficult than the original surgery . . . . If her symptoms were not significantly worse, . . . I would not rush in to do a revision surgery." Sept. 11 Tr. at 582:14-25 (Ortega, Crawford). Dr. Crawford elaborated that, "if she's not really having much pain, which she wasn't at the time of our evaluation, putting her at risk of this repeat surgery far outweighs any benefits that she might get." Sept. 11 Tr. at 583:3-6 (Crawford).

Dr. Crawford, along with Dr. Shelley and Dr. Malizzo, examined Rawers on December 12, 2019. See IME Report at 1. At that point, Rawers stated that "she had no pain with lateral rotation" and told the doctors that "her head does not feel heavy," although "she reports getting sore in her neck with prolonged flexion, which she generally avoids." IME Report at 13. At the time of trial, September 10, 2020, Rawers testified that her neck was "throbbing. It feels like I have a 25-pound weight sitting right at the base of my spine. It's uncomfortable." Sept. 10 Tr. at 106:22-24 (Rawers). Rawers' neck pain at the time of trial, therefore, was worse than her pain when the IME panel examined her. Compare IME Report at 13, with Sept. 10 Tr. at 106:22-24 (Rawers). This heightened pain further demonstrates the probability that Rawers will need revision surgery. Dr. Crawford's testimony that he would not "rush in to do a revision surgery" was based upon the assumption that Rawers "is not really having much pain" in her head and neck. Sept. 11 Tr. at 582:14-25 (Ortega, Crawford). Dr. Crawford agreed, however, that Rawers' risk of revision surgery "would all depend on how she's clinically doing." Sept. 11 Tr. at 587:1-2 (Crawford). Dr. Crawford also acknowledged that Rawers has the following risk factors making a revision surgery more likely: (i) failure to fuse at multiple levels; (ii) broken screws; (iii) micro movements in the neck; (iv) stable nonunion at two levels. See Sept. 11 Tr. at 589:1-590:3 (Crawford, O'Connell). Last, Dr. Rauck did not opine whether Rawers will need an ACDF revision. See Sept. 10 Tr. at 262:12-17 (Rauck)("I know there was different opinions a little bit on the need for any future spine surgery . . . . I'm not a spine surgeon, so . . . I would defer to one of the spine surgeons . . . as to whether or not she would need any future spine surgeries."). In sum, Drs. Saiz and Ravessoud testified directly that Rawers likely will need revision surgery, and Drs. Shelly and Crawford agreed that Rawers is at heightened risk of needing the surgery. All doctors agreed that the necessity of this surgery will depend upon Rawers' pain level, which she testified has increased. The Court concludes that, therefore, based upon the IME Report, the experts'

(Rawers); Sept. 10 Tr. at 232:9-12 (Cunniff, Ravessoud); Sept. 11 Tr. at 379:10-15 (Lilley, Shelley); Sept. 11 Tr. at 505:8-12 (Saiz); Sept. 11 Tr. at 589:1-590:3 (Crawford, O'Connell); Rawers Closing at 1-2; Rawers FOFs ¶ 24, at 5; Rawers FOFs ¶ 29, at 6; Rawers FOFs ¶ 92, at 18; Rawers FOFS ¶ 136, at 27; Rawers FOFS ¶ 141, at 28; Rawers FOFs ¶¶ 283-84, at 43-44; Rawers FOFs ¶ 326, at 49.

133.     Risks associated with the future ACDF include: (i) cutting the carotid artery; (ii) post-surgical swallowing issues; (iii) permanent damage to the esophagus; and (iv) bone loss.  <u>See</u> Sept. 10 Tr. at 246:14-19 (Ravessoud)(explaining that "[a]ny spine surgery carries the risk of neurologic injury, infection, hardware failure, breakage.  Additional problems after the surgery, such as not healing, not uniting, adjacent segment degeneration"); Sept. 11 Tr. at 501:18-503:4 (Saiz); Sept. 11 Tr. at 583:13-584:11 (Crawford)(noting that a posterior approach to an ACDF revision "is probably less risky than the anterior approach"); Rawers Closing at 2; Rawers FOFS ¶ 142, at 28; Rawers FOFs ¶ 286, at 44; Rawers FOFs ¶ 298, at 46; Rawers FOFs ¶ 327, at 49; Rawers FOFs ¶ 332, at 50.

134.     Rawers' neck range of motion will further diminish following ACDF revision surgery.  <u>See</u> Sept. 11 Tr. at 506:13-18 (Saiz)(explaining that Rawers "has already lost a significant range of motion.  But she will lose more than she has now" following ACDF revision surgery); Rawers Closing at 2; Rawers FOFs ¶ 289, at 45.

135.     "One of the goals of a revision surgery would be to gain back height so that her head is sitting on her shoulders and it requires less musculature to work" to support Rawers' head. Sept. 11 Tr. at 504:15-18 (Saiz).  <u>See</u> Rawers FOFs ¶ 287, at 44-45.

---

testimony, and the preponderance of the evidence, Rawers will more likely than not require an ACDF revision at some point in the future.

136.    The ACDF revision surgery would take an entire day to complete.  See Sept. 11 Tr. at 506:1-7 (Saiz)(noting that, although it is possible she would need two separate surgical sessions, in Rawers' "case you could probably get away with an all-dayer, so you're looking at the same day"); Rawers FOFs ¶ 288, at 45.

137.    "[I]n treating a . . . symptomatic nonunion, it is very common to have to treat that surgically, and surgical rates are pretty good, but they're not 100% successful."  Sept. 10 Tr. at 247:13-16 (Ravessoud).

138.    Rawers will also require future physical therapy and pain medication related to her neck and left upper arm pain the motor vehicle accident caused.  See Rawers I, 488 F. Supp. 3d at 1089; IME Report at 26; Rawers FOFs ¶ 27, at 6.

139.    If Rawers chose not to get a future ACDF revision surgery, she would have to endure the resulting pain for the remainder of her life.  See Sept. 11 Tr. at 591:18-22 (Crawford, O'Connell); Rawers FOFs ¶ 337, at 50.

**6.    Rawers' Expenses.**

140.    Rawers' medical bills following the motor vehicle accident total $469,902.00.  See Expert Report: Reasonableness Review of Medical Bills at 4-17 (dated Jan. 14, 2020), filed May 18, 2020 (Doc. 57-5)("Schofield Report"); Schofield Report at 4-17; Sept. 11 Tr. at 424:2-4 (Schofield); id. at 425:16-17 (Schofield).

141.    Rawers' previous reasonable medical bills resulting from to the accident amount to $287,129.62.  Cf. Schofield Report at 4-17; Sept. 11 Tr. at 426:10-16 (Lilley, Schofield); id. at 437:6-16 (Cunniff, Schofield); id. at 441:21-442:6 (Schofield)(explaining that this total is lower than her expert report total, because the "plaintiff's attorney" requested "that we not consider anything from Health Care Solutions," and that she "deducted from Plaintiff's payment summary

care related to the lumbar spine after that last spinal cord stimulator was placed" including the medial block "injections and the MRIs"). See also Sept. 11 Tr. at 447:3-9 (Cunniff, Schofield)(testifying that Schofield's expert report pertains only to "reasonableness of amount" of Rawers' medical bills, and not whether those bills relate to the motor vehicle accident).

142. A reasonable cost for Rawers' future ACDF revision surgery is $95,250.00. See Saiz Report at 14.[24] But see Rawers FOFs ¶¶ 261-65, at 40-41.

## CONCLUSIONS OF LAW

The Court will now state its conclusions of law ("COLs"). The Court will begin by summarizing the case's procedural history. It will then set out the law regarding issues relevant to its analysis. The Court will then present that analysis.

## PROCEDURAL BACKGROUND

This case's procedural history includes Rawers' Complaint for Damages, see Complaint ¶ 1, at 1, and the Court's grant of partial summary judgment in Rawers' favor, see Rawers I, 488

---

[24]Dr. Saiz, one of Rawers' expert witnesses, arrived at this figure by adding: (i) surgeon's fee of $13,000.00; (ii) implant's fee of $15,000.00; (iii) hospital fees of $65,000.00; and (iv) post-operative physical therapy of $2,250.00. See Saiz Report at 14. Dr. Saiz indicated that this figure constitutes his "opinion as a **Board-Certified Orthopedic Surgeon** as well as a **Board-Certified Spine Surgeon**." Saiz Report at 14 (bold in original). Schofield, by contrast, projected the revision surgery cost as between $78,612.00 and $171,351.00. See Schofield Report at 19. Schofield testified that "it's the hospital fee where you're going to find that tremendous fluctuation range" and indicated that costs are higher in Las Cruces than in the rest of New Mexico. Sept. 11 Tr. at 462:16-17 (Schofield). The Court relies upon Dr. Saiz' projection because of his expertise in this particular area. Dr. Saiz testified that he has completed "thousands" of ACDF revision surgeries. See Sept. 11 Tr. at 467:16-17 (Saiz); id. at 467:24-468:4 (Saiz)(explaining that "my practice has morphed into more of a revision-type practice . . . . So I typically will see a lot of the non-unions, I'll see a lot of the failed back surgeries, be it cervical, thoracic, and lumbar"). Dr. Saiz' projection is within Schofield's range. Moreover, he also conducted a medical examination of Rawers and therefore was better able to identify the specific costs associated with her likely future procedure. See Saiz Report at 1. Schofield's expertise, by contrast, is in general medical billing. See Schofield Report at 1-2. Accordingly, because the Court relies on Saiz' expertise, it concludes that her future surgery will likely cost $95,250.00.

F. Supp. 3d at 1071-73.  It also includes a bench trial, written closing arguments, <u>see</u> Rawers Closing at 1, United States Closing at 1, and proposed findings of fact, <u>see</u> Rawers FOFs at 1; United States FOFs at 1.

**1.     <u>The Complaint</u>.**

1.     Rawers filed her Complaint in Federal Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346.  <u>See</u> Complaint ¶ 1, at 1.  Rawers alleges that Skinner-Ramp, a USPS mailwoman, negligently crashed into Rawers' car, causing her significant injury.  <u>See</u> Complaint ¶¶ 6-12, at 2-3.  In her Complaint, Rawers names the United States and Clarissa Skinner-Ramp as Defendants.  <u>See</u> Complaint at 1.  The Complaint contains one count: "Negligence Resulting in Personal Injury Damages and Property Damages."  Complaint at 7.

**2.     <u>The Motion to Dismiss</u>.**

2.     The United States filed a motion to dismiss Rawers' claims against Skinner-Ramp, because Rawers may bring Federal Tort Claims Act claims only against the United States and not against individual employees.  <u>See</u> Unopposed Motion to Dismiss Claims Against Defendant Clarissa Skinner-Ramp, filed August 21, 2019 (Doc. 28)("Partial MTD").  The Court granted the Partial MTD.  <u>See</u> Order Granting Unopposed Motion to Dismiss Claims Against Defendant Clarissa Skinner-Ramp at 1, filed September 20, 2019 (Doc. 31).

**3.     <u>Summary Judgment</u>.**

4.     On May 18, 2020, the United States filed a Motion for Summary Judgment.  <u>See</u> Motion for Summary Judgment by the United States, filed May 18, 2020 (Doc. 56)("U.S. MSJ").  In the U.S. MSJ, the United States argues that Rawers filed her Complaint prematurely, "divesting this Court of jurisdiction."  U.S. MSJ at 1.  Rawers filed a Motion for Partial Summary Judgment on the same day.  <u>See</u> Motion for Summary Judgment by Karen Rawers, filed May 18, 2020 (Doc.

57)("Rawers MSJ").  Rawers argues that the undisputed material facts demonstrate duty, breach, and causation.  See Rawers MSJ at 1.  She therefore contends that a genuine issue of material fact exists only with respect to damages.  See Rawers MSJ at 1.

5.      The Court held a hearing on both motions on June 15, 2020.  See Clerk's Minutes at 1, filed June 15, 2020 (Doc. 69).  The Court then issued a Memorandum Opinion and Order granting summary judgment for Rawers on all issues except damages, which she did not seek in her MSJ.  See Rawers v. United States, 488 F. Supp. 3d 1059, 1071-72 (D.N.M. 2020)(Browning, J.)("Rawers I").  First, the Court held that it had subject-matter jurisdiction over the case, because 28 C.F.R. § 14.2(c) is a claim-processing rule rather than a jurisdictional rule.  See Rawers I, at *37-38.  Second, the Court concluded that the September 28 Letter does not constitute an amendment under 28 C.F.R. § 14.2(c).  See Rawers I, at *1.  Finally, the Court concluded that Rawers established that Skinner-Ramp acted negligently per se.  See Rawers I, at *40-41.  Accordingly, the Court denied the United States' Motion for Summary Judgment and granted Rawers' Motion for Partial Summary Judgment.  See Rawers I, at *42-43.

**6.      The Bench Trial.**

7.      The Court held a two-day bench trial from September 10 to September 11, 2020, and the parties agreed not to have opening statements.  See Sept. 10 Tr. at 4:11-13 (Court).  The Court pre-admitted all of the parties' exhibits into evidence.  See Sept. 10 Tr. at 7:24-9:6 (Court, Cunniff, O'Connell).

8.      First, Rawers appeared as a witness.  See Sept. 10 Tr. at 12:6-13 (Rawers).  Rawers began with direct, see Sept. 10 Tr. at 13:6 (O'Connell), the United States followed with cross-examination, see Sept. 10 Tr. at 123:6 (Cunniff), Rawers conducted re-direct, see Sept. 10 Tr. at 181:24 (O'Connell), and the United States concluded with re-cross, see Sept. 10 Tr. at 195:3

(Cunniff).  Rawers testified: (i) "to the facts underlying the auto accident and subsequent injuries and medical she underwent"; and (ii) "consistent with her deposition . . . ."  Plaintiff's Trial Witness List at 1, filed July 24, 2020 (Doc. 78).

9.     Rawers then called Dr. Ravessoud, Rawers' treating physician and an orthopedic surgeon, to the stand.  See Sept. 10 Tr. at 198:7 (Ravessoud).  Dr. Ravessoud was scheduled to testify regarding "the medical care he provided to Plaintiff, why the accident caused her to require such medical care, why such medical care was clinically necessary, the medical records associated with such care, and the injuries and pain and suffering Plaintiff experienced as a result of the accident."  Plaintiff's Trial Witness List at 2.  Rawers conducted direct, see Sept. 10 Tr. at 199 (O'Connell), and the United States concluded with cross-examination, see Sept. 10 Tr. at 232 (Cunniff).

10.     Next, Rawers called Dr. Rauck, Rawers' retained expert who is board certified in anesthesia and pain medicine, to the stand.  See Sept. 10 Tr. at 249:13 (Rauck).  Rawers called Rauck to testify about "his conclusions and findings and determinations regarding his examination of Plaintiff on December 30, 20[19] and his expert opinion issued on January 12, 20[20] . . . ."  Plaintiff's Trial Witness List at 1.  Rawers conducted direct, see Sept. 10 Tr. at 249:19 (O'Connell), and the United States concluded with cross-examination, see Sept. 10 Tr. at 267:12 (Cunniff).

11.     On September 11, the United States first called Dr. Brian Shelley, a physician who authored in part the IME Report and focuses on patients with chronic pain, to the stand, via Zoom.  See Sept. 11 Tr. at 294:10 (Shelley).  The United States called Dr. Shelley to testify about

the expert report and examination of the IME panel.[25]    Dr. Shelley convened the panel and was the primary author of the IME report. He participated in the examination of Plaintiff is expected to testify regarding the examination, the bases for the panel's conclusions, the status of Plaintiff's cervical spine fusion, the

_____

[25]The Independent Medical Examination Panel produced the IME Report in this case.

state of her back and implanted spinal cord stimulator (SCS), her future medical needs, her current mental and physical state, and her medical history and the documentation thereof.

Defendant's Witness List at 1-2, filed July 24, 2020 (Doc. 79). The United States began with direct examination, see Sept. 11 Tr. at 294:25 (Cunniff), Rawers continued with cross-examination, see Sept. 11 Tr. at 333:7 (Lilley), and the United States concluded with re-direct, see Sept. 11 Tr. at 391:5 (Cunniff).

12. Second, Rawers called Joan Schofield, a registered nurse who specializes in medical cost analysis, to the stand. See Sept. 11 Tr. at 404:8 (Schofield). Rawers called Schofield to testify about "the reasonable cost of the medical care that Plaintiff received as a result of the accident . . . ." Plaintiff's Trial Witness List at 2. Rawers conducted direct examination, see Sept. 11 Tr. at 404:15 (Lilley), the United States followed with cross-examination, see Sept. 11 Tr. at 435:17 (Cunniff), and Rawers finished with re-direct, see Sept. 11 Tr. at 458:21 (Lilley).

13. Third, Rawers called Dr. Paul Saiz, a doctor who is certified in both orthopedic surgery and spine surgery in New Mexico, to the stand. See Sept. 11 Tr. at 463:16 (Saiz). Rawers called Dr. Saiz to testify regarding "his conclusions and findings and determinations regarding his examination of Plaintiff on December 4, 2019 and his expert opinion issued on December 12, 2019 . . . ." Plaintiff's Trial Witness List at 1. Rawers started with direct examination, see Sept. 11 Tr. at 463:22 (O'Connell), the United States followed with cross-examination, see Sept. 11 Tr. at 517:12 (Ortega), and Rawers finished with re-direct, see Sept. 11 Tr. at 557:2 (O'Connell).[26]

---

[26]In its FOFs, the United States notes that, on appeal, it "does not waive its rights to challenge the admissibility" of Dr. Saiz' testimony. See FOFs at 21, n.5. The Court addressed already the admissibility of this testimony in its opinion on the United States' Motion in Limine to Limit Testimony Regarding Whether Rawers' Medical Expenses Were Reasonable and Necessary; Limiting the Testimony of Treating Physicians to the Care They Rendered, filed August 26, 2020 (Doc. 56). See Rawers v. United States, No. CIV 19-0034 JB\CG, 2020 WL 5658093 (D.N.M. Sept. 23, 2020)(Browning, J.). This opinion applies the evidentiary rulings

14.     Last, the United States called Dr. Mark Crawford, an orthopedic spine surgeon and IME panelist, to the stand via Zoom.  See Sept. 11 Tr. at 559:21 (Crawford).  The United States called Dr. Crawford to testify about "the IME report and examination of the IME panel, including his examination of Plaintiff's cervical spine, his analysis of her medical records related thereto, and his opinion regarding the need for future medical care and surgery with respect to her neck fusion."  Defendant's Witness List at 2.  The United States began with direct examination, see Sept. 11 Tr. at 560:5 (Ortega), and Rawers concluded with cross-examination, see Sept. 11 Tr. at 586:9 (O'Connell).

15. The parties agreed to submit written closings.  See Sept. 11 Tr. at 593:11-14 (Court).

**16.     Closing Statements.**

The parties submitted written closings on September 25, 2020.  In her Closing, Rawers asks the Court to award $3,788,251.00.  See Rawers Closing at 10.  The United States asks the Court to award a reasonable amount to compensate Rawers, but does not specify what sum it believes is appropriate.

**a.      The United States' Closing Argument.**

The United States contends that the April 5, 2016, motor vehicle accident did not cause much of Rawers' chronic pain.  See United States Closing at 1.  First, the United States notes that Rawers' "back and related medical problems predate the accident by approximately a decade," resulting in "many surgeries . . . prior to the 2016 accident."  United States Closing at 1.  Notably, the United States emphasizes that Rawers had a neurostimulator implanted in 2013, "a rare measure reserved for serious pain not otherwise treatable."  United States Closing at 2.  The United

---

detailed in that opinion.

States continues that Rawers has also been unable to work since 2009.  See United States Closing at 2.  The United States acknowledges, however, that, with respect to Rawers' neck, "the experts agreed that there was no indication that her preexisting degenerative disk disease was symptomatic preceding the accident."  United States Closing at 2.

Next, the United States notes that, while the experts agree that the accident caused Rawers' neurostimulator to malfunction, her medical records do not indicate any issues until three months after the accident.  See United States Closing at 3.  The United States insists that "the pain Plaintiff experienced in her back during this period was not due to a new injury, but rather to loss of the pain management benefits from the neurostimulator."  United States Closing at 3.  The United States agrees with Rawers that she experienced neck pain from the accident until her ACDF over two years later.  See United States Closing at 3.  The United States insists, however, that Rawers' doctors began planning her ACDF beginning in August, 2016.  See United States Closing at 3.

Discussing Rawers' surgeries, the United States contends that "experts agree that" Rawers' second neurostimulator surgery "restored Plaintiff to her pre-accident baseline as it pertains to the benefits of the neurostimulator."  United States Closing at 4.  Accordingly, the United States maintains that "any back issues stemming from the accident have been rectified."  United States Closing at 4.  The United States then discusses Rawers' ACDF surgery.  See United States Closing at 4.  The United States emphasizes that the experts disagree whether Rawers will need a second neck surgery.  See United States Closing at 5.  Specifically, the United States contends that only Saiz testified that a second surgery will be necessary.  See United States Closing at 5.  The United States insists that "an additional surgery involves substantial risks and may not improve" Rawers' condition.  United States Closing at 5.

The United States moves to Rawers' current health condition, submitting that Rawers'

"entitlement to hedonic damages is her current condition, and how that compares to her condition pre-accident." United States Closing at 6 (citing UJI-Civ. 13-1802 NMRA 2019). The United States agrees that Rawers' neck cannot be restored to its pre-accident state. See United States Closing at 6. With respect to Rawers' back, however, the United States argues that it has been restored to its pre-accident state. See United States Closing at 7. The United States continues that Rawers "has been able to resume many of the activities of daily living she performed" and that many of her limitations "preceded the accident." United States Closing at 7.

Next, the United States asserts that, under the FTCA, recovery is "capped at the amount in the administrative claim, 'except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts.'" United States Closing at 8 (quoting 28 U.S.C. § 2675(b)). The United States asserts that Rawers submitted an administrative claim of $953,170.95 on December 18, 2017, and did not establish successfully that this cap should be raised. See United States Closing at 8. The United States avers that, when Rawers filed her claim, she already knew "the scope of her injuries." United States Closing at 8. The United States describes the relevant timeline preceding Rawers' filing:

> At that point, more than 20 months after the April 2016 accident, Plaintiff had already had her first neurostimulator surgery and learned two months prior to filing the administrative claim that she would likely require a second replacement device. *See* [Memorial Bone and Joint re Dr. Ravessoud (dated Oct. 13, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 46)]. Also by December 2017, Plaintiff had been suffering chronic neck pain. Even though Plaintiff denies knowing that her medical providers were apparently considering cervical surgery in 2016, there is no indication that she attempted to discover more about the condition of her neck at the time she filed the administrative form, as the FTCA requires.

United States Closing at 8.

The United States also argues that Rawers' second neurostimulator replacement in 2017

"severed the Government's liability with respect to subsequent back procedures and expenses."
United States Closing at 8. The United States explains that "the malfunction of the August 2017
neurostimulator was an extraordinary event that was not foreseeable." United States Closing at 9
(citing UJI-Civ 13-306, NMRA 2019). Accordingly, the United States insists that it is not liable
"for implantation of the February 2018 device and related medical expenses incurred thereafter."
United States Closing at 9. The United States maintains that, likewise, Rawers has not
demonstrated that she will need a second neck surgery. See United States Closing at 9. The United
States therefore asserts that Rawers' claim regarding future neck surgery is "too speculative to
support an award of damages." United States Closing at 9 (citing Mosley v. Titus, 762 F. Supp. 2d
1298, 1324 (D.N.M. 2010)(Browning, J.)).

Last, the United States notes that Rawers did not introduce her medical bills as evidence,
nor did she testify about her medical bills. See United States Closing at 10. The United States
observes that Rawers' witnesses "knew little about the dozens of individual treatment events cited
by Plaintiff in this litigation." United States Closing at 10. The United States argues that Rawers'
"failure to substantiate the medical expenses with actual bills or other evidence is fatal to her ability
to recover these claimed damages, regardless of any testimony as to reasonableness and necessity."
United States Closing at 10 (citing Padilla v. Hay, 1995-NMCA-067, ¶ 7, 120 N.M. 220, 222, 900
P.2d 969, 971). The United States concludes that Rawers has not "produced the evidence to prove
all of the damages that she seeks to recover." United States Closing at 10-11.

    **b.**   **Rawers' Closing Argument.**

Rawers requests a total of $3,788,251.00 in damages. See Rawers Closing at 1. Rawers
concludes that her previous injuries attributable to the collision include: (i) "neck pain, from
aggravation of previously asymptomatic spinal degeneration; canal stenosis and nerve

impingement required three-level ACDF"; (ii) "numbness and tingling in the . . . left hand"; and (iii) "low back pain and left lower extremity pain, from exacerbation of pre-existing condition; requiring removal and replacement of spinal cord stimulator, with wound complications." Rawers Closing at 1. Rawers states that her current medical condition includes: (i) "neck pain and stiffness . . . with stable nonunion"; (ii) "numbness and tingling in the . . . left hand, improved"; and (iii) "low back pain and left lower extremity pain, at expected baseline of pre-existing condition; spinal cord stimulator functioning well." Rawers Closing at 1. Rawers continues that she will "have cervical pain and left upper extremity pain despite future treatment, related to the motor vehicle crash of 4/5/16, and that she w[ill] need future medication and physical therapy to maintain her current level of functioning." Rawers Closing at 1. Rawers also insists that she will need a future spinal cord revision, because her initial ACDF generated "poor surgical outcome," in which "the entire weight of Karen's head is now loaded upon a single vertebra." Rawers Closing at 1-2. See Rawers Closing at 2 (noting that "there is little question about whether such surgery is going to be needed"). Rawers avers that the experts agree that, if she undergoes a second ACDF surgery, it "would unquestionably be causally related to the accident and be medically reasonable and necessary treatment." Rawers Closing at 2.

Rawers notes that, for nearly a year, the accident caused her neurostimulator to malfunction. See Rawers Closing at 2. This malfunction, according to Rawers, "was catastrophic . . . . It allowed the pain signals, undiluted, to constantly come rushing to her brain at full throttle." Rawers Closing at 3. While Rawers states that she led a "very active, full, manageable lifestyle" before the accident, her life has "now changed for the dramatic worse." Rawers Closing at 3. Rawers emphasizes that, after the accident, "she lived for years with daily pain at 7 or 8 on the 10-point pain scale." Rawers Closing at 3.

Rawers contends that, since the accident, she has had three related surgeries. See Rawers Closing at 4. The first surgery was "an unsuccessful revision and replacement of the generator and the lead" of her neurostimulator in July, 2017. Rawers Closing at 4. The second surgery was a "removal of the previous device and implantation of a new one" in February, 2018. Rawers Closing at 4. The third surgery was the ACDF, which Rawers describes as follows:

> This particular procedure was performed anteriorly (meaning from the front). It was initiated by a lateral incision along Ms. Rawers' throat. Ms. Rawers' surgeon then used a clamp to pull her esophagus, arteries, vessels, and muscle tissues to one side, thus exposing her cervical spine. Following that her surgeon removed the damaged discs and fused the vertebra, released the clamps and replaced the structures in her neck to their original orientation. As you can imagine, this is a particularly difficult surgery to recover from and Ms. Rawers experienced incredible pain and difficulty swallowing (in fact she was on a 100% soft food diet for nearly a month following the procedure). Karen still has trouble swallowing and may be a permanent, livelong problem.

Rawers Closing at 4. She still takes painkillers, including Fentanyl, to manage her cervical pain, and expects to have a "limited range of motion in her neck and shoulders for the rest of her life." Rawers Closing at 4. Specifically, Rawers avows that, when she wants to turn her head, "she has to stop, rotate the entire upper half of her body and turn it with her head as a union," and alleges that this problem "will only continue to get worse." Rawers Closing at 4. Similarly, Rawers contends that she "must physically stop, turn her whole body, and bend at the knees to put things in the dishwasher or in the laundry." Rawers Closing at 4. According to Rawers, the pain in her left arm also makes it difficult for her to clean her home. See Rawers Closing at 5. Likewise, driving "has become something that she truly dislikes and avoids," because "she has to twist the entire upper half of her body in the direction she needs to look" and has difficulty making turns and parking. Rawers Closing at 5. Rawers submits that she can engage in only two activities a day, or one major activity like attending a baseball game. See Rawers Closing at 5. Moreover, Rawers "testified, in an ashamed manner, she even snaps at her support dog when overwhelmed

by pain." Rawers Closing at 5.

Rawers continues that the accident also impacts her ability to walk and exercise. <u>See</u> Rawers Closing at 5. Rawers insists that, before the accident, she walked two miles in forty-five minutes each morning, but she now is able only to walk one mile in ninety minutes and must rest afterward. <u>See</u> Rawers Closing at 5. She sleeps only in ninety to 120 minute intervals. <u>See</u> Rawers Closing at 6. Rawers also suggests that "her chance at a permanent, intimate, loving romantic relationship is now very low due to the accident." Rawers Closing at 7. Relatedly, Rawers cannot "engage in physical intimacy," because "the associated nerve pain is always an issue." Rawers Closing at 6.

Rawers emphasizes that she also is unable to cook and bake as she could before the accident. <u>See</u> Rawers Closing at 6-7. Rawers asserts that she "was a trained chef who worked at world class restaurants and taught Culinary and Pastry Arts at the Le Cordon Bleu." Rawers Closing at 7. Rawers insists that cooking "was far more than a hobby. . . . It was her art." Rawers Closing at 7.

In sum, Rawers concludes that "[t]here is no area" of her "life which has not been affected negatively as a result of this accident." Rawers Closing at 7. Rawers acknowledges her pre-existing injuries and explains that she does not expect compensation for those injuries in this case. <u>See</u> Rawers Closing at 7. Nevertheless, Rawers argues that she should be "fully and fairly compensated for every aggravation of her pre-existing injuries or onset of new injuries arising from the accident." Rawers Closing at 7. Rawers illustrates how the accident has affected her daily life, averring that, "should she make the mistake of trying to do her laundry, the dishes, vacuum, and then go to the grocery store, her body will explode in pain, rebel against her and essentially punish her . . . ." Rawers Closing at 8. Consequently, she affirms that "what was once

simple is now borderline Herculean and requires careful planning so as not to pay the heavy penalty associated with overdoing it." Rawers Closing at 8. Accordingly, Rawers requests the following damages:

| Purpose | Amount Requested | Additional Information |
|---|---|---|
| Past Medical Expenses | $367,009.66 | |
| Future Medical Expenses | $171,251.00 | For future ACDF revision surgery. Rawers notes that "Schofield testified future surgery was in a range of $78,612 to $171,251" but "$171,251 was the amount for surgery in the Las Cruces area." Rawers Closing at 9. |
| Past Pain and Suffering | $750,000.00 | |
| Future Pain and Suffering | $1,000,000.00 | Rawers contends that because "she is now 52 years old, she has approximately 30 years of serious pain and suffering to endure due to the MVA." Rawers Closing at 9. |
| Loss of Enjoyment of Life | $1,000,000.00 | |

| Nature, Extent, Duration of Injuries | $500,000.00 | Rawers contends that "her neck will hurt her for the rest of her life, as the now symptomatic injury and pain are permanent." Rawers Closing at 9. |
|---|---|---|
| Total | 3,788,260.66 | |

Rawers Closing at 9-10.

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert</u> . . ., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert,</u> whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224. "<u>Daubert</u> . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.

1.    **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)**     the testimony is based on sufficient facts or data;

**(c)**     the testimony is the product of reliable principles and
            methods; and

**(d)**     the expert has reliably applied the principles and methods
            to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, <u>e.g.</u>, physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917, 928 (10th Cir. 2004).

In  <u>United States v. Goxcon-Chagal</u>,  886  F. Supp.  2d  1222,  1239  (D.N.M. 2012)(Browning, J.), the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle.

886 Supp. 2d at 1239.  The Court did not admit testimony on whether a highway portion was a "drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down the interstate' as traveling in a known drug route"  <u>United States v. Goxcon-Chagal</u>, 886

F. Supp. 2d at 1247.  See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed.  That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness).   The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[27] See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the

---

[27]The Court is clipping the wings of experts all the time.  See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016)(Browning, J.)(precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. 602, 619 (D.N.M. 2012)(Browning, J.)(precluding a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis). Attorneys ask experts to do too much, and experts try to do too much.  The experts are being paid; they are trying to be helpful to the attorney.  Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony under the Federal Rules, Drexel L.R. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty.  Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias.).  The experts will often do anything.  They toss statements into their reports to be helpful.  Too many attorneys release the report as written -- without editing and without trimming.  This failure to edit and to trim creates unnecessary litigation.  Many expert reports contain statements that the proponent attorney does not need or even want.  The reports draw Daubert motions or rule 702 challenges.  The proponent is then forced to defend the statements.

expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

## 2.    __The Standard in__ Daubert.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.   See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).   The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. at 594-95.   The district court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.   See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).   The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509 U.S. at 592 . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."

Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an

expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of

evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

3.    **Necessity of Evaluating an Issue Under Daubert.**

The restrictions in <u>Daubert</u> apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the <u>Frye</u>[28] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." <u>Daubert</u>, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." <u>Daubert</u>, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under <u>Daubert</u>. . . ." <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

## LAW REGARDING INDEPENDENT MEDICAL EXAMINATIONS

"The deposition-discovery rules are to be accorded a broad and liberal treatment." <u>Schlagenhauf v. Holder</u>, 379 U.S. 104, 114-15 (1964)(quoting <u>Hickman v. Taylor</u>, 329 U.S. 495,

---

[28]<u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

507 (1947)).  The Federal Rules of Civil Procedure permit the physical and mental examinations of parties upon "good cause shown," and when that party places their mental or physical condition "in controversy."  Fed. R. Civ. P. 35.

"While Rule 35 should be construed liberally in favor of granting discovery, its application is left to the sound discretion of the court."  Simpson v. Univ. of Colo., 220 F.R.D. 354, 362 (D. Colo. 2004).  See Stinchcomb v. United States, 132 F.R.D. 29, 30 (E.D. Pa. 1990)(Waldman, J.).  Just because the plaintiff's medical condition is relevant, however, does not mean that the court should order an independent medical examination.  The words "good cause" in rule 35 indicate that there must be a greater showing of need than relevance.  Schlagenhauf v. Holder, 379 U.S. 104, 117-18 (1964)(citing Guilford Nat. Bank of Greensboro v. S. Ry., 297 F.2d 921, 924 (4th Cir. 1962)).

The movant's ability to obtain the information by other means is relevant in deciding whether to grant such a motion.  See Schlagenhauf v. Holder, 379 U.S. at 118.  One court has held that, if discovery of medical reports has been obtained, good cause for an order to submit to a physical examination may no longer exist.  See Hughes v. Groves, 47 F.R.D. 52, 57 (W.D. Mo. 1969)(Becker, J.).  A state court denied a rule 35 motion in a case in which the party whose examination was sought had been treated in a railroad hospital, and the railroad had access to the hospital records and the reports of the hospital's physicians.  See Martin v. Tindell, 98 So. 2d 473, 476 (Fla. 1957), cert. denied, 355 U.S. 959 (1958).

In Scott v. Spanjer Bros., Inc., 298 F.2d 928 (2d Cir. 1962), the United States Court of Appeals for the Second Circuit held that it was not error for the trial judge to pick the examiner:

> We believe that the appointment of an impartial medical expert by the court in the exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair trial of lawsuits. It is now well accepted that the trial judge is not a mere umpire at the trial; indeed, there may be circumstances in which he would

have a duty to seek impartial assistance in order to enlighten the jury and himself on issues which have become confused because of partisanship in presentation.

Scott v. Spanier Bros., Inc., 298 F.2d at 930-31.

## ANALYSIS

1. The Court awards Rawers of $1,147,138.86 in damages. New Mexico state law governs the determination of negligence in this case, while the FTCA governs the adjudication of the tort claim. See Stipulated Facts at 11. The Court's jurisdiction over this claim is proper, because district courts have "exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1346(b)(1). The FTCA imputes a limited waiver of sovereign immunity on the United States, allowing Rawers to recover damages resulting from the April 5, 2016, motor vehicle accident. See De Baca v. United States, 399 F. Supp. 3d 1052, 1165 (D.N.M. 2019)(Browning, J.)(citing Richards v. United States, 369 U.S. 1, 6 (1962)). Consequently, under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The Court determines its measure of damages in accordance with New Mexico law. See 28 U.S.C. § 1346(b)(1). The Court therefore holds that the United States is liable to Rawers in the amount of $1,147,138.86.

**I. RAWERS' ADMINISTRATIVE CLAIM TO THE USPS LIMITS HER CLAIM TO $3,500,000.00, BECAUSE 28 U.S.C. § 2675 LIMITS FTCA RECOVERY TO THE AMOUNT OF THE CLAIM PRESENTED TO THE USPS.**

2. Rawers submitted an initial claim to the USPS for $953,179.75, see SF-95 at 1, but now requests $3,788,251.00, see Rawers Closing Arguments ¶ P, at 52. The United States insists that the Court should cap Rawers' damages at $953,179.95. See United States Closing at 8. The

FTCA provides:

> Action . . . shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b). This bar is "a jurisdictional limitation, which should be strictly construed." Franklin v. United States, 992 F.2d 1492, 1503 (10th Cir. 1993). "The burden of proving newly discovered evidence or intervening facts rests with the FTCA claimant." Tolbert v. United States, No. CIV 05-0178 MV/RHS, 2006 WL 8444134, at *2 (D.N.M. June 7, 2006)(Vasquez, J.). See De Baca v. United States, 399 F. Supp. 3d at 1156 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998))("A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his other claims.")).

3.     Rawers has three medical event expenses which were not "reasonably discoverable at the time of presenting the claim," 28 U.S.C. § 2675(b): (i) her February 1, 2018, neurostimulator replacement, for which a reasonable cost was $77,450.49, see Schofield Report at 16; (ii) her September 11, 2018 ACDF, which cost $116,711.79, see Schofield Report at 17; and (iii) her likely future ACDF revision surgery, which will probably cost $95,250, see Saiz Report at 14. Rawers' medical costs since submitting the SF-95, therefore, total $289,412.28. On September 28, 2018, Rawers submitted a letter updating the USPS about her claim, notifying USPS that she had been "required to undergo a second surgery (to remove and replace the damaged neurostimulator) and then a third surgery (to fuse her cervical spine) as a result of the accident." Sept. 28 Letter at 3. Accordingly, Rawers "revoke[d] her offer of $ 953,179.95" and "demand[ed] $3,500,000.00 in compensation." Sept. 28 Letter at 2-3.

4.     In Rawers I, the Court held that the September 28 letter supplemented, rather than

amended, Rawers' original pleading.  See Rawers I, 2020 WL 5663437, at *38-39.  A supplemental

pleading "may set forth new facts in order to update the earlier pleading, or change the amount or

nature of the relief requested in the original pleading."  6A C. Wright, A. Miller & M. Kane, Fed.

Prac. & Proc. Civ. § 1504 (3d ed. 2020)(footnotes omitted).  Here, Rawers' September 28 Letter

provides additional information about what "occurred after she first filed her claim."  Rawers I,

2020 WL 5663437, at *38-39.  When Rawers supplemented her administrative claim, therefore,

$3,500,000.00 became "the amount of the claim presented to the federal agency . . . ."  28 U.S.C.

§ 2675(b).  See Sept. 20 Letter at 3.  The Court need not, as the United States argues, cap Rawers'

damages at the amount requested in her original claim.  See United States FOFs ¶¶ 98-106, 18-19.

Cf. Rawers I, at 1130-32. The FTCA does not require the Court to cap damages at the amount

Rawers stated in her original claim; rather, the Court's cap must match the claim Rawers presented

to USPS.  See 28 U.S.C. § 2675(b).  Consequently, the Court concludes that, because Rawers

supplemented her administrative claim, her allowable damages are capped at $3,500,000.00.  See

28 U.S.C. § 2675(b); Sept. 20 Letter at 3.  The Court cannot and will not grant Rawers' request

for $3,788,251.00, however, see Rawers FOFs ¶ P, at 52, because her damages are capped at

$3,500,000.00, see 28 U.S.C. § 2675(b).

## II.     **RAWERS IS ENTITLED TO DAMAGES FOR MEDICAL EXPENSES, BECAUSE SHE INCURRED REASONABLE EXPENSES FOR NECESSARY MEDICAL CARE FOR INJURIES THAT THE MOTOR VEHICLE ACCIDENT PROXIMATELY CAUSED.**

5.     The Court will compensate Rawers for her "reasonable expense of necessary

medical care, treatment and services received and the present cash value of the reasonable expenses

of medical care, treatment and services reasonably certain to be received in the future," UJI 13-

1804 NMRA, which Rawers has "proved . . . to have resulted from the negligence," UJI 13-1802

NMRA.  See United States Closing at 6.

## A. THE REASONABLE COST OF RAWERS' 2016 MEDICAL EXPENSES RESULTING FROM THE MOTOR VEHICLE ACCIDENT IS $14,014.00.

6. Rawers' emergency room visit following the motor vehicle accident resulted from the accident. See Emergency Room Report at 1; MMC CT of Lumbar Spine a 1; MMC CT of Neck at 1; Sept. 10 Tr. at 164:10-14 (Rawers)(testifying that she visited the emergency room at Memorial Medical center following the accident).

7. The reasonable cost of Rawers' emergency room visit, including her ambulance ride and the CT scans of her neck and lumbar spine, is $9,913.00. See Schofield Report at 8, 10; Saiz Report at 5-6; Emergency Room Report at 1; MMC CT of Lumbar Spine at 1; MMC CT of Neck at 1.

8. Rawers' 2016 office visits to Health Care Solutions also resulted from the motor vehicle accident.[29] See Dr. Schaefer Records re Headaches at 1 (stating that Rawers reports the onset of severe headaches "stemming from an MVA [motor vehicle accident] one week ago"); Saiz Report at 7; Healthcare Solutions Dr. Schaefer re low back at 1; Health Care Solutions re Dr. Schaefer Eval at 1; Healthcare Solutions re Dr. Murphy (dated July 19, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 17)(stating that "in April she was involved in an MVA that damaged the stimulator leads and she has been in severe pain since"); Healthcare Solutions re Dr. Murphy (dated August 31, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit

---

[29]At trial, Schofield reduced the amount of reasonable medical bills contained in her original report, because Rawers' attorneys asked her to remove all charges from Health Care Solutions. See Sept. 11 Tr. at 416:1-10 (Schofield). Schofield testified that "we've made a determination . . . those were primary care visits, well woman care. They were not related to this claim." Sept. 11 Tr. at 416:1-10 (Schofield). In fact, only one of Rawers' visits to Healthcare Solutions was a "well woman visit." Health Care Solutions re Vanessa Santana at 1 (dated October 12, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 45). The remainder of Rawers' Health Care Solutions visits relate to the motor vehicle accident, and, therefore, the Court discusses them here.

18)(stating that Rawers is "here to follow-up [sic] on pain management of chronic low back pain after reinjury in MVA 4 months ago, at the same time she aggravated cervical DDD; the accident also disrupted the leads to implanted nerve stimulator"); Healthcare Solutions re Dr. Murphy (dated September 29, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 19); Las Cruces Pain Center re Dr. Schaefer (dated October 18, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 20); Health Care Solutions re Dr. Murphy (dated November 17, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 21). Many of Dr. Schaefer's records, when discussing Rawers' back pain, note that Rawers "states that the current episode of pain started one week ago. The event which precipitated this pain was after being pulled by her dog while walking them." See, e.g., Healthcare Solutions Dr. Schaefer re low back at 1; Health Care Solutions re Dr. Schaefer Eval at 1. Rawers' records from Dr. Schaefer's office from before the accident, however, also replicate identical language. See Health Care Solutions (HCS), Multiple Events, (dated June 9, 2014 to December 2, 2015)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 94); Health Care Solutions visit with NP Montgomery (dated February 1, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 1). The Court concludes that this language represents an error in Rawers' medical records, and indicates that Healthcare Solutions has copy and pasted identical language from Rawers' medical records since 2014. See Sept. 10 Tr. at 97:15-23 (O'Connell, Rawers)(testifying that this repeated language is an error in her medical records); Sept. 11 Tr. at 349:1-24 (Lilley, Shelley)(noting that the language in the Healthcare Solutions reports "is carried forward from prior encounters before the accident" and agreeing that these entries are not accurate); Rawers FOFs ¶¶ 73-76; Rawers FOFs ¶ 177, at 33; Rawers FOFs ¶¶ 209-202, at 35; Rawers FOFs ¶ 275, at 32 (stating that Rawers' records had errors "indicating that she had scoliosis, had Harrington rods, and had a husband; Rawers does not have

a history of these"); Rawers FOFs ¶ 293, at 45. Because the Healthcare Solutions records are not accurate, the Court relies upon Rawers' testimony that she visited Healthcare Solutions repeatedly in hopes of resolving her increased pain following the motor vehicle accident. See Sept. 10 Tr. at 40:1-41:23 (O'Connell, Rawers). Accordingly, the aforementioned visits resulted from the motor vehicle accident. See UJI 13-1802 NMRA.

9.      The reasonable cost of Rawers' 2016 visits to Healthcare Solutions is $2,009.00. See Schofield Report at 12.

10.      Rawers' physical therapy visits with Las Cruces Comprehensive Rehab and Home Care in 2016 also relate to the motor vehicle accident. See LC Comprehensive Rehab re pain and headaches at 1; PT Notes at 1; LC Comprehensive PT notes at 1 (dated April 20, 2016 to May 13, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 13); Sept. 10 Tr. at 42:6-9 (Rawers)(explaining that, after the accident, she underwent "a lot of physical therapy, hoping to strengthen my back, strengthen the core, help me walk better"); id. at 166:7-10 (Rawers)(testifying that "I received physical therapy after the accident . . . . It was about getting my core and my back stronger"); Saiz Report at 6 (explaining that Rawers' "physical therapy notes focus on the headaches and cervical pain and culminate with soreness present within the cervical, thoracic and lumbar spine").

11.      The reasonable cost of these physical therapy visits is $1,171.00. See Schofield Report at 8.[30]

12.      The May 18, 2016, visit to Neurology Associates of Mesilla Valley resulted from the motor vehicle accident. See Neurology Associates of Mesilla re Dr. Iqball at 1 (dated May 18,

---

[30]The Schofield report incorrectly dates some of these encounters in 2017, when in fact, they all occurred in 2016. Compare Schofield Report at 8, with LC Comprehensive PT notes.

2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 15); Saiz Report at 6; Schofield Report at 12. The visit related to her left leg, which "has always been super sensitive since the initial accident. It's just gotten worse over time, especially after the car accident . . . ." Sept. 10 Tr. at 138:15-17 (Rawers). The visit was related to Rawers' increased leg pain following the motor vehicle accident. See Sept. 10 Tr. at 138:15-17 (Rawers)

13. The reasonable cost of the May 18, 2016, visit to Neurology Associates of Mesilla Valley is $220.00. See Schofield Report at 12.

14. Rawers' December 7, 2016, visit to the Las Cruces Pain Center resulted from the motor vehicle accident. See Las Cruces Pain Center re Dr. Vazquez at 1 (dated December 7, 2016)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 22)(stating that Rawers "was recently involved in a motor vehicle accident in which the lead" from her neurostimulator "migrated and now provides limited coverage of her pain" and describing her pain as "insidious" and "severe"); Saiz Report at 7; Schofield Report at 4-5; Sept. 11 Tr. at 380:19-381:2 (Lilley, Shelley)(agreeing that Rawers' visits to the Las Cruces Pain Center are related to the accident).

15. The reasonable cost of the December 7, 2016, Las Cruces Pain Center visit is $1,448. See Schofield Report at 4-5.

16. Rawers' reasonable 2016 medical expenses resulting from the April 5, 2016, motor vehicle accident during 2016 are $14,014.00. See supra ¶¶ 6-15.

**B.    THE REASONABLE COST OF RAWERS' 2017 MEDICAL EXPENSES RESULTING FROM THE MOTOR VEHICLE ACCIDENT IS $145,043.83.**

17. The motor vehicle accident is the proximate cause of Rawers' visits to the Las Cruces Pain Center throughout 2017.[31] Her first visit, on January 6, 2017, relates to her lower

_____

[31]The Court evaluates all of these appointments together, because the Schofield Report does not provide exact dates for all charges from the Las Cruces Pain Center, but only provides

back pain, which arose because her "neurostimulator has lost effectiveness." Las Cruces Pain Center re Haydee Fiske re low back pain at 1 (dated January 6, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 23). See Saiz Report at 7. Her next visit, on January 10, 2017, similarly states that Rawers was there "for follow up to reprogram her stimulator due to limited coverage." Las Cruces Pain Center re Dr. Vazquez reprogramming simulator at 1 (dated January 10, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 24). Rawers' attempts to have the neurostimulator reprogrammed related to its malfunction following the motor vehicle accident. See Sept. 11 Tr. at 325:5-22 (Lilley, Shelley). Next, Rawers discussed the pre-surgical implantation of a trial stimulator at her February 21, 2017, appointment. See Follow up with Haydee Fiske at 1 (dated February 21, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 26)(stating that Rawers "has done her psychological evaluation" and "reports she is ready to proceed with her stim[ulator] trial"). Rawers also discussed the pre-surgical implantation of a trial stimulator at her March 23, 2017, appointment. See Las Cruces Pain Center re follow up with Haydee Fiske at 4 (dated March 23, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 27)(stating that "the risks and benefits of" a trial neurostimulator "were discussed with the patient"). Implanting a trial stimulator is reasonable before implanting a new stimulator. See Sept. 11 Tr. at 337:2-11 (Shelley)(testifying that "it's not wrong to do a trial to make sure she would still benefit from it"). On May 1, 2017, Dr. Vazquez implanted a "dorsal column stimulator trial" in Rawers. Las Cruces Pain Center re Dr. Vazquez Operative Report at 1 (dated May 1, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 28). The trial stimulator "significantly reduced" Rawers' pain "from the post-accident machine, but it didn't take me all the way back to pre-accident." Sept. 10 Tr. at 61:11-15 (Rawers). Rawers returned to Las

---

the year in some instances. See Schofield Report at 5-6.

Cruces Pain Center on May 5, 2017, where she reported that the "placement of a dorsal column stimulator . . . greatly alleviated her symptoms." Las Cruces Pain Center re follow up with Haydee Fiske at 1 (dated May 5, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 29). Rawers then visited the Las Cruces Pain Center to have the trial stimulator removed. <u>See</u> Las Cruces Pain Center re follow up with Haydee Fiske at 1. Rawers next returned to the Las Cruces Pain center on July 11, 2017, to "discuss replacing" the stimulator and to refill pain medications. Las Cruces Pain Center re follow up with Katherine Johnston at 1 (dated July 11, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 30). On July 27, 2017 -- shortly before Rawers' revision surgery -- Rawers had an appointment at the Las Cruces Pain Center where she "report[ed] she will be undergoing the DCS implant 8/1/17." Las Cruces Pain Center re Haydee Fiske documents neck and back pain at 1 (dated July 27, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 32). On August 24, 2017, Rawers went to the Las Cruces Pain Center "for a follow up visit reporting she has a Staph infection at the laminectomy site after her DCS implant." Las Cruces Comprehensive Rehab at 1 (dated August 24, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 40). On September 28, 2017, Rawers visited the Las Cruces Pain Center and reported that her post-surgical infection had healed and that "she will start physical therapy." Las Cruces Pain Center re follow up with Fiske at 1 (dated September 28, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 44). Last, Rawers visited the Las Cruces Pain Center on November 21, 2017, complaining of low back and neck pain; noting that "it is taking longer for the Tramadol to get the pain back under control"; and describing her neck pain as "miserable." Las Cruces Pain Center re NP Johnston at 1 (dated November 11, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 47). In sum, Rawers' appointments at the Las Cruces Pain Center relate to her lower back pain resulting from her post-

accident neurostimulator function, as well as neck pain and post-surgical care. These treatments were necessary and related to the accident. See Sept. 11 Tr. at 380:21-382:2 (Lilley, Shelley). The Court agrees with this conclusion, and determines that Rawers' 2017 appointments at the Las Cruces Pain Center resulted from her motor vehicle accident. See Sept. 11 Tr. at 380:21-382:2 (Lilley, Shelley).

18. The reasonable cost associated with Rawers' 2017 Las Cruces Pain Center visits is $17,857.00. See Schofield Report at 4-6.

19. Rawers' February 17, 2017, appointment at New Dawn Psychotherapy resulted from the motor vehicle accident. See New Dawn Psychotherapy re BurstDR Stimulator at 5 (dated February 17, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 25). Rawers was "a candidate for the . . . spinal cord stimulator implant . . . . Client has a strong desire to regain physical mobility and return to daily activities without pain. She has a good understanding and realistic expectations of the SCS implant and its outcomes . . . ." New Dawn Psychotherapy re BurstDR Stimulator at 5. This appointment is therefore a result of the motor vehicle accident, because it was a prerequisite to her receiving spinal cord stimulator revision surgery. See Sept. 10 Tr. at 59:15-22 (Rawers)(testifying that "I had to have a psych eval" before she could have a trial stimulator installed, "which led to getting a new permanent one installed by Dr. Ravessoud"); Sept. 11 Tr. at 388:11-13 (Shelley)(testifying that, "in reference to the encounter on 2/17/17 . . . yes, that is related to the spinal cord stimulator"); Sept. 11 Tr. at 569:15-20 (Crawford)(explaining that Rawers "subsequently underwent another trial" stimulator "as well as another psychological evaluation for the spinal cord stimulator and . . . required revision surgery").

20. The reasonable cost associated with Rawers' February 17, 2017, psychotherapy appointment is $165.00. See Schofield Report at 14.

21.     The motor vehicle accident is the proximate cause of Rawers' August 1, 2017, surgery to (i) revise and replace her neurostimulator epidural paddle lead; and (ii) revise her neurostimulator pulse generator system.  See Rawers I, 2020 WL 5663427, at *42-43 (holding that "the crash caused Rawers' spinal cord stimulator to malfunction" and "damaged Rawers' spinal cord stimulator, necessitating its replacement and revision"); Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 134 N.M. 43, 57, 73 P.3d 181, 195 (2003); Saiz Report at 13 (stating that "diagnoses affected by motor vehicle accident on 4/5/106" include "malfunction of spinal cord stimulator with thoracic paddles"); Sept. 10 Tr. at 37:9-17 (Rawers)(explaining that she noticed immediately after the accident problems with her neurostimulator); id. at 205:20-25 (Ravessoud)(explaining that Rawers' "existing neurostimulator was not working properly and efforts to reprogram it were unsuccessful"); Sept. 11 Tr. at 331:12-16 (Shelley)(testifying that, "because the stimulator wasn't working . . . it was reasonable due to the malfunction caused by the accident that she have that first stimulator actually revised"); id. at 335:17-20 (Cunniff, Shelley). New Mexico law provides:

> A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred.  It need not be the only cause, nor the last nor nearest cause.  It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 134 N.M. 43, 57, 73 P.3d 181, 195 (citing UJI 13-305 NMRA (2003)).  See UJI 13-305 NMRA (2020)(same).

22.     The reasonable cost of Rawers' August 1, 2017, surgery is $121,973.38.  See UJI 13-804 (allowing damages for "the reasonable expense of necessary medical care, treatment, and services received"); Schofield Report at 15.

23.     For the reasons stated above, Rawers' pre-operative and post-operative care in

relation to the August 1, 2017, surgery also results from the motor vehicle accident. Rawers had her first meeting with Dr. Ravessoud to discuss revision surgery on July 17, 2017. <u>See</u> Memorial Bone and Joint re Evaluation by Dr. Ravessoud at 1 (dated July 17, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 41). Shortly after the surgery, Dr. Ravessoud submitted the hardware that he removed from Rawers' back for a pathology report. <u>See</u> Dr. Ravessoud Pathology report (dated August 2, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 35). Ten days after surgery, Rawers met with Dr. Ravessoud "for a follow-up examination she is 10 days postop revision." Memorial Bone and Joint re follow up with Dr. Ravessoud (dated August 11, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 37). Rawers also went to the emergency room on August 17, 2017, after her surgical incision site reopened. <u>See</u> Memorial Bone and Joint re follow up with Dr. Ravessoud (dated August 18, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 38); Sept. 10 Tr. at 190:21-22 (Rawers)(testifying that "I was at a baseball game and I stood up to cheer, and as I clapped," the incision site "came open"). After the wound re-opened and became infected, Rawers began receiving home health services to assist her with cleaning and dressing the wound. <u>See</u> Las Cruces Comprehensive Rehab at 1 (dated August 18, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 39). On August 24, 2017, Rawers received a delivery of wound care items. <u>See</u> Schofield Report at 9. On September 5, 2017,[32] Rawers visited the Memorial Wound Care Center after being "referred by Dr. Ravessoud for management of open wound to the thoracic spine." MMC Wound Care Dr. Ahmed progress note at 1 (dated September 5, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 42). Rawers returned to Memorial Medical Center for wound care several

---

[32]The Schofield Report misdates this treatment event as August 21, 2017. <u>See</u> Schofield Report at 14.

times throughout August and September, 2017.  See Schofield Report at 10.  All wound care Rawers received in 2017 related to the surgery, and thereby to the motor vehicle accident.  See Sept. 11 Tr. at 388:14-389:1 (Shelley).  Relatedly, "risks of infection" exist following neurostimulator revision surgeries.  See Sept. 10 Tr. at 219:2-3 (Saiz).  Accordingly, Rawers' pre- and post-surgical care, including wound care, was a foreseeable result of Rawers' surgery.  See Rawers FOFs ¶ 229, at 27 (stating that "all wound care after the accident was medically necessary and reasonable as a result of the accident").

24.    The reasonable cost of Rawers' pre- and post-operative care for the August 1, 2017, stimulator revision surgery is $5,048.45.  See Schofield Report at 9-16.

25.    Rawers' October 12, 2017, visit to Health Care solutions does not relate to the motor vehicle accident.  See Saiz Report at 8.  This visit was a "well woman exam" unrelated to Rawers' back and neck injuries.  Health Care Solutions re Vanessa Santana at 1 (dated October 12, 2017)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 45).  This exam is not related to the injuries Rawers incurred in the motor vehicle accident.  See Sept. 11 Tr. at 400:7-25 (Cunniff, Shelley).  She also had "ear fullness" and "dizziness."  Health Care Solutions re Vanessa Santana at 1.  This appointment, therefore, does not result from Rawers' injuries following the motor vehicle accident.  See Health Care Solutions re Vanessa Santana at 1.

26.    Rawers' November 28, 2017, visit to Memorial Medical Center also is unrelated to the motor vehicle accident.  See Schofield Report at 10.  On November 28, 2017, Rawers visited the hospital for a "mammography screen" and a "dexa bone density AX."[33]  Schofield Report at

---

[33]Performing bone density scans

helps a health care professional decide if a person is at increased risk for osteoporosis-related fracture.  The purpose of [bone mineral density, or] BMD testing is to help predict the risk of future fracture so that the treatment program can

10. This treatment event is unrelated to the motor vehicle accident.  See Sept. 11 Tr. at 386:20-387:2 (Lilley, Shelley).

27.     The reasonable cost of Rawers' medical expenses in 2017 resulting from the accident is $145,043.83.

### C.     THE REASONABLE COST OF RAWERS' 2018 MEDICAL EXPENSES RESULTING FROM THE MOTOR VEHICLE ACCIDENT IS $128,071.79.

28.     For the reasons stated above, the Court concludes that Rawers' January 15, 2018, follow-up visit to Memorial Wound Care resulted from her August 1, 2017, surgery.  See Schofield Report at 14.

29.     The reasonable cost of Rawers' January 15, 2018 visit to Memorial Wound Care is $172.00.  See Schofield Report at 14.

30.     The motor vehicle accident is not the proximate cause of Rawers' February 1, 2018 neurostimulator replacement surgery.  See Sept. 11 Tr. at 337:22-25 (Lilley, Shelley)(agreeing that the second generator surgery was reasonable).  The United States argues that "the failure of the 2017 neurostimulator constitutes an independent intervening cause that interrupted the chain of causation commenced at the time of the motor vehicle accident."  United States FOFs ¶ 32, at 28. The United States insists that, therefore, "damages are not recoverable for the expenses incurred

---

be optimized.  The information from a BMD is used to aid a decision as to whether nonprescription and/or prescription medicine therapy is needed to help reduce the risk of fracture.  Additionally, if a patient has a fracture or is planning orthopedic surgery, a diagnosis of osteoporosis might affect the surgical plan.  A fracture that could potentially heal in a cast with normal bone mass might require either a longer period of casting or even surgery if the patient has osteoporosis.  Sometimes spinal surgeons treat patients with low bone density with bone building medication prior to surgery in order to improve the surgical outcome of bone that is operated on.

Catherine        Burt        Driver,        Bone        Density        Scan, https://www.medicinenet.com/bone_density_scan/article.htm#bone_density_scan_facts        (last visited Jan. 15, 2021).

by Plaintiff for the 2018 neurostimulator." United States FOFs ¶ 32, at 28. Rawers argues that the doctrine of intervening cause is inapplicable in New Mexico where, as here, "a non-intentional intervening force is involved subsequent to the original tortfeasor's negligence." Rawers FOFs ¶ X, at 53-54 (citing Lucero v. Sutten, 2015-NMCA-010, 341 P.3d 32; Silva v. Lovelace Health Sys., Inc., 2014-NMCA-086, 331 P.3d 958). Under New Mexico law, an "independent intervening cause interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission." UJI 13-306 NMRA.

31.     Here, the neurostimulator's failure was an unforeseeable intervening cause of Rawers' 2018 neurostimulator replacement surgery. See UJI 13-306 NMRA; United States Closing at 8-9. Rawers contends that "all surgeries at Memorial Medical Center were necessary and reasonable as a result of the accident" and that "all of Dr. Ravessoud's treatment and surgeries was medically necessary and reasonable as a result of the accident." Rawers FOFs ¶ 228, at 37. See Rawers FOFs ¶ 296, at 46 (stating that Rawers' "spinal cord stimulator replacements in 2017 and 2018 were related to the MVA"). Dr. Ravessoud, who conducted both Rawers' August 1, 2017, neurostimulator revision surgery, and her February 1, 2018, neurostimulator replacement surgery, testified that the neurostimulator malfunction "was unexpected. It's a brand new device . . . ." Sept. 10 Tr. at 212:10-12 (Ravessoud). Dr. Ravessoud stated that "we never did have an explanation for why that generator stopped working like it was supposed to." Sept. 10 Tr. at 212:10-12 (Ravessoud). Dr. Ravessoud admitted that "I don't have the expertise to tell you if there was a mechanical defect, a generator problem . . . . There's a possibility it might have been too deep, but I don't believe that to be the case." Sept. 10 Tr. at 233:18-21 (Ravessoud). Dr. Ravessoud told Rawers that the neurostimulator was likely "the bad one in the batch." Sept. 10 Tr. at 701:1 (Rawers). Dr. Rauck agreed that "[w]e don't have a good explanation why it

failed . . . ." Sept. 11 Tr. at 289:2-3 (Rauck). Dr. Crawford, who has performed twenty-five neurostimulator implantation surgeries, testified that the neurostimulator malfunction was "very unusual" and that he had "not seen one fail like this." Sept. 11 Tr. at 570:8-571:7 (Ortega, Crawford). True, Dr. Saiz testified that "the malfunctioning spinal stimulator is related to the accident of 4/5/2016." Sept. 11 Tr. at 474:15-17 (Saiz). The Court agrees with Dr. Saiz that, if the motor vehicle accident had not occurred, Rawers would not have needed the February 1, 2018, surgery. See Sept. 11 Tr. at 474:15-17 (Saiz). In other words, the accident "contributes to bringing about the" February 1, 2018, surgery, and the surgery "would not have occurred without it." UJI 13-306 NMRA. Nevertheless, because the spinal cord stimulator malfunction was an independent intervening cause, the accident was not the proximate cause of Rawers' February 1, 2018 surgery. See UJI 13-306 NMRA. See also United States FOFs ¶ 52, at 10 (arguing that the "failure of the 2017 neurostimulator was unusual and unexpected"). In other words, "the implantation of the 2018 neurostimulator was not caused by the accident," because, "but for the unforeseeable failure of the 2017 neurostimulator, the implantation of the 2018 neurostimulator would not have occurred." United States FOFs ¶ 53, at 10-11.

32. For the reasons stated above, the motor vehicle accident did not proximately cause Rawers' pre-operative and post-operative treatment related to the February 1, 2018, surgery, is not proximately caused by the motor vehicle accident. See Memorial Bone and Joint re Follow up with Susann Ravessoud at 1 (dated February 12, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 50)(stating that "Rawers presents to the office for [t]wo week follow-up of back surgery"); Memorial Bone and Joint re Follow up with Susann Ravessoud at 1 (dated March 12, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 51)(noting the "reason for appointment" as "post op back six weeks"); Memorial Bone and Joint re Follow up with Susann

Ravessoud at 1 (dated April 23, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 55)(stating that Rawers' "Chief complaint" is "back pain" and noting that "she is having good and bad days from the lower back pain"). Rawers' "MRI lumbar spine" likewise does not result from the motor vehicle accident, because it relates to her second neurostimulator surgery. Schofield Report at 13. See Saiz Report at 9 (noting that the MRI "document[s] degenerative disc changes at L3-4 with prior surgery from L4 through S1"). Similarly, Rawers' follow-up appointment with Dr. Ravessoud regarding the lumbar spine MRI does not result from the motor vehicle accident. See Las Cruces Pain Center re eval by Dr. Ravessoud at 1 (dated June 13, 2018)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 57)(stating that the "reason for appointment" is "follow-up [sic] back MRI"). The Court does not include these treatment events in its damages calculation, because they all relate to Rawers' February 1, 2018, neurostimulator surgery.[34]

33.     The motor vehicle accident is the proximate cause of Rawers' September 11, 2018, ACDF surgery. See Rawers I, at 1086-87; MMC Operative Report (dated September 11, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 64); Sept. 11 Tr. at 535:5-535:10 (Saiz)(explaining that Rawers "was symptomatic after the accident. So all treatment in regards to her neck pain was secondary to the accident, which culminated with the surgery"); Rawers FOFs ¶ 295, at 45.

34.     The reasonable cost of Rawers' ACDF surgery was $116,711.79. See Schofield Report at 17. Care provided during the ACDF surgery by the assistant surgeon had a reasonable total of $6,137.00. See Schofield Report at 11.[35]

---

[34]Rawers states that "all of Rawers' treatment at the pain center were related to the accident and was necessary and reasonable." Rawers FOFs ¶ 287, at 37. For the reasons the Court explains in the text, many of her visits to the Las Cruces Pain Center were unrelated to the accident.

[35]The Court does not consider a listed charge of $1,674.00 in this section, because

35.     Consequently, the motor vehicle accident also proximately caused Rawers' pre-operative and post-operative care resulting from the ACDF surgery.  See Saiz Report at 13-14. First, Rawers received an MRI before the surgery, which reveals "degenerative disc changes, C4-5, C5-6 and C6-7 with foraminal stenosis, left-sided at C4-5 (without central stenosis), as well as C5-6 degenerative disc changes, mild central stenosis, as well as moderate-to-severe stenosis at C6-7 centrally."  Saiz Report at 9.  See MVRMC re MRI of cervical spine at 1 (dated June 26, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 58).  This MRI was a necessary prerequisite to the ACDF surgery.  Likewise, the September 11, 2018, pathology report resulted from the ACDF surgery.  See MMC Pathology Report at 1 (dated September 11, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 66); Schofield Report at 13; Saiz Report at 10 (characterizing the pathology report as "document disc tissue from the surgery performed by Dr. Ravessoud").  Rawers' subsequent physical therapy also focused on rehabilitation following her ACDF.  See PT notes at 1 (dated October 31, 2018, through December 31, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 75); Saiz Report at 10.[36]  The Court, therefore, considers the aforementioned treatment events in calculating Rawers' medical expenses.

36.     The reasonable cost of Rawers' pre- and post-ACDF medical care was $5,051.  See Schofield Report at 13.

_____

Schofield was "unable to determine" whether the charge was reasonable.  Schofield Report at 11. Rawers has provided no other evidence that this charge was reasonable or necessary.  Because Rawers bears the burden of proving that listed charges are reasonable and necessary, and she has not done so here, the Court does not include this charge in its calculation of Rawers' medical expenses.

[36]The Schofield Report does not list any charges for Rawers' 2018 physical therapy sessions.  See Schofield Report at 8.  Although the physical therapy appointments resulted from Rawers' ACDF surgery, the Court cannot award properly Rawers damages for these appointments, because it has no evidence regarding their cost.

37.     The Court cannot conclude reasonably that the motor vehicle accident caused any of the care Rawers received at the Las Cruces Pain Center in 2018.  As discussed above, the Schofield Report surprisingly does not document specific dates for treatments at the Las Cruces Pain Center in 2018. See Schofield Report at 4-7.  Rawers underwent two surgeries in 2018.  The ACDF surgery resulted from the motor vehicle accident, while the spinal cord stimulator surgery did not result from the accident.  Rawers bears the burden of demonstrating her damages by a preponderance of the evidence, and the Court cannot award damages based on speculation.  Because the Schofield Report lacks specific dates, the Court cannot ascertain which 2018 Las Cruces Pain Center charges result from the ACDF and the motor vehicle accident, and which charges result from the spinal cord stimulator surgery.  Accordingly, the Court will not include the 2018 Las Cruces Pain Center charges in its medical expenses calculation.  See Schofield Report at 5-6.

38.     Rawers' November 14, 2018, appointment with Healthcare Solutions is unrelated to the motor vehicle accident.  See Health Care Solutions Note from Vanessa Santana at 1 (dated November 14, 2018)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 71).  The appointment was for an "annual physical."  Health Care Solutions Note from Vanessa Santana at 1. See Saiz Report at 10 (same).  Rawers' need for a standard annual physical does not result from the motor vehicle accident, and the Court will not include the cost of this treatment event in the medical expenses calculation.

39.     Rawers' reasonable 2018 medical expenses resulting from the motor vehicle accident are $128,071.79.

**D.     RAWERS HAS NOT DEMONSTRATED BY A PREPONDERANCE OF THE EVIDENCE THAT HER 2019 MEDICAL EXPENSES RESULTED**

**FROM THE MOTOR VEHICLE ACCIDENT.**

40.     There are several treatment events in 2019 relating to medial branch block injections.  See, e.g., Las Cruces Pain Center follow up with NP Vanderveen (dated April 3, 2019)(admitted at Trial as Rawers' Exhibit 79)(reporting that Rawers is scheduled for medial branch blocks); Las Cruces Pain Center procedure report by Jesse Coleman (dated April 29, 2019)(admitted at Trial as Rawers' Exhibit 82)(documenting medial branch block injections at L2, L3, L4, and L5); Las Cruces Pain Center evaluation by NP Vanderveen (dated May 9, 2019)(admitted at Trial as Rawers' Exhibit 83)(stating that Rawers "is here for followup reporting 75-80% relief from her medial branch blocks for several days"); Las Cruces Pain Center lab draw by NP Vanderveen (dated May 9, 2019)(admitted at Trial as Rawers' Exhibit 84); Schofield Report at 6 (detailing charges for "injection . . . lumbar/sacral").  A medial branch block "is an attempt to anesthetize the nerve coming out of the joint in the lumbar spine."  Sept. 11 Tr. at 401:5-7 (Shelley).  Dr. Shelley testified that Rawers' medial block injections are not related to the motor vehicle accident, and the Court determines that this testimony is reliable, because Rawers had already returned to her pre-accident baseline in her lower back when she received the injections.  See Sept. 11 Tr. at 401:1-15 (Cunniff, Shelley).  Similarly, Rawers' lumbar spine MRI on May 17, 2019, does not relate to the motor vehicle accident; Schofield Report at 13 (noting that, after the second spinal cord stimulator surgery, Rawers "has now returned to her baseline with the spinal cord stimulator and her current low back complaints are not related to the motor vehicle accident"); Rawers FOFs ¶ 257, at 40 (stating that "expenses for lumbar blocks should not be included in Rawers' medical expenses").

41.     Rawers provides no documentation for her March 12, 2019, visit to Neurology Associates of Mesilla Valley.  See Schofield Report at 12.  The Court, therefore, has no sound

basis by which to analyze whether this visit resulted from the motor vehicle accident. Because Rawers has the burden to prove her damages, the Court cannot award Rawers the costs associated with this appointment. For the same reasons, the Court excludes Rawers' January 2, 2019 visit to Memorial Bone and Joint Center from its medical expenses calculation -- there is no documentation indicating the purpose of the appointment. See Schofield Report at 9; Saiz Report at 10.

42. Rawers April 15, 2019, visit to Healthcare Solutions is also unrelated to the accident. See Health Care Solutions evaluation by Dr. Johnson at 1 (dated April 15, 2019)(admitted at Trial on September 10, 2020, as Rawers' Exhibit 81). Rawers' "reason for appointment" was "spot on head, continues to grow." Health Care Solutions evaluation by Dr. Johnson at 1. Dermatology concerns do not relate to Rawers' issues resulting from the motor vehicle accident.

43. The Court will not award damages for Rawers' March 4, 2019, visits to the Las Cruces Pain Center. See Las Cruces Pain Center follow up with NP Johnston (dated March 4, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 78). As with Rawers' 2018 treatments at the Las Cruces Pain Center, the Schofield Report does not document specifically the cost of Rawers' March 4, 2019, visit to Las Cruces Pain Center. See Schofield Report at 4-7. Instead, the Schofield Report lists many treatment events in 2019 that lack specific dates. See Schofield Report at 4-7. Rawers bears the burden of demonstrating her damages by a preponderance of the evidence; the Court cannot award properly damages based on speculation. See Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 22, 111 N.M. 410, 415, 806 P.2d 59, 64 ("Damages based on surmise, conjecture or speculation cannot be sustained. Damages must be proved with reasonable certainty."). Because the Schofield Report lacks specific dates, the Court

cannot ascertain the cost of the March 4, 2019, appointment and, therefore, cannot include the charges in its medical expenses calculation. See Schofield Report at 5-6. For the same reasons, the Court cannot include properly Rawers' visits to the Las Cruces Pain Center on the following dates in its calculations: (i) February 4, 2019, see Las Cruces Pain Center re lab draw by NP Johnston (dated February, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 76); Las Cruces Pain Center Appointment with NP Johnson (dated February 4, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 77); (ii) April 15, 2019, see Las Cruces Pain Center procedure report by Jessie Coleman (dated April 5, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 80); and (iii) May 21, 2019, see Las Cruces Pain Center evaluation by NP Johnston (dated May 21, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 85).

44.     Rawers' listed charges from her July 2, 2019, and her September 11, 2019 Las Cruces Pain Center appointments are for drug tests. See Schofield Report at 5. Rawers' medical records indicate that -- with respect to her prescriptions for tramadol, Narcan Liquid, and a twenty-five microgram Fentanyl patch -- per the Las Cruces Pain Center's "treatment policy," Rawers must undergo screenings for "misuse, abuse, or diversion." Las Cruces Pain Center follow up with NP Johnston at 4 (dated Sept. 11, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 87)("Sept. 11 Las Cruces Pain Center Records"). Accord Las Cruces Pain Center follow up with NP Johnston at 4 (dated July 2, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 86)(same). See Las Cruces Pain Center follow up with NP Johnston for blood draw at 1 (dated Sept. 11, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 88)(noting that Rawers underwent a "blood draw," because of her "long term (current use) of opiate analgesic"). This policy required the drug tests at issue here, which are intended to "ensure compliance, the absence of drug interactions, to evaluate of the presence of illicit drugs, and screen for drug

diversion." Sept. 11 Las Cruces Pain Center Records at 5. At trial, Rawers indicated that she was using tramadol, twenty-five micrograms of fentanyl, and had a Narcan pen before the accident. See Sept. 10 Tr. at 45:11-46:13 (O'Connell, Rawers); id. at 100:20-23 (Rawers)("I did get a Narcan pen because I was receiving the fentanyl. Eventually, if you got fentanyl, you had to have a Narcan pen. Now, it's Narcan nasal spray."). The Court concludes, therefore, that Rawers' documented expenses from her visits to the Las Cruces Pain Center on July 2, 2019, and September 11, 2019, do not relate to the motor vehicle accident, because the charges are associated with drug testing required for persons taking certain medications, and Rawers was taking those medications before the motor vehicle accident. See Las Cruces Pain Center follow up with NP Johnston at 4 (dated July 2, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 86); Sept. 11 Las Cruces Pain Center Records; Las Cruces Pain Center follow up with NP Johnston for blood draw at 1 (dated Sept. 11, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 88). Because the Court does not have medical records for Rawers' October 11, 2019, and July 5, 2019, drug tests, and because of the reasons just described, the Court does not include these drug test charges in its damages calculations. See Schofield Report at 5, 7. Moreover, for these reasons, the Court will not count charges associated drug screens listed in the Schofield Report from 2019 that do not list specific treatment dates. See Schofield Report at 6.

45. The Schofield Report also does not list any costs associated with Rawers' 2019 visits to Las Cruces Comprehensive Rehab. Cf. Schofield Report at 8 (detailing expenses associated with bills from the Las Cruces Comprehensive Rehab in 2016 and 2017). The Court, therefore, cannot award damages for those visits, because it has no information stating how much those visits cost. See Las Cruces Comprehensive Rehab at 1 (dated Jan. 4, 2019 through Jan. 25, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 89); Las Cruces

Comprehensive Rehab PT visit stating numbness (dated March 6 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 90); Las Cruces Comprehensive Rehab (dated March 11, 2019 through May 3, 2019)(admitted at Trial on September 10, 2020 as Rawers' Exhibit 91).

46. Rawers provides no documentation for her July 5, 2019, and her November 8, 2019, visits to the Las Cruces Pain Center for "office visit, established patient." Schofield Report at 7. The Court, therefore, has no sound basis by which to analyze whether this visit resulted from the motor vehicle accident. Because Rawers has the burden to prove her damages, the Court will not award Rawers the costs associated with these appointments.

47. Rawers has not demonstrated by a preponderance of the evidence that the motor vehicle accident proximately caused any of her 2019 medical expenses.

**E.    RAWERS' FUTURE MEDICAL EXPENSES.**

48. The reasonable cost of Rawers' likely future ACDF surgery is $95,250.00. <u>See</u> Saiz Report at 14.

49. As the Court explained above, the Court concludes that, by a preponderance of the evidence, Rawers will require an ACDF surgery.

50. The Court cannot predict any other future medical expenses, because there is no evidence indicating what additional medical expenses -- if any -- Rawers is likely to incur. <u>See</u> <u>Mascarenas v. Jaramillo</u>, 1991-NMSC-014, ¶ 22, 111 N.M. 410, 415, 806 P.2d 59, 64.

**F.    RAWERS' PAIN AND SUFFERING DAMAGES ARE $764,759.24.**

51. "As the Court has held previously, '[i]t is common in personal injury to settle on the basis of three times the medical expenses.'" <u>Quintana v. Yost</u>, No. CIV 17-0701 JB/JHR, 2018 WL 3849881, at *7 (D.N.M. Aug. 11, 2018)(Browning, J.)(quoting <u>Aranda v. Foamex Int'l</u>, 884 F. Supp. 2d 1186, 1207 (D.N.M. 2012)(Browning, J.)); <u>Sanchez v. Dick's Sporting Goods, Inc.</u>,

No. CIV 14-0222 MCA/KBM, 2014 WL 12791244, at *4 (D.N.M. May 15, 2014)(Armijo, J.)(same). See Faught v. Pulver, No. CIV 15-7105, 2015 WL 13877894, at *1 (N.D. Ill. Sept. 30, 2015)(Gettleman, J.)(noting that "it is not unusual for personal injury attorneys to establish a rough estimate of the value of a case at three times specials."); Dorsey D. Ellis, Jr., Fairness and Efficiency in the Law of Punitive Damages, 56 S. Cal. L. Rev. 1, 58, n. 248 (1982)("[T]hree times the special damages is often used as a rule of thumb for settling personal injury claims.")

52.     Here, Rawers requests nearly ten times the amount of the "medical expenses she incurred as a result of her injury," which, therefore, "does not appear to reflect a reasonable estimate of her claim . . . ." Sanchez v. Dick's Sporting Goods, Inc., 2014 WL 12791244, at *4. See of See Rawers Closing at 1 (requesting $3,788,251.00 in damages).

53.     The Court concludes that $764,759.24 in damages, to which the Court refers collectively as pain and suffering damages, or two times Rawers' medical expenses, is appropriate here to compensate Rawers because: (i) "it will reasonably and fairly compensate" Rawers for of the nature, extent, and duration of her injuries, "result[ing] from" the motor vehicle accident, UJI 13-1806; UJI 13-1802; (ii) it is a "reasonable amount to compensate" Rawers "for the pain and suffering" that she has "experienced and [is] reasonably certain to . . . experience[] in the future as a result of the" motor vehicle accident, UJI 13-1807; and (iii) it is a "reasonable amount to compensate" Rawers "for the loss of enjoyment of life" that she has "experienced and [is] reasonably certain to . . . experience[] in the future as a result of the" motor vehicle accident, UJI 13-1807A. See Rael v. GEICO Gen. Ins. Co., No. CV 17-338 SCY/LF, 2017 WL 3051953, at *3 (D.N.M. June 27, 2017)(Yarbrough, M.J.)(noting that, when applying the three times medical expenses formula, "rather than blindly being applied, this formula must give way to the particular facts of a case"). The Court does not see a meaningful way of differentiating individual sums for

"the nature, extent, and duration" of Rawers injuries in comparison to her "loss of enjoyment of life," for example, and, therefore, generates a sum which takes into account Rawers' past pain and suffering, future pain and suffering, loss of enjoyment of life, and the nature, extent, and duration of Rawers' injuries, and to which the Court generally refers throughout this opinion as pain and suffering damages.[37]

54.     Damages for loss of enjoyment of life are also known as hedonic damages. See Couch v. Astec Industries, Inc., 2002-NMCA-084, ¶¶ 17-20, 132 N.M. 631, 53 P.3d 398; DAMAGES, Black's Law Dictionary (11th ed. 2019)(West).

55.     Hedonic "damages are not allowed in most jurisdictions."  DAMAGES, Black's Law Dictionary (11th ed. 2019).

---

[37]Rawers' explanations separating her various damages have not convinced the Court.  See Rawers Closing at 9-10.  For example, Rawers states that she deserves $1,000,000.00 for loss of enjoyment of life, while asking for $500,000.00 for the nature of her injuries.  Rawers states:

> **Loss of Enjoyment of Life.**  Rawers described what her life is like now -- only a maximum of two basic daily tasks a day at most. Her passion for cooking is destroyed.  Future friendships and relationships are severely compromised. She has become more socially isolated after the accident with no real chance to expand that circle.  What is the fair daily compensation for each of these factors?  Rawers is seeking **$1M** to compensate her the daily losses she will endure.

> **Nature, Extent, Duration of injuries.**  Rawers went several years enduring three different surgeries.  Her neck will hurt her for the rest of her life, as the now symptomatic injury and pain are permanent.  A future neck surgery will only cause unbelievable hardship.

Rawers Closing at 9-10 (bold in original).  The Court does not see how it could justify assigning specific amounts to loss of enjoyment of life in comparison to the nature of Rawers' injuries, and Rawers' explanations do little to clarify how she makes distinctions her calculations.  In this case, it is cleaner and more logical to separate Rawers' medical expenses from the other compensation to which Rawers is entitled, and, regarding the other compensation, to consider collectively Rawers' past pain and suffering, future pain and suffering, loss of enjoyment of life, and the nature, extent, and duration of Rawers' injuries.

56. New Mexico law, however, allows plaintiffs to recover hedonic damages. See Couch v. Astec Industries, Inc., 2002-NMCA-084, ¶¶ 17-20, 132 N.M. 631, 53 P.3d 398. See also Walker v. Spina, 359 F. Supp. 3d 1054, 1082 (D.N.M. 2019)(Browning, J.)(predicting that the Supreme Court of New Mexico "would allow an expert to quantify a party's hedonic damages"). Accordingly, the Court considers Rawers' loss of enjoyment of life in calculating Rawers' damages.

57. The Court, therefore, awards Rawers $764,759.24 in damages for her pain and suffering, taking into account UJI 13-1806; UJI 13-1802; UJI 13-1807; and UJI 13-1807A.

## G.    RAWERS' TOTAL DAMAGES ARE $1,147,138.86.

58. Rawers total damages for medical expenses are $382,379.62, which includes: (i) $287,129.62[38] for past medical expenses, and (ii) an allowance for her expected future ACDF surgery of $95,250.00. See UJI 13-1804. But see Rawers Closing at 9-10 (asking for $3,788,251.00). Rawers' total damages for medical expenses are $382,379.62, because this figure represents her "reasonable expense of necessary medical care, treatment and services received . . . and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future." UJI 13-1804.

59. The total judgment awarded to Rawers is $1,147,138.86.

---

[38]This number includes Rawers' related medical damages from 2016 of $14,014.00, from 2017 of $144,043.83, and from 2018 of $128,071.79.

**IT IS ORDERED** that: (i) Plaintiff Karen Rawers shall recover $382,379.62 for past and future medical expenses; (ii) Rawers shall recover $764,759.24 for pain and suffering. Consequently, the Court awards judgment in Rawers' favor against the Defendant United States of America in the amount of $1,147,138.86.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jess R. Lilley
Jerome O'Connell
Lilley & O'Connell, P.A.
Las Cruces, New Mexico

   *Attorneys for the Plaintiff*

Fred Federici
   Acting United States Attorney
Roberto D. Ortega
Sean M. Cunniff
Christopher F. Jeu
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Defendant*